IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

No. 21-3031

---

UNITED STATES OF AMERICA,
Appellee

v.

ERIK MATTHEW HARRIS,
Appellant

---

Appeal from a judgment entered
in the United States District Court for the
Western District of Pennsylvania at No. 2:19-cr-00313

---

BRIEF FOR APPELLANT

---

LISA B. FREELAND
Federal Public Defender

RENEE  PIETROPAOLO
Assistant Federal Public Defender

Federal Public Defender for the
Western District of Pennsylvania
1001 Liberty Avenue, Suite 1500
Pittsburgh, PA 15222

(412) 644-6565

## TABLE OF CONTENTS

Table of Authorities ....................................................................................iv

Jurisdictional Statement ...............................................................................1

Statement of Issues.......................................................................................2

Statement of Related Cases and Proceedings ..............................................3

Concise Statement of the Case......................................................................4

Argument......................................................................................................7

I.    Section 922(g)(3)'s prohibition on possession of a firearm by a
      person who is an unlawful user of a controlled substance impermissibly
      burdens Mr. Harris' Second Amendment right to keep and bear arms...........7

      A.    The right to keep and bear arms guaranteed by the Second
            Amendment is an individual right grounded in the inherent
            right of self-defense................................................................8

      B.    This Court applies a two-step inquiry for assessing the
            constitutionality of firearms restrictions .............................10

      C.    There is no historical justification for firearms prohibitions on
            unlawful users of marijuana. ...............................................10

      D.    Mr. Harris distinguished himself from those persons historically
            excluded from the Second Amendment's protections. ......................18

      E.    The government failed to meet its burden of proving there is a
            substantial fit between disarming recreational users of
            marijuana and its interest in keeping the public safe. ........................21

            1.    The Government's "off-point" studies do not speak to
                  the need to disarm recreational marijuana users. ...........................22

            2.    The government offered no evidence the law was sufficiently
                  tailored to its goal of protecting the public. ...................................30

3.      In resolving this question of first impression, this Court should decline to follow conflicting out-of-circuit authority ......................30

II.    Section 922(g)(3)'s prohibition on gun possession by anyone who is "an unlawful user of or addicted to any controlled substance" is unconstitutionally vague. ................................................................................34

A.      Due Process and the Separation of Powers prohibit vague laws. .......35

B.      Because the statute burdens a fundamental right, Mr. Harris can raise a facial vagueness challenge. .......................................................37

C.      Section 922(g)(3) does not provide the kind of notice that will enable ordinary citizens to understand what conduct it prohibits and invites arbitrary and discriminatory enforcement. .....42

D.      The statute is vague as-applied to Mr. Harris. .....................................49

III.   The evidence was insufficient to establish Erik Harris knowingly made a false statement as to his legal status when he certified he was not an unlawful user of marijuana or addict given that the phrase is not defined and has no commonly understood meaning; the judgment must be vacated. ....................................52

Conclusion .............................................................................................................60

Appendix Volume I...................................................................... Appx1-9

Certificates

Certificate of Service

# TABLE OF AUTHORITIES

**Cases:**

*Akron v. Akron Center for Reproductive Health, Inc.*,
　462 U.S. 416 (1983)......................................................................37

*American Civil Liberties Union v. Mukasey*,
　534 F.3d 181 (3d Cir. 2008)..........................................................21

*Aptheker v. Secretary of State*,
　378 U.S. 500 (1964)......................................................................38

*Ass'n of N.J. Rifle and Pistol Clubs Inc. v. Att'y Gen. N.J.*,
　910 F.3d 106 (3d Cir. 2018)........................................................21,22

*Ass'n of N.J. Rifle and Pistol Clubs Inc. v. Att'y Gen. N.J.*,
　974 F.3d 237 (3d Cir. 2020) ..........................................................21

*Baptiste v. Attorney General*,
　841 F.3d 601 (3d Cir. 2016)..........................................................35

*Beers v. Att'y Gen.*,
　927 F.3d 150 (3d Cir. 2019)..........................................................12

*Binderup v. Att'y Gen.*,
　836 F.3d 336 (3d Cir. 2016)............................ 7,10-13,18,21-23,25,26,29,32-34

*Black's Auto Repair and Towing, Inc. v. Monongalia Magistrate Court*,
　567 S.E.2d 671 (W.Va. 2002)........................................................15

*Bond v. United States*, 564 U.S. 211 (2011) ............................................41

*City of Chicago v. Morales*, 527 U.S. 41 (1999) .....................................37

*Coates v. Cincinnati*, 401 U.S. 611 (1971)..............................................39

*Colautti v. Franklin*, 439 U.S. 379 (1979)..............................................37

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................................8,9,30,31

*Farrell v. Burke*,
    449 F.3d 470 (2d Cir. 2006)...................................................................37

*FCC v. Fox Television Stations*, 567 U.S. 239 (2012) ............................................35

*Folajtar v. Att'y Gen.*,
    980 F.3d 897 (3d Cir. 2020)......................................................10,12,13

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .................................................35

*Gundy v. United States*, 139 S. Ct. 2116 (2019)....................................................41

*Jackson v. Virginia*, 443 U.S. 307 (1979)...............................................................52

*Johnson v. United States*, 576 U.S. 591 (2015) .......................................35,38,39,40

*Kanter v. Barr*,
    919 F.3d 437 (7th Cir. 2019) ...............................................................13

*Kolendar v. Lawson*, 461 U.S. 352 (1983) ...................................................35,37,48

*Love v. Pepersack*,
    47 F.3d 120 (4th Cir. 1995) ....................................................................8

*Manning v. Caldwell for City of Roanoke*,
    930 F.3d 264 (4th Cir. 2019) ................................................................44

*Marks v. United States*, 430 U.S. 188 (1977) ...........................................................12

*Maynard v. Cartwright*, 486 U.S. 356 (1988) ...........................................................37

*McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010)................................9,21,38

*NAACP v. Alabama*, 357 U.S. 449 (1958).............................................................21

*New York State Rifle & Pistol Assoc., Inc. v. Bruen*,
    S. Ct. No. 20-843 ...................................................................................21

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo,*
   804 F.3d 242 (2d Cir. 2015)...............................................................22

*Pac. Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1 (1991)...............................36

*Rehaif v. United States,* 139 S. Ct. 2191 (2019) ....................................44

*Sable Commc'ns. of Cal., Inc. v. Fed. Commc'n.,*
   492 U.S. 115 (1989)...........................................................................21

*Sessions v. Dimaya,* 138 S. Ct. 1204 (2018).......................................36,46

*Skilling v. United States,* 561 U.S. 35 (2010) ........................................46

*Small v. United States,* 544 U.S. 385 (2005) .........................................21

*Smith v. United States,* 348 U.S. 147 (1954) .........................................56

*Touby v. United States,* 500 U.S. 160 (1991) .........................................41

*Turner Broadcasting System, Inc. v. FCC,*
   520 U.S. 180 (1997)...........................................................................30

*Tyler v. Hillsdale County Sherriff's Dept.,*
   837 F.3d 678 (6th Cir. 2016) ..........................................25,26,29,33

*In re Winship,* 397 U.S. 358 (1970).......................................................57

*Wong Sun v. United States,* 371 U.S. 471 (1963) ...................................56

*United States v. Augustin,*
   376 F.3d 135 (3d Cir. 2004)......................................................7,45,46

*United States v. Bennett,*
   329 F.3d 769 (10th Cir. 2003) ..........................................................48

*United States v. Boyd,*
   999 F.3d 171 (3d Cir. 2021)...............................................................13

*United States v. Bramer*,
    832 F.3d 908 (8th Cir. 2016) ........................................................48,50

*United States v. Carter*,
    669 F.3d 411 (4th Cir. 2012) ...........................................................15

*United States v. Carter*,
    750 F.3d 462 (4th Cir. 2014) ...........................................................30

*United States v. Castro*,
    704 F.3d 125 (3d Cir. 2013)............................................................58

*United States v. Chapman*,
    7 F.3d 66 (5th Cir. 1993) ............................................................ 53-54

*United States v. Cook*,
    970 F.3d 866 (7th Cir. 2020) ........................................................48,50

*United States v. Davies*,
    942 F.3d 871 (8th Cir. 2019) ........................................................44,54

*United States v. Davis*, 139 S. Ct. 2319 (2019) .............................................36,40,41

*United States v. Dugan*,
    657 F.3d 998 (9th Cir. 2011) ........................................................29,31

*United States v. Edwards*,
    182 F.3d 333 36 (5th Cir. 1999) ......................................................48

*United States v. Fearn*,
    589 F.2d 1316 (7th Cir. 1978) .........................................................56

*United States v. Hasson*,
    26 F.4th 610 (4th Cir. 2022) ........................................................47,50

*United States v. Herrera*,
    313 F.3d 882 (5th Cir. 2002) .....................................................30,48,54

*United States v. Holloway*,
    948 F.3d 164 (3d Cir. 2020)........................................................11,12

*United States v. Isaacs,*
    539 F.2d 686 (9th Cir. 1976) ...............................................................56

*United States v. Johnson,*
    19 F.4th 248 (3d Cir. 2021) .................................................................58

*United States v. L. Cohen Grocery Co.*, 255 U.S. 81 (1921).....................38

*United States v. Marzzarella,*
    614 F.3d 85 (3d Cir. 2010)..........................................9,10,14,18,22,30

*United States v. Patterson,*
    431 F.3d 832 (5th Cir. 2005) ...............................................................48

*United States v. Playboy Entertainment Group, Inc.,*
    529 U.S. 803 (2000)............................................................................29

*United States v. Pressler,*
    256 F.3d 144 (3d Cir. 2001)................................................................58

*United States v. Purdy,*
    264 F.3d 809 (9th Cir. 2001) ..............................................................48

*United States v. Repella,*
    359 F.App'x 294 (3d Cir. 2009) ..........................................................58

*United States v. Rodriguez-Soriano,*
    931 F.3d 281 (4th Cir. 2019) ..............................................................57

*United States v. Squires,*
    440 F.2d 859 (2d Cir. 1971)................................................................53

*United States v. Turnbull,*
    349 F.3d 558 (8th Cir. 2003) ..............................................................45

*United States v. Williams*, 553 U.S. 285 (2008) ......................................43

*United States v. Yancey,*
    621 F.3d 681 (7th Cir. 2010) ..........................................................29,31

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982) ..................................................................................36,39

**Statutes**:

18 P.S. § 780-113(a)(31) .....................................................................31

18 P.S. § 780-113(g) ...........................................................................31

18 U.S.C. § 16(b) .................................................................................40

18 U.S.C. § 921(a)(2) ..........................................................................54

18 U.S.C. § 921(a)(15) ........................................................................43

18 U.S.C. § 922(a)(6).............................................................2,4,51,52,59

18 U.S.C. § 922(g) ...............................................................................43

18 U.S.C. § 922(g)(1)...............................................13,23,32,44,49,54

18 U.S.C. § 922(g)(3).................................................................passim

18 U.S.C. § 922(g)(4).........................................................................25

18 U.S.C. § 924(c) ..............................................................................40

18 U.S.C. § 924(e)(2)(B) ....................................................................40

18 U.S.C. § 3231 ...................................................................................1

21 U.S.C. § 802 ..........................................................................7,34,42

21 U.S.C. §802(1) ...............................................................................42

21 U.S.C. §802(17) .............................................................................42

28 U.S.C. § 1291 ...................................................................................1

**Rules:**

Fed.R.Crim.P. Rule 11(a)(2)................................................................2,4

**Other Authorities**:

U.S. Const. amend. II................................................................8

Pub. L. No. 63-223, 38 Stat. 785 (1914)................................................15

Pub. L. No. 90-618, 82 Stat. 1213 (1968)................................................15

Sharon M. Boles & Karen Miotto, Substance abuse and violence: A review of
   the literature, Aggression and Violent Behavior, 8, 155-174 (2003) ...........27,28

Jacob Borodovsky, et al. "Smoking, vaping, eating: Is legalization impacting the
   way people use cannabis?" The International journal on drug policy, 36,
   141-47 (2016) ................................................................47

Bureau of Justice Statistics, U.S. Dep't of Justice, Drug Use and Dependence,
   State and Federal Prisoners, 2004 (2007) ....................................24

Amy J. Dilcher, Damned if They Do, Damned if They Don't: The Need for a
   Comprehensive Public Policy to Address the Inadequate Management of Pain,
   13 Annals Health L. 81 (2004) ...............................................15

David Downs, The Science behind the DEA's Long War on Marijuana, Scientific
   American (Apr. 19, 2016).....................................................17

Drug Policy Alliance, A History of the Drug War .......................16,17,19

Joseph G. S. Greenlee, The Historical Justification for Prohibiting Dangerous
   Persons from Possessing Arms, 20 Wyo. L. Rev. 249 (2020) ....................12

Lana Harrison & Joseph Gfroerer, The Intersection of Drug Use and Criminal
   Behavior: Results from the National Household Survey on Drug Abuse,
   38 Crime & Delinquency 422 (1992) ...................................15-16,23-26,28

Herdon, George, The Story of Hemp in Colonial Virginia, p.153
    (Univ.Va.1959) ...................................................................................14

Hudak, John, Marijuana: A Short History, 2nd ed. Brookings Institution Press,
    2020........................................................................................................18

H. Virginia McCoy, et al., Perpetrators, Victims, and Observers of Violence:
    Chronic and Non-Chronic Drug Users,
    16 J. Interpersonal Violence 890 (2001).........................................24,28

Office of Applied Studies, Substance Abuse and Mental Health Services
    Administration, Illicit Drug Use Among Persons Arrested for Serious Crimes,
    (2005) ....................................................................................................25

E.B. de Sousa Fernandes Perna et al., Subjective Aggression During Alcohol &
    Cannabis Intoxication Before & After Aggression Exposure, 233
    Psychopharmacology 3331 (2016) ......................................................27

Glenn Harlan Reynolds, A Critical Guide to the Second Amendment, 62
    Tenn.L.Rev. 461 (1995)........................................................................14

J W Swanson, Violence and psychiatric disorder in the community: evidence from
    the Epidemiologic Catchment Area surveys, 41 Hosp. Community Psychiatry
    761 (1990)..............................................................................................25

Michael Vitiello, Marijuana Legalization, Racial Disparity, and the Hope for
    Reform, 23 Lewis & Clark L. Rev. 789 (2019)............................16,17

Evelyn H. Wei, et al., Teasing Apart the Developmental Associations Between
    Alcohol and Marijuana Use and Violence, 20 J. of Contemp. Crim. Just. 166
    (2004) .........................................................................24,26,27,28

## JURISDICTIONAL STATEMENT

This is an appeal from a judgment entered October 27, 2021 in the United States District Court for the Western District of Pennsylvania at 2:19-cr-00313. The district court had jurisdiction under 18 U.S.C. § 3231.

Mr. Harris filed a timely notice of appeal November 1, 2021. Appx1.[1] This Court has jurisdiction under 28 U.S.C. § 1291.

---

[1] Citations to the Appendix are identified with "Appx_."

## STATEMENT OF ISSUES

**I.    Does § 922(g)(3)'s prohibition on possession of a firearm by an unlawful user of a controlled substance impermissibly burden Mr. Harris' Second Amendment right to keep and bear arms?**

**Preservation and Ruling**:

This issue was preserved through Mr. Harris' motion to dismiss indictment and conditional plea pursuant to Federal Rule of Criminal Procedure 11(a)(2). Appx,32-51,134-209. The court denied the motion without opinion. Appx9.

**II.    Is section 922(g)(3)'s prohibition on gun possession by anyone who is "an unlawful user of or addicted to any controlled substance" unconstitutionally vague?**

**Preservation and Ruling:**

*See* Issue I, *supra*.

**III.    Was the evidence insufficient to establish Erik Harris knowingly made a false statement as to his legal status when he certified he was not an unlawful user of marijuana or addict given that the phrase is not defined and has no commonly understood meaning?**

**Preservation and Ruling**:

Mr. Harris preserved this challenge in the motion to dismiss and conditional plea. Mr. Harris urged dismissal of the § 922(a)(6) counts because "the government cannot prove the offenses charged under [that] section" given that he could know what "unlawful user" means and accordingly could not "have made false statements about being an 'unlawful user.'" Appx50. Mr. Harris maintained that because he could not know what the term "unlawful user" meant, he could not have "knowingly ma[d]e a false statement regarding his status as an unlawful user." Appx134; Appx145 (Harris "could not have made a '*knowing'* false statement' regarding his status as a user [where] he did not…know what use was 'unlawful.'"). *See* Appx209 (reserving right to appeal the issue and arguments made in the motion to dismiss). The court summarily denied the motion. Appx9.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

Counsel is unaware of other cases or proceedings related to this appeal.

## CONCISE STATEMENT OF THE CASE

### I. Procedural History

Erik Harris was charged with being an unlawful user of a controlled substance in possession of a firearm on February 25, March 8, and March 14, 2019, 18 U.S.C. § 922(g)(3) (Counts 1-3), and with falsification of firearms purchase forms on those same days, § 922(a)(6) (Counts 4-6). Appx25-30.

Mr. Harris moved to dismiss the indictment, arguing that 18 U.S.C. § 922(g)(3), which disarms anyone who is "an unlawful user of or addicted to any controlled substance," is unconstitutionally vague, and that because that phrase is vague, he could not have "knowingly" made a false statement within the meaning of § 922(a)(6) when he denied being an "unlawful user." In addition, Mr. Harris maintained § 922(g)(3) violates the Second Amendment and exceeds Congress' power under the Commerce Clause. Appx32-51,134-36,147-73. The district court summarily denied the motion. Appx9. Thereafter, Mr. Harris tendered a conditional guilty plea, reserving his right to appeal the matters raised in his motion to dismiss. *See* Appx187-88,209.

### II. Statement of Relevant Facts

At the time of this investigation, Erik Harris was a student at California University of Pennsylvania and on track to be the first in his family to graduate college. Appx222-24. Until then, he had no history of violence and no prior convictions for offenses which would restrict his right to own a firearm, and he had

4

never been incarcerated. In 2019, he purchased three firearms. When asked why, Mr. Harris invoked the Second Amendment. Appx.Vol.III 6:19-:34.[2]

One night, Erik was celebrating the birthday of Jaemere Scott's mom at Jaemere's house and a bar. He became intoxicated. 23:18-:22; 24:46-25:22; 25:39; 25:51-26:00. When Erik left the bar, he realized his gun was not in his car. 26:26; 29:51. The next day, he thoroughly searched his car and friend's house. He also contacted the bar. When he could not find the gun, he called police to report it stolen. 26:52-27:35.

Police ultimately recovered that firearm from Jaemere. 50:38; 55:15. Erik was at his girlfriend's when he saw police outside Jaemere's house. He heard Jaemere was arrested in possession of a gun—Erik's gun. 50:42; 51:44-:52; 52:12-:24.

Officers accused Mr. Harris of purchasing the firearm for Mr. Scott, a prohibited person. Erik repeatedly and emphatically denied doing so, *see* 27:37; 27:50-28:01; 29:54; 48:37; 49:04-:13, even after agents advised they would search both men's phones and social media, listen to Jaemere's recorded jail calls, and

---

[2] Appendix Volume III consists of a digital file of the recorded law enforcement interview of Erik Harris conducted April 18, 2019, which will hereafter be identified by the time-stamp. Filed contemporaneously with this Opening Brief is a motion to lodge this exhibit.

review store video from the date of the firearm purchase. 46:02-46:41; 47:49-48:00; 53:09-54:18.

Police never charged Erik Harris with being a straw purchaser.

During his police interview, Erik Harris openly discussed his marijuana use. 4:17-:19; 4:24; 4:39; 4:54; 5:01-:06; 5:11-:20; 38:30-:32. He was thereafter indicted for being an "unlawful user of marijuana" in possession of firearms, § 922(g)(3), and making false statements in connection with their purchase.

**Sentencing**

Mr. Harris had zero criminal history points but faced a Guidelines range of 12 to 18 months. Appx228,231-32,243. The court rejected the defense plea for probation and sentenced Mr. Harris to six months incarceration followed by three years' supervised release, with the first six months of that period to be served in home confinement. Appx252.

This appeal follows. Appx1.

# ARGUMENT

**I.**    **Section 922(g)(3)'s prohibition on possession of a firearm by an unlawful user of a controlled substance impermissibly burdens Mr. Harris' Second Amendment right to keep and bear arms.**

**Standard of Review**: This Court exercises plenary review over a challenge to a statute's constitutionality. *Binderup v. Att'y Gen.*, 836 F.3d 336, 341 (3d Cir. 2016) (en banc).

**Introduction**

Section 922(g)(3) prohibits possession of a firearm by anyone "who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))…." Although the term "unlawful user" is not defined, this Court interprets it to require proof the accused "engaged in regular use over a period of time proximate to or contemporaneous with the possession of the firearm." *United States v. Augustin,* 376 F.3d 135, 139 (3d Cir. 2004). Mr. Harris' guilty plea was based entirely on his purchase of firearms on February 25, March 8, and March 14, 2019 and his admission to being a regular user of marijuana during that period. Appx181,199-201. Categorically disarming some large (and growing) number of Americans from possessing firearms, even in their homes, because they use marijuana substantially infringes on the personal, fundamental right under the Second Amendment to keep and bear arms.

**A.    The right to keep and bear arms guaranteed by the Second Amendment is an individual right grounded in the inherent right of self-defense.**

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. For decades, the Second Amendment was understood by courts as setting forth a collective right tied to militia service. *See, e.g., Love v. Pepersack*, 47 F.3d 120, 124 (4th Cir. 1995). It was against that backdrop that Congress enacted 18 U.S.C. § 922(g) prohibiting the possession of firearms by certain classes of persons including, as relevant here, those who are users of or are addicted to controlled substances. § 922(g)(3).

In *District of Columbia v. Heller*, the Supreme Court relied on text and history to recognize that the Second Amendment protects an individual's right to possess a firearm "unconnected with militia service." 554 U.S. 570, 582 (2008). The Court emphasized that the Second Amendment "codified a pre-existing right" to keep and bear arms, ensuring that the right "could not be infringed." *Id. Heller* characterized the view that "individual self-defense is merely a 'subsidiary interest'" as "profoundly mistaken" and emphasized that self-defense "was the *central component* of the right itself." *Id.,* 599 (emphasis in original). Thereafter, the Court clarified that the right to keep and bear arms for the core lawful purpose

of self-defense is a fundamental right necessary to our system of ordered liberty. *McDonald v. City of Chicago, Ill*., 561 U.S. 742, 767, 778 (2010).

To be sure, *Heller* acknowledged that the Second Amendment right is "not unlimited." *Heller*, 554 U.S. at 626. "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id*. While declining to "undertake an exhaustive historical analysis…of the full scope of the Second Amendment," the Court stated, "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller,* 554 U.S. at 626-27 & n.26.

Thereafter, this Court observed that § 922(g)(3) is ***not*** among the list of "longstanding" "presumptively lawful" regulatory measures identified by *Heller*. *United States v. Marzzarella*, 614 F.3d 85, 93 (3d Cir. 2010). And it admonished, "prudence counsels caution when extending these recognized exceptions to novel regulations unmentioned by *Heller*." *Id.*

9

**B.    This Court applies a two-step inquiry for assessing the constitutionality of firearms restrictions.**

In "determining the constitutionality of firearm restrictions" such as § 922(g)(3), this Court employs a two-step framework. *Binderup*, 836 F.3d at 346-47. First, a challenger must prove the law burdens his Second Amendment rights. *Id*. This requires a "challenger to clear two hurdles: he must (1) identify the traditional justifications for excluding from Second Amendment protections the class of which he appears to be a member,[] and then (2) present facts about himself and his background that distinguish his circumstances from those of persons in the historically barred class." *Id*., 347 (citing *Marzzarella*, 614 F.3d at 89). If a challenger succeeds at step one, the court proceeds to step two, where "the burden shifts to the Government to demonstrate that the regulation satisfies some form of heightened scrutiny." *Id*.

**C.    There is no historical justification for firearms prohibitions on unlawful users of marijuana.**

"Historically, limitations on the right to keep and bear arms were tied to dangerousness…[T]he Government disarmed people who posed a danger to others." *Folajtar v. Att'y Gen.*, 980 F.3d 897, 913 (3d Cir. 2020) (Bibas, dissenting). Judge Hardiman, joined by Judges Fisher, Chagares, Jordan, and Nygaard, concluded that "the most germane evidence available directly supports the conclusion that the founding generation did not understand the right to keep

10

and bear arms to extend to certain categories of people deemed too dangerous to possess firearms." *Binderup*, 836 F.3d at 367-74 (Hardiman, concurring in part and concurring in the judgments). "The most cogent principle that can be drawn from traditional limitations on the right to keep and bear arms is that dangerous persons likely to use firearms for illicit purposes were not understood to be protected by the Second Amendment." *Id.*, 357 (Hardiman).

The plurality in *Binderup* "look[ed] to the historical justification for stripping **felons**…of their Second Amendment rights," and concluded "unvirtuous" citizens are not protected by the Second Amendment. *Binderup*, 836 F.3d at 348 (Ambro). It found the term "unvirtuous" historically applied to those who had committed a "serious" criminal offense, violent or nonviolent. *Id*. Thereafter, another panel of this Court went on to define a "serious" offense as including an offense that presents a potential for danger and risk of harm to self and others. *United States v. Holloway*, 948 F.3d 164, 172-73 & n.10 (3d Cir. 2020).

The *Holloway* majority read *Binderup* as adopting the "virtuous citizenry" theory of serious offense. *Holloway*, 948 F.3d at 172 n.9. But it seemingly equated a lack of virtue with dangerousness: "*Binderup* instructs that the Founders sought to permit only the virtuous citizen to possess a firearm. The historical record tells us that those who present a risk of danger lack virtue and the Founders considered danger in evaluating who had the right to bear arms." *Id*., 174 n.11. Dissenting,

11

Judge Fisher referred to "'seriousness'–and by extension 'unvirtuousness'" as having no legal significance; rather it is a "way of describing offenses committed by those historically barred from possessing a firearm." *Id.*, 178 (Fisher, dissenting).

In *Folajtar*, Judge Bibas questioned the *Holloway* Court's summary of *Binderup's* holdings. 980 F.3d at 913 (Bibas, dissenting). "*Holloway* dropped a footnote, relying on" *Beers v. Att'y Gen.*, 927 F.3d 150 (3d Cir. 2019)'s reading of *Binderup* to say that "'the historical justification for disarming felons was that they were "unvirtuous."'" *Id.* "But *Beers* was vacated, so it is not precedent." *Id.* "[T]hat footnote was built on sand that has since washed away." *Id.* Plus, neither *Beers* nor *Holloway* did a *Marks* analysis[3] of the fractured opinions in *Binderup.*

Judge Bibas explains that although the *Binderup* plurality espoused the virtue theory, the academic sources and out-of-circuit precedent it cited mostly fit the dangerousness test. *Folajtar*, 980 F.3d at 913-21 (Bibas, dissenting). The *Folajtar* dissent methodically dissects the authority espousing a virtue theory as lacking historical foundation. *Id.*, 915-21. *See* Joseph G. S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 265 (2020) (tracing virtuous-citizen-theory to its roots in scholarship from the 1980s).

---

[3] *Marks v. United States*, 430 U.S. 188 (1977).

To that end and tracking then-Judge Barrett's historical analysis, Judge Bibas summarizes English and early-American law reflecting that citizens were disarmed based on dangerousness, not lack of virtue: "The historical touchstone is danger, not virtue." *Folajtar*, 980 F.3d at 912, 914 (Bibas) (citing *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, dissenting) ("[h]istory...demonstrates that legislatures have the power to prohibit dangerous people from possessing guns. But that power extends only to people who are *dangerous*")). Judge Hardiman likewise concluded, "We have found no historical evidence" "indicating that 'virtuousness' was a limitation on one's qualification for the right— contemporary insistence to the contrary falls somewhere between guesswork and *ipse dixit*." *Binderup*, 836 F.3d at 371-73.

Notably, this Court does not appear to have applied the "virtuous" test outside § 922(g)(1). Considering an "as-applied" challenge to a different subsection, § 922(g)(8), this Court concluded that historically limitations on the right to keep and bear arms were tied to ***dangerousness***. *United States v. Boyd*, 999 F.3d 171, 186 (3d Cir. 2021). As support, and without ever mentioning the virtue test, *Boyd* cited Judge Hardiman's *Binderup* opinion and the dissenting opinions of Judge Bibas in *Folajtar* and then-Judge Barrett in *Kanter*. *Id.*

13

**Unlike "longstanding prohibitions" on felons and the mentally ill, the restriction in § 922(g)(3) is of recent vintage.**

This Court has already recognized that "no restrictions on possession by substance abusers existed at the time of ratification." *Marzzarella*, 614 F.3d at 93. Below, the Government cited no authority showing that marijuana users were prohibited from possessing firearms in 1791.[4] Indeed, hemp, made from the marijuana plant, was well regarded at the founding. George Washington and Thomas Jefferson both cultivated hemp. Herdon, George, *The Story of Hemp in Colonial Virginia*, p.153 (Univ.Va.1959). John Adams advocated development of a domestic hemp industry to bolster the economy. *The Boston Evening-Post*, June 20, 1763, Letter to Publishers by Humphrey Ploughjogger (pseudonym for John Adams, from microfiche at the Essex Institute, Salem, Massachusetts).

By contrast, prohibitions on felons and the mentally ill date back to the Founding. At the Founding, those two groups shared a type of disability that greatly curtailed their civil rights. Both, for example were prohibited from voting. As one commentator observed, "the franchise and the right to arms were 'intimately linked' in the minds of the Founders...." Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn.L.Rev. 461, 480-81 (1995). At the time, "felons, children, and the insane were excluded from the right to arms

---

[4] The Bill of Rights, which contained the Second Amendment, was passed by Congress on September 25, 1789, and ratified on December 15, 1791.

14

precisely as (and for the same reasons) they were excluded from the franchise." *Id*.; *see also, Black's Auto Repair and Towing, Inc. v. Monongalia Magistrate Court*, 567 S.E.2d 671, 675 (W.Va. 2002) (a person imprisoned for a felony suffers a "civil death," having "a status-based legal disability similar to that of an infant or incompetent").

Section 922(g)(3) is of recent vintage, being enacted as part of the Gun Control Act of 1968. Pub.Law 90-618 (prohibiting one "who is an unlawful user of or addicted to marihuana or any depressant or stimulate" from ***shipping, transporting, or receiving*** in interstate commerce any firearm). Notably, the precursor to § 922(g)(3) did not prohibit ***possession*** of firearms by such persons. *Id. See United States v. Carter*, 669 F.3d 411, 417-18 (4th Cir. 2012). It was not until 1986 that possession was added. *Id*., 418.

Regulation of controlled substances in the United States is also of comparatively recent vintage, dating back only to the beginning of the last century, when Congress passed the Harrison Narcotics Act in 1914. Pub. L. No. 63-223, 38 Stat. 785 (1914); *see also*, Amy J. Dilcher, *Damned if They Do, Damned if They Don't: The Need for a Comprehensive Public Policy to Address the Inadequate Management of Pain*, 13 Annals Health L. 81, 85-86 (2004) (discussing history of federal regulation of controlled substances). Prohibitions on marijuana are even more recent.

15

Marijuana has been used for thousands of years for both medical and spiritual purposes.[5] In late nineteenth century America, marijuana became a popular ingredient in many medicinal products and was sold openly in pharmacies. During the 19th century, hashish use became a fad in France and also, to some extent, in the United States.[6] The Harrison Act did ***not*** include a prohibition against marijuana. Vitiello, 794.

Much of the impetus to criminalize marijuana dates to the influx of Mexican immigrants, who introduced recreational marijuana use, following the Mexican Revolution of 1910.[7] The drug became associated with the immigrants, and the fear and prejudice about the Spanish-speaking newcomers became associated with marijuana.[8] Advocates of criminalizing marijuana often made overtly racist appeals. Vitiello, 798.[9] Americans uncritically accepted extravagant and baseless

---

[5] *See* Michael Vitiello, *Marijuana Legalization, Racial Disparity, and the Hope for Reform*, 23 Lewis & Clark L. Rev. 789, 791 (2019); https://www.history.com/topics/crime/history-of-marijuana; https://drugpolicy.org/issues/brief-history-drug-war.

[6] Frontline, "Busted: America's War on Marijuana, Apr. 28, 1998, https://www.pbs.org/wgbh/pages/frontline/shows/dope/etc/cron.html (timeline).

[7] Vitello, 797.

[8] https://www.pbs.org/wgbh/pages/frontline/shows/dope/etc/cron.html.

[9] It is disturbingly easy to find racist appeals to criminalize marijuana by Harry Anslinger, founding commissioner of the Treasury Department's Federal Bureau of Narcotics: "'Reefer makes darkies think they're as good as white men'…'Marihuana influences Negroes to look at white people in the eye, step on white men's shadows and look at a white woman twice'…[M]arijuana causes

claims that "[m]arijuana is the most violence-causing drug in the history of mankind.'" Vitiello, 799. *But see id*., 798 (noting that earlier in his career Anslinger believed, "[t]here is probably no more absurd fallacy" than the claim that marijuana leads to violence). During the Great Depression, Americans may have been more willing to believe propaganda aimed at Mexicans who they feared were taking jobs. Vitiello, 800. In the 1930s, states began to outlaw marijuana. *Id*. And in 1937, Congress passed the Marihuana Tax Act. *Id.*

In 1944, the La Guardia Committee pushed back with findings that marijuana was not physically addictive, not a gateway drug, and not causally connected to crime.[10]

In 1971, President Nixon declared "war on drugs." He temporarily placed marijuana in Schedule I pending review by a commission. When that commission in 1972 unanimously recommended decriminalizing possession and distribution of marijuana for personal use, he ignored it.[11] The racist political motivation for this move has been well-documented. *See, e.g., Vitiello,* 801-02 (explaining Nixon's motivations for launching war on drugs and opposing decriminalization of

---

white women to seek sexual relations with Negroes, entertainers and any others." Vitiello, 799.

[10] David Downs, *The Science behind the DEA's Long War on Marijuana,* Scientific American (Apr. 19, 2016).

[11] Drug Policy Alliance, A History of the Drug War, https://drugpolicy.org/issues/brief-history-drug-war.

marijuana were to appeal to racial animus); Hudak, John, *Marijuana: A Short History*, 2nd ed. Brookings Institution Press, 2020.

As illustrated, there is no historical tradition for denying those who use marijuana the right to keep and bear arms (—indeed, the historical record shows the criminalization of marijuana was tied to racism, ***not*** to increasing public safety—) and no reason to believe the Founders would have deemed persons who use marijuana to be among the dangerous (or even the unvirtuous) excluded from Second Amendment protections. Section 922(g)(3) therefore burdens conduct protected by the Second Amendment, and the question becomes whether the government can prove the law fits reasonably with its interest in preventing gun violence. *Marzzarella*, 614 F.3d at 95.

### D. Mr. Harris distinguished himself from those persons historically excluded from the Second Amendment's protections.

To the extent unlawful users of controlled substances or addicts may be considered dangerous (or unvirtuous), Erik Harris presented facts to distinguish himself from those in the historically barred class.[12]

---

[12] It is only when there are traditional justifications for excluding from Second Amendment protections the class of persons of which the defendant appears to be a member that a defendant must go further and present facts about himself that distinguish his circumstances from those in the historically barred class. *Binderup*, 836 F.3d at 347. *See* II.D., *infra.*

When police interviewed him, Erik Harris was a 21-year-old college student, with no history of violence and no prior convictions for offenses which would restrict his right to own a firearm. He had never been incarcerated. Appx43,222-24,245; 00:50. He worked for a non-profit Christian organization, which work the government commended as "laudable." Appx43,61. In 2019, he purchased firearms. When asked why, Mr. Harris invoked the Second Amendment. 6:19-:34.

Erik Harris acknowledged regular recreational marijuana use. Appx171-72. He was not an addict and had never required treatment. Appx43; 36:39-:42. There was no evidence he ever sold marijuana.

The widespread use of marijuana and the movement to decriminalize adult use is evidence marijuana users are distinct from users of controlled substances generally. According to a 2021 Gallup poll, 49% of U.S. adults report having tried marijuana, and 12% report smoking marijuana, nearly equal to the percentage of those who report smoking cigarettes.[13] *See* Appx157 (fifty-five million Americans reportedly use marijuana).

A solid majority of Americans, 64%, support marijuana legalization in the United States.[14] According to Congressional Findings, "37 States, the District of

---

[13] https://news.gallup.com/poll/353645/nearly-half-adults-tried-marijuana.aspx.

[14] https://drugpolicy.org/legalization-status-report.

Columbia, Puerto Rico, Guam, and the U.S. Virgin Islands have adopted laws

allowing legal access to cannabis, and 15 States, the District of Columbia, the

Commonwealth of the Northern Mariana Islands, and Guam have adopted laws

legalizing cannabis for adult recreational use." H.R. 3617 Sec. 2 (117th congress

1st session), https://www.congress.gov/bill/117th-congress/house-bill/3617/text.[15]

On April 1, 2022, the Marijuana Opportunity, Reinvestment and Expungement

Act, which law would de-criminalize cannabis for adults and make amendments

retroactive, passed in the House; it next goes to the Senate.[16]

Were adult recreational marijuana use evidence of dangerousness or

unvirtuous, legalization efforts would not enjoy such broad support. Appx157-

58,160.

---

[15] Pennsylvania State Senator Mike Regan intends to introduce a bill to legalize the use of cannabis for those 21 and older. https://www.legis.state.pa.us/cfdocs/Legis/CSM/showMemoPublic.cfm?chamber=S&SPick=20210&cosponId=36290

[16] https://www.govtrack.us/congress/bills/117/hr3617

**E.    The government failed to meet its burden of proving there is a substantial fit between disarming recreational users of marijuana and its interest in keeping the public safe.**[17]

In enacting 922(g), "Congress sought to keep guns out of the hands of those who have demonstrated that they may not be trusted to possess a firearm without becoming a threat to society." *Small v. United States*, 544 U.S. 385, 393 (2005). Plainly, the government's interest in protecting the community from crime by keeping guns out of the hands of dangerous persons is important. The government's burden is to show a reasonable fit between the challenged law and its

---

[17] Mr. Harris acknowledges that in *Binderup*, this Court applied intermediate scrutiny. *Id.*, 836 F.3d at 353. To preserve this question for further appellate or collateral review, Mr. Harris maintains that because the challenged law burdens the fundamental core right of self-defense in the home, strict scrutiny applies. *See Ass'n of N.J. Rifle and Pistol Clubs Inc. v. Att'y Gen. N.J.*, 974 F.3d 237 (3d Cir. 2020) (Matey, dissenting), *petition for certiorari filed*, S. Ct. No. 20-1507 (advocating for strict scrutiny); *Ass'n of N.J. Rifle and Pistol Clubs Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 127 (3d Cir. 2018) (Bibas, dissenting) (explaining intermediate scrutiny applies to laws that do not affect weapons' function, like serial-number requirements, but when a law impairs the core right of self-defense, strict scrutiny applies). *See New York State Rifle & Pistol Assoc., Inc. v. Bruen*, S. Ct. No. 20-843 (wherein petitioners advocate for strict scrutiny of law regulating public carrying of firearms).

To survive strict scrutiny, the government must show that its action is narrowly tailored to further a compelling government interest, *see NAACP v. Alabama*, 357 U.S. 449, 463 (1958), and that the regulation is the "least restrictive means of achieving that interest." *American Civil Liberties Union v. Mukasey*, 534 F.3d 181, 190 (3d Cir. 2008) (citing *Sable Commc'ns. of Cal., Inc. v. Fed. Commc'n.*, 492 U.S. 115, 126 (1989)). Any less rigor would make the Second Amendment "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," a step the Supreme Court declined to take in *McDonald*, 561 U.S. at 780.

As illustrated, the government cannot meet its burden under either standard.

important interest by presenting "some meaningful evidence, not mere assertions" and to show that the regulation does not "burden substantially more [conduct] than is necessary" to further that interest. *Marzzarella*, 614 F.3d at 97-98; *Binderup*, 836 F.3d at 354-56. To be sure, intermediate scrutiny does not demand the least restrictive means possible, but it does require proof of tailoring. *Assoc. of N.J. Rifle and Pistol Clubs*, 910 F.3d at 131 (Bibas, dissenting); *Marzzarella*, 641 F.3d at 98. The government did not introduce meaningful evidence to justify its assertions that recreational marijuana users are dangerous or evidence § 922(g)(3) was reasonably tailored to serve its interest in public safety.

### 1.    The Government's "off-point" studies do not speak to the need to disarm recreational marijuana users.

As set forth, Mr. Harris challenges the constitutionality of § 922(g)(3) as applied to him, a recreational user of marijuana having no prior felony record. To meet its burden of establishing § 922(g)(3)'s prohibition is substantially related to the goal of protecting the public by keeping firearms away from people who pose a heightened risk of violence, the government must "'present some meaningful evidence, not mere assertions, to justify its predictive [and here conclusory] judgments.'" *Binderup*, 836 F.3d at 341, 354; *see also N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 264 (2d Cir. 2015) (under intermediate scrutiny, "the state cannot 'get away with shoddy data….'[It] must show '*reasonable* inferences based on *substantial* evidence' that the statutes are

substantially related to the governmental interest."). By relying on excerpts from nine "off-point" articles and unsupported assumptions, the government failed to meet its burden. *See* Appx69-133,168.[18] As will be shown, the government's studies deal in generalities and do not involve individuals in Mr. Harris' situation, that is, recreational marijuana users, not traffickers, who do not have prior felony convictions and have not previously been incarcerated. *See Binderup*, 836 F.3d at 354 (concluding the government fell "well short of satisfying its burden" by relying on "off-point statistical studies to argue that it is reasonable to disarm the Challengers [under § 922(g)(1)] because of their convictions."). Indeed, the government's studies repudiate a causal connection between marijuana use and violent crime.

As a threshold matter, many of the government's studies caution that its findings "do[] not mean...that drug use causes crime." Appx94. The Harrison[19] study concludes, "[t]here is no firm evidence of a causal relationship between drug use and crime." Rather, "available research suggests that drug addicts commit few

---

[18] One source is not an empirical study but a policy recommendation published in *Reducing Gun Violence in America*, a book dedicated to "victims of gun violence and...those who work daily to reduce it." Appx64 (citing Vittes article, which discusses drug use generally and includes suicides as example of violence).

[19] Lana Harrison & Joseph Gfroerer, *The Intersection of Drug Use and Criminal Behavior: Results from the National Household Survey on Drug Abuse*, 38 Crime & Delinquency 422, 423 (1992).

violent offenses." Appx84. The McCoy study,[20] which addresses many of the

problems inherent in the government's studies, analyzes why the reported

correlation between drug use and violence does not equate to a cause-and-effect

relationship. McCoy, 891. In part, findings differ depending on the substance

examined and the population sample.[21]

With respect to population sample, McCoy observes that "many studies on

the drug-violence relationship have used population samples in drug treatment or

criminal justice system settings, creating biases that do not allow for generalization

to a larger population of out-of-treatment chronic drug users." McCoy, 891;

Harrison, 424 (although there is "comparatively good information on drug use

among incarcerated criminals" there is little information about drug use and

criminal behavior among the general population). Many of the government's

studies suffer from such selection bias. For example, the 2007 Bureau of Justice

statistics[22] are drawn from state and federal prisoners, and the 2005 SAMHS

---

[20] H. Virginia McCoy, *et al., Perpetrators, Victims, and Observers of Violence: Chronic and Non-Chronic Drug Users,* 16 J. Interpersonal Violence 890 (2001).

[21] Evelyn H. Wei, *et al., Teasing Apart the Developmental Associations Between Alcohol and Marijuana Use and Violence,* 20 J. of Contemp. Crim. Just. 166, 170 (2004).

[22] Bureau of Justice Statistics, U.S. Dep't of Justice, *Drug Use and Dependence, State and Federal Prisoners,* 2004 (2007).

study[23] is drawn from persons arrested for serious crimes. Those studies do not
speak to the question presented here regarding the incidence of violence by tens-
of-millions of otherwise law-abiding marijuana users. *See Binderup,* 836 F.3d at
354 (off-point studies estimating the likelihood an incarcerated felon will reoffend
after release do not speak to the need to disarm these particular challengers, who
had never been incarcerated and are not felons under state law); *Tyler v. Hillsdale
County Sherriff's Dept.*, 837 F.3d 678, 698 (6th Cir. 2016) ("without any
longitudinal evidence documenting that previously committed people, on average,
pose a greater threat of violence than members of the general public," the
government could not meet its burden of proving § 922(g)(4)'s ban on firearms
possession by anyone who has been committed to a mental institution was
reasonable as applied to a person who had been involuntarily committed 30 years
ago and had no intervening mental health problems).

With regard to the substance, the government's evidence was not
particularized to marijuana.[24] The Harrison study, which was based on decades-old

---

[23] Office of Applied Studies, Substance Abuse and Mental Health Services
Administration, *Illicit Drug Use Among Persons Arrested for Serious
Crimes,* (2005).

[24] One article examines the relationship between violence (including fighting
while drinking and throwing something at one's partner) and psychiatric disorders
(including substance abuse disorders) and is thus inapposite. Appx63 (citing J W
Swanson, *Violence and psychiatric disorder in the community: evidence from the
Epidemiologic Catchment Area surveys,* 41 Hosp. Community Psychiatry 761,
763-65 (1990)).

data, "observed narcotic addicts and heavy cocaine users are frequently involved in criminal offenses." Harrison, 423. *See* Appx63,94. Among that population, the principal crime is drug trafficking; only a small number engage in non-drug crimes. Harrison, 423. "[D]rug use in general [including "getting drunk at least once a month"], and cocaine use in particular, are the most important correlates of being booked for property and violent crimes." Harrison, 435, 438.

Studies addressing the prevalence of violence by cocaine (or other drug) users are irrelevant as Mr. Harris did not mount a facial challenge to (g)(3) but an as-applied challenge to the restriction placed on him, a recreational marijuana user having no prior felony convictions. Appx140-41. *See Binderup*, 836 F.3d at 354-55 & 379 ("as-applied challenge[] rests on the question of whether 'application [of a statute] to *a particular person* under *particular circumstances* deprive[s] that person of a constitutional right."). *Accord Tyler*, 837 F.3d at 695 (empirical evidence showing those currently suffering from mental illness or those recently removed from an involuntarily commitment commit violence does not justify lifetime ban on firearms by anyone previously committed).

When studies focus on marijuana, they show marijuana users are ***not*** prone to violence. Wei, 167 ("***most studies do not support an acute or direct association between marijuana use and violence.***"). For example, the Wei study, a longitudinal study and apparently the only study to specifically examine the causal

26

link between marijuana and violence, concludes that **"the relationship between frequent marijuana use and violence (and vice versa) was spurious"** and "was no longer significant when common risk factors such as race/ethnicity and hard drug use were controlled for." Appx95,101; Wei, 178.

Wei relies on a study by Boles,[25] describing three ways substance abuse is related to violence. First, is "psychopharmacological violence," or violence perpetrated under the influence of substances. Boles, 159. "[S]ubstance use may contribute to a person behaving violently, or it may alter a person's behavior in such a manner as to bring about that person's violent victimization[]. The most relevant substances in this regard are alcohol, stimulants (cocaine and amphetamines), PCP, and barbiturates[]." Boles, 159. "Laboratory research has demonstrated that alcohol and marijuana have opposite psychopharmacological associations vis-à-vis aggression." Wei, 167. A 2016 study found that alcohol intoxication increased levels of aggression whereas *cannabis users experienced a reduction in levels of aggression* even when scientists attempted to agitate test subjects.[26] This is consistent with other studies that "fail[] to find that marijuana

---

[25] Sharon M. Boles & Karen Miotto, *Substance abuse and violence: A review of the literature*, Aggression and Violent Behavior, 8, 155-174 (2003).

[26] E.B. de Sousa Fernandes Perna et al., *Subjective Aggression During Alcohol & Cannabis Intoxication Before & After Aggression Exposure***,** 233 Psychopharmacology 3331, 3338-39 (2016), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4988999/

use psychopharmacologically induces violence…'*[S]cientific reviews have concluded that violent behavior is either decreased or unaffected by marijuana use.*" Wei, 167; Boles, 159 ("There is little evidence supporting the relationship between psychopharmacological violence and the use of marijuana or opioids.").

The second type of violence is "systemic violence," *e.g.*, territorial disputes among dealers. Boles, 159; Harrison, 424. In discussing systemic violence, McCoy highlighted that drug users experience higher rates of *victimization*. McCoy, 892.[27] And Harrison concludes that the link to violence is peripherally related to drug abuse but directly related to trafficking. Harrison, 424. There was no evidence Mr. Harris was involved in trafficking.

Third is economic violence related to drug acquisition. Boles, 159. Although the government posited that drug users are driven to commit crimes due to the high costs of illegal drugs, Appx64, the Harrison study found "*there is virtually no research indicating that cannabis use* [as opposed to opiate and cocaine use] *leads to crimes for economic gain*." Harrison, 423.

The government also asserted that "drug abusers 'are more likely to have difficulty exercising self-control, making it dangerous for them to possess deadly

---

[27] The contiguous states of New York and New Jersey allow for the personal possession and consumption of cannabis and such laws generally mean a policy that supports a legally controlled market where consumers can buy marijuana for personal use from safe legal sources.

firearms.'" Appx64. Here, too, the government cited no supporting evidence. It simply quoted out-of-circuit opinions likewise devoid of evidentiary support. *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010); *United States v. Dugan*, 657 F.3d 998, 999 (9th Cir. 2011).

In discharging its burden to establish a reasonable fit between the statutory ban and its objective, the government "must present more than anecdote and supposition." *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 822 (2000); *Tyler*, 837 F.3d at 694. It is insufficient to deprive persons of a constitutional right based on the intuition that they cannot be trusted with firearms. This contradicts Supreme Court instruction and treats the Second Amendment as a second-class right.

The government's off-point studies and unsupported assertions fell well short of satisfying its burden of showing a prohibition on gun possession by recreational users of marijuana not having a prior felony conviction fits reasonably with its interest in disarming dangerous persons. *Binderup*, 836 F.3d at 354 (the "Government cannot draw any reasonable conclusions about the risk posed by [Challengers'] possession of firearms from such obviously distinguishable studies).

## 2. The government offered no evidence the law was sufficiently tailored to its goal of protecting the public.

Intermediate scrutiny requires that a law not "burden substantially more [protected activity] than is necessary to further [the government's] interest."

*Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 214 (1997); *Marzzarella*,

614 F.3d at 98. Thus, the government was required but failed to explain why the

prohibition on gun possession by recreational marijuana users even in the home

and irrespective of the quantity used or time frame for use is "sufficiently tailored"

to its goal of protecting the public. "Given that there are more than 150

substances…in the Controlled Substances Act [] and that each…has widely

varying and different effects on an individual, it would seem elementary…that

Congress must specify the particular substances whose use may cause particular

damages and injuries to an individual sufficient to deprive that individual of his

Constitutional Rights under the Second Amendment." *United States v. Herrera*,

313 F.3d 882, 889 (5th Cir. 2002) (DeMoss, dissenting).

**3.    In resolving this question of first impression, this Court should decline to follow conflicting out-of-circuit authority.**

Mr. Harris acknowledges that since *Heller* was decided several courts have

issued precedential opinions upholding § 922(g)(3) against as-applied Second

Amendment challenges. *See United States v. Carter*, 750 F.3d 462 (4th Cir. 2014);

*United States v. Dugan*, 657 F.3d 998 (9th Cir. 2011) (marijuana seller and user

who was firearms dealer); *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010).

This Court should decline to follow that out-of-circuit authority because it conflicts

with this Circuit's precedent in at least two respects.

First, the out-of-circuit authority incorrectly identifies the ban on cannabis users from possessing firearms as "longstanding" and so presumptively lawful under *Heller* without demonstrating that users were historically understood to be unprotected. *Yancey* simply asserted that keeping guns away from "habitual drug users" is "analogous to disarming felons." *Id.*, 621 F.3d at 684. And the Ninth Circuit simply followed *Yancey*. *See Dugan*, 657 F.3d at 999. The analogy between recreational marijuana users and felons is particularly inapt in Pennsylvania where possession of a small amount of marijuana, up to 30 grams, for personal use is a ***misdemeanor*** punishable by a maximum of 30 days. *See* 18 P.S. §§ 780-113(a)(31), (g).

Second, and perhaps more significantly, the out-of-circuit authority misapplies the test for resolving "as-applied" challenges and thereby fails to hold the government to its burden of demonstrating through *evidence* a substantial relationship between the ban on gun possession by marijuana users and its objective of disarming dangerous persons. For example, in *Carter*, the Fourth Circuit disregarded the scientific evidence before it that there is ***no*** statistically significant correlation between marijuana use and violence as irrelevant. It instead lumped all drug users together, stating that the government was not required to make such a "particularized demonstration" on the matter. *Id.*, 750 F.3d at 467-68.

The Fourth Circuit's analysis is legally incorrect and conflicts with this Circuit's precedent.

In *Binderup*, both the plurality and concurrence agree that when responding to an ***as-applied*** challenge, the government's burden is to present evidence, not mere assertions, showing a link between the challenged regulation as-applied to the challenger and the goal of preventing gun violence. *See Binderup*, 836 F.3d at 354-55 (Ambro) (explaining that what is required is "reliable statistical evidence" that a person in the challenger's circumstances was "more likely to misuse firearms or [was] otherwise irresponsible or dangerous."); *id*., 379 (Hardiman). As Judge Hardiman put it, an "as-applied challenge []rests on the question of whether 'application [of a statute] to *a particular person* under *particular circumstances* deprive[s] that person of a constitutional right." *Id.*

At issue in *Binderup* was § 922(g)(1)'s prohibition on a firearm possession by a person with a prior conviction for a crime punishable by more than one year, including any state misdemeanor punishable by two years or less, as applied to challengers with convictions for state misdemeanors punishable by more than two years. *Binderup*, 836 F.3d at 339-40. The Court found that the government could not meet its burden of demonstrating a reasonable fit between the challenged regulation and the goal of preventing gun violence though "off-point statistical studies." *Id.*, 354-55. Specifically, "studies [that] estimate the likelihood that

32

incarcerated felons will reoffend after their release" were "irrelevant" because "[t]he Challengers were not incarcerated and are not felons under state law; they are state-law misdemeanants who spent no time in jail." *Id.,* 354-55; *id.,* 379 (Hardiman). Similarly, studies that addressed recidivism rates in the years immediately following admission to *probation* were not pertinent as the challengers' offenses (and probation sentences) were decades old. *Id.*

Thus, as the *Binderup* Court made clear, the task before the district court here was to ascertain the constitutionality of § 922(g)(3) *as applied* to a recreational marijuana user having no prior felony convictions. As it did in *Binderup,* the government relied on off-point studies connecting drug use generally with violence. Studies purporting to show a link between drug use generally and violence do not speak to the connection between recreational marijuana use and violence and are irrelevant. *See also Tyler*, 837 F.3d at 694-98.

In sum, the government failed to satisfy its burden to show through "reliable statistical evidence" that recreational users of marijuana having no prior felony convictions are more likely to misuse firearms than a typical law-abiding person; the judgment must be vacated and the case remanded.

## II.    Section 922(g)(3)'s prohibition on gun possession by anyone who is "an unlawful user of or addicted to any controlled substance" is unconstitutionally vague.

**Standard of Review**: Whether a statute violates the Constitution is a question of law reviewed *de novo. Binderup*, 836 F.3d at 341.

**Introduction**

18 U.S.C. § 922(g) defines nine categories of persons prohibited from possessing firearms. Mr. Harris was convicted under § 922(g)(3), which covers anyone "who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))…."[28] The statute does not define "unlawful user," and there is no objective legal or common definition for that term. Subsection (g)(3) is the only of § 922(g)'s nine categories where an individual's inclusion in the class is not ascertainable by reference to public or medical records and the only category that is mutable. Although this Court and others have tried to give shape to § 922(g)(3)'s shapeless provision, courts have not been able to define precisely when a person becomes an unlawful user, such that the right to possess a firearm disappears or when a person ceases to be an unlawful user, such that the right reappears. The statute does not allow citizens to determine whether they come within the prohibition, and it invites arbitrary enforcement. This is particularly concerning because the statute implicates the fundamental constitutional right to bear arms. Section 922(g)(3)'s

---

[28] Mr. Harris was charged as an "unlawful user." Appx25-27.

phrase "an unlawful user of or addicted to any controlled substance" is facially

void for vagueness.

## A.    Due Process and the Separation of Powers prohibit vague laws.

The Fifth Amendment Due Process Clause precludes the government from

taking away a person's life, liberty, or property under a statute "so vague that it

fails to give ordinary people fair notice of the conduct it punishes, or so

standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576

U.S. 591, 595 (2015); *Baptiste v. Attorney General*, 841 F.3d 601, 615 (3d Cir.

2016). The vagueness doctrine guarantees that ordinary people have "fair notice"

of the conduct a statute proscribes in terms that are clear enough to follow and

understand. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The

prohibition on vague statutes also ensures "those enforcing the law do not act in an

arbitrary or discriminatory manner." *FCC v. Fox Television Stations*, 567 U.S. 239,

253 (2012); *see also Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (vague statutes

"permit a standardless sweep [that] allows policemen, prosecutors, and juries to

pursue their personal predilections").

The constitutional mandate that statutes be drafted for clarity also protects

separation of powers: "Congress, rather than the executive or judicial branch,

35

[must] define what conduct is sanctionable and what is not." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (internal citations omitted).[29]

Each of the concerns that require vague statutes to be declared unconstitutional applies with greater force in the context of criminal statutes. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc*., 455 U.S. 489, 498-99 (1982). Indeed, the more significant the criminal sanction, the more searching a court's analysis must be. *See Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 46 (1991) (O'Connor, dissenting). "[P]erhaps the most important factor affecting the clarity" the Constitution demands is whether the law "threatens to inhibit the exercise of constitutionally protected rights." *Hoffman*, 455 U.S. at 499. Here, the law burdens the Second Amendment, and "a more stringent vagueness test should apply." *Id*., 499.

---

[29] *Dimaya* described the prohibition on vague laws as "a corollary of the separation of powers—requiring that Congress, rather than the executive or judicial branch, define what conduct is sanctionable and what is not." 138 S. Ct. at 1212; *see also id*., 1227 (Gorsuch, J., concurring in part) ("it would be a mistake to overlook the doctrine's equal debt to the separation of powers."). And in *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019), the Court referred to the doctrine as "rest[ing] on the twin constitutional pillars of due process and separation of powers." Vague laws "undermine the Constitution's separation of powers" by "threaten[ing] to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges." *Id*.

**B.**    **Because the statute burdens a fundamental right Mr. Harris can raise a facial vagueness challenge.**

The Supreme Court has held that facial challenges are appropriate when assessing laws implicating fundamental rights. Thus, statutes that restrict First Amendment rights can be struck down as facially vague, s*ee, e.g., Maynard v. Cartwright*, 486 U.S. 356, 361 (1988), as can statutes that restrict substantive due process rights, *see, City of Chicago v. Morales*, 527 U.S. 41, 55 (1999) (explaining that even though First Amendment rights were not implicated, because a loitering ordinance restricted "the 'liberty' protected by the Due Process Clause," a facial vagueness challenge was appropriate)[30]; *Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 451 (1983) (holding that an abortion-related law was unconstitutionally vague on its face); *Kolendar v. Lawson*, 461 U.S. 352, 358 n.8 (1983) (asserting that the Court in fact it had, "at times…invalidate[d] a criminal statute [for vagueness] on its face when it could conceivably have had some valid application," and holding that a loitering law that "implicates consideration of the constitutional right to freedom of movement" is "unconstitutionally vague on its face"); *Colautti v. Franklin*, 439 U.S. 379, 391 (1979) (explaining in the context of holding that an abortion-related law was unconstitutionally vague that a facial

---

[30] "*Morales* was a plurality opinion, but a majority of the Court concurred in the result, and no concurring justice suggested that First Amendment rights were implicated." *Farrell v. Burke*, 449 F.3d 470, 495 n.12 (2d Cir. 2006) (Sotomayor).

challenge is appropriate when a statute "threatens to inhibit the exercise of constitutionally protected rights"); *Aptheker v. Secretary of State*, 378 U.S. 500, 515–517 (1964) (holding that "since freedom of travel is a constitutional liberty closely related to rights of free speech and association," a law restricting that freedom was unconstitutionally vague on its face).

The Second Amendment is "among those fundamental rights necessary to our system of ordered liberty." *McDonald*, 561 U.S. at 767, 778. Therefore, a law that implicates an individual's Second Amendment right to bear arms is subject to facial vagueness challenge the same as a law that implicates the First Amendment or the substantive Due Process Clause. To hold otherwise would treat the Second Amendment as a "second class right." *McDonald*, 561 U.S. at 780.

The Supreme Court recently explained that its previous statements suggesting that to prevail in a facial vagueness challenge a party had to show the statute was vague in all its applications should not be read literally. In *Johnson v. United States*, the Court clarified that although it had repeatedly said that most vagueness challenges can only be raised on an as-applied basis, because a vague provision is unconstitutional only if it wouldn't clearly apply to *any* case, its "*holdings* squarely contradict" that proposition. 576 U.S. at 602-03 (emphasis in original) (citing *United States v. L. Cohen Grocery Co*., 255 U.S. 81, 89-93 (1921) (invaliding statute as facially vague without deciding or even pausing to consider

whether it was vague as-applied to the particular litigant before the Court) and *Coates v. Cincinnati*, 401 U.S. 611 (1971) (striking law prohibiting people on sidewalks from "conducting themselves in a manner annoying" to passersby even though reasonable people could agree that it would apply to spitting in someone's face)). Thus, the Court in *Johnson* repudiated the notion that a statute is facially void for vagueness "only if it is vague in all its applications." 576 U.S. at 693.

Importantly, the Court had previously described this *all-its-applications principle* as the "rationale" for a second principle, the *own conduct principle*, which provided that a litigant could not attack a statute as facially vague unless it was vague as applied to his own conduct:

> One to whose conduct a statute clearly applies may not successfully challenge it for vagueness. The rationale is evident: to sustain such a challenge, the complainant must prove that the enactment is vague not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. Such a provision simply has *no* core.

*Hoffman*, 455 U.S. at 495 n.7 (emphasis in original). In other words, a defendant as to whom the statute's application was clear could not challenge it facially precisely because a facial challenge failed if there were *any* applications of the statute that were not vague. By abandoning the all-its-applications principle in *Johnson*, the Court necessarily discarded the own-conduct principle.

This interpretation is consistent with the analysis in *Johnson* and *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), where the Court struck down statutes—the residual clauses in 18 U.S.C. § 924(e)(2)(B) and § 16(b)—as facially vague without first concluding they were vague as applied. *See Johnson*, 576 U.S. at 638 (wherein Justice Alito in dissent observes that the majority had "reject[ed]" the rule that vagueness challenges generally "must be examined in light of the facts…at hand."). In rejecting Justice Thomas' dissenting view that the statute could not be facially vague unless the defendant showed it was vague as applied to his conduct, *Dimaya*, 138 S. Ct. at 1250, the *Dimaya* majority explained, "*Johnson* made clear that our decisions 'squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp.'" *Id.*, 1214 n.3. The Court did the same thing in *United States v. Davis*, 139 S. Ct. 2319 (2019), holding the residual clause in § 924(c) facially vague without discussing whether the clause was vague as-applied to the defendant's offense. *Id.*, 2323-36. If the own-conduct principle were still good law, the Court would have had to decide whether the residual clauses were vague as applied to the statutes underlying each petitioner's prior convictions. It did not.

Finally, it should not be overlooked that *Dimaya* and *Davis* emphasize that the void-for-vagueness doctrine does more than simply protect individuals' personal constitutional rights; it also safeguards the separation of powers by

preventing Congress from delegating legislative power to other branches. *See* n.29, *supra*. Vague laws undermine separation of powers by "threaten[ing] to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges." *Davis*, 139 S. Ct. at 2325. The separation-of-powers concern is one of non-delegation. *See Touby v. United States*, 500 U.S. 160, 165 (1991) ("The non-delegation doctrine is rooted in the principle of separation of powers"). Under the non-delegation doctrine, Congress "may not transfer to another branch powers which are strictly and exclusively legislative." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019). As Justice Gorsuch explained, "most any challenge to a legislative delegation can be reframed as a vagueness complaint: A statute that does not contain 'sufficiently definite and precise' standards 'to enable Congress, the courts, and the public to ascertain' whether Congress's guidance has been followed at once presents a delegation problem and provides impermissibly vague guidance to affected citizens." *Gundy*, 139 S. Ct. at 2142 (Gorsuch, dissenting). A non-delegation/separation-of-powers challenge is a facial challenge that does not depend on the facts of a particular litigant's case. So when Congress passes a statute that is beyond its constitutional power to enact, anyone prosecuted under that statute may challenge its validity, including through a facial-vagueness claim. *See Bond v. United States*, 564 U.S. 211, 222, 223 (2011) (where an "individual[] sustain[s]…injury from actions that transgress separation-of-powers limitations,"

he necessarily has "standing to object," since those "structural principles" are designed to "protect the individual.").

In short, and consistent with longstanding precedent, Mr. Harris can attack § 922(g)(3) on its face.

### C.    Section 922(g)(3) does not provide the kind of notice that will enable ordinary citizens to understand what conduct it prohibits and invites arbitrary and discriminatory enforcement.

Section 922(g)(3) prohibits possession of a firearm by any person "who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))…." The cross reference to section 102 of the CSA defines "addict"[31] and "controlled substance" but nowhere defines "unlawful user."

Section 922(g)(3)'s "unlawful user" clause is distinct from all of § 922(g)'s other categories of prohibited persons because the members of those other categories are objectively ascertainable. In particular, the statute prohibits possession by any person

- who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

- who is a fugitive from justice;

---

[31]"[A]ddict" means "any individual who habitually uses any narcotic drug so as to endanger the public morals, health, safety, or welfare, or who is so far addicted…as to have lost the power of self-control…." 21 U.S.C. § 802(1). Narcotic is also a defined term. *Id.*, 802(17).

- who has been adjudicated as a mental defective or committed to a mental institution;

- who is an undocumented alien or an alien admitted under a nonimmigrant visa,

- who has been discharged from the Armed Forces under dishonorable conditions;

- who has renounced citizenship;

- who is subject to a domestic violence restraining order; and

- who has been convicted in any court of a misdemeanor crime of domestic violence.

§ 922(g)(1)-(9). The conduct regulated by these subsections rely on words with settled legal meaning defined by statute. For example, the statute covers any person who is a "fugitive from justice," and § 921(a)(15) defines that term. Section (g)(5) applies to certain aliens, while containing a cross-reference to Title 8 where definitions of "alien, "admitted," and "non-immigrant visa" are found. Similarly, whether a person has been adjudicated as a mental defective or committed to a mental institution or convicted of a crime punishable by one year are objectively knowable facts.

By contrast, the determination of who is an "unlawful user" requires "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. 285, 306 (2008). A person knows when he is smoking marijuana that he is using and knows marijuana is a

controlled substance, but it's a judgment call as to whether he knows he is an unlawful user within the meaning of the statute. *See Rehaif v. United States*, 139 S. Ct. 2191 (2019); *see also United States v. Davies*, 942 F.3d 871, 874 (8th Cir. 2019) (reversing 922(g)(1) conviction, which criminalizes firearm possession by anyone who has been "convicted" of a crime punishable by more than a year, where defendant had pled guilty in state court but not yet been sentenced; defendant knew he had pled guilty but may not have known he was "convicted" within the meaning of the statute). The statute gives no hint as to when a person becomes an unlawful user or ceases to be a user, how frequently or for how long he must use, or how close in time or place the use must be to the possession. *See, generally, Manning v. Caldwell for City of Roanoke*, 930 F.3d 264 (4th Cir. 2019) (statute prohibiting "habitual drunkards" from purchasing alcohol, which did not define "habitual drunkard," did not provide fair notice as to what that term encompassed, invited arbitrary enforcement, and was void-for-vagueness).

Dictionaries define "user" broadly as "one that uses."[32] The statute identifies user in the present tense—"*is* an unlawful user." The present tense provides no clarity as to how to define present use or when such use ends and a person is again permitted to exercise his Second Amendment right to possess a firearm. Is anyone

---

[32] http:/www.merriam-webster.com/dictionary/user;
http:/www.dictionary.cambridge.org/us/dictionary/English/user.

who has used in the past and may use in the future a present user? Does a present user include the music lover who uses marijuana at concerts, but hasn't attended a concert in two years, or the athlete who smokes daily but not during the season.

Nor does present use convey requirements as to regularity or frequency. A person might identify as a user of public transportation but take the bus infrequently, only when going into the city. A person might identify as a "user" of contraception but not use any for months when celibate or single. A heart attack survivor might be a Nitrogycerin user, but only use the medication at the first sign of chest pain. A patient might tell his dermatologist he's a sunscreen user when he only applies it at the beach or pool.

The statute likewise provides no temporal or spatial nexus between the use and the firearm possession. What if you smoke marijuana at friend's home while you constructively possess a firearm, which remains locked in a gun safe at your home.

In *Augustin*, this Court tried to give shape to § 922(g)(3). Acknowledging that "'the law runs the risk of being unconstitutionally vague without a judicially-created temporal nexus between the gun possession and regular drug use,'" this Court attempted to provide one. *United States v. Augustin*, 376 F.3d 135, 138 (3d Cir. 2004) (quoting *United States v. Turnbull*, 349 F.3d 558, 561 (8th Cir. 2003)). Elaborating on that judicially-created temporal nexus, this Court explained, "[t]he

use of the present tense"—"*is* an unlawful user"—"was not idle. Quite simply, Congress intended the statute to cover unlawful drug use ***at or about the time of the possession of the firearm*** …." *Augustin,* 376 F.3d at 138 (emphasis added). Additionally, the use must be regular: The government must prove the accused "engaged in regular use over a period of time proximate to or contemporaneous with the possession of the firearm." *Id*., 139.

Again, the limits are not based on statutory language. "A statute that is unconstitutionally vague cannot be saved…by judicial construction that writes in specific criteria that its text does not contain." *Skilling v. United States*, 561 U.S. 358, 416 (2010) (Scalia, concurring). As explained, the vagueness doctrine is a corollary of the separation of powers and requires Congress, not the executive or judicial branches, to define what conduct is sanctionable and what is not. *Dimaya*, 138 S. Ct. at 1212; *see id*., 1227 ("legislators may not 'abdicate their responsibilities for setting the standards of the criminal law' ") (Gorsuch, concurring).

Moreover, the judicially-created limits raise more questions than they answer. Congress has not defined "regular use." Does regular mean "recurring… at fixed, uniform, or normal intervals," such that a person who smokes with his siblings on his yearly family vacation is a regular user. https://www.merriam-webster.com/dictionary/regular. The word "regular", a word not in the text, does

not provide any standards for assessing how frequent or how consistent the intervals must be. Nor has Congress defined what use is "proximate to or contemporaneous with the possession of the firearm." *See* https://www.merriam-webster.com/dictionary/ (defining "contemporaneous" as existing, occurring, or originating during the same time and "proximate" as "immediately preceding or following (as in a chain of events, causes, or effects"). Does contemporaneous with possession require using while a firearm is within reach? Does it contemplate using close enough in time to the possession that you are experiencing a continuing effect of the controlled substance?[33] Does it reach possession at a time when you are plainly not under the effect of the controlled substance, as when you lock your gun in a safe and then head to a party where you smoke or you smoke before breakfast and head to the gun range after dinner?

Although the government suggests one can easily stop smoking and regain Second Amendment rights, Appx65, the statute does not explain when a person ceases to be an unlawful user, such that this right reappears. What if you smoke daily but stop smoking to go on a hunting trip with friends?

---

[33] "With smoked cannabis, the psychoactive effects and peak THC blood levels occur in minutes, and the effects last approximately one to four hours." Jacob Borodovsky, *et al*. "*Smoking, vaping, eating: Is legalization impacting the way people use cannabis?*" The International journal on drug policy, 36, 141-47 (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5010515/

Although several courts have rejected as-applied vagueness challenges to §

922(g)(3), those courts have uniformly refused to consider a facial vagueness

challenge. *See United States v. Hasson,* 26 F.4th 610, 616-17 (4th Cir. 2022)

(facial challenge precluded where defendant's conduct fits within statute); *United*

*States v. Cook*, 970 F.3d 866, 877-78 (7th Cir. 2020) (same); *United States v.*

*Bramer*, 832 F.3d 908, 909 (8th Cir. 2016) ("Though we are inclined to think"

challenge to 922(g)(3)'s facial vagueness "could be meritorious," court declined to

decide that because the defendant did not show statute was vague as applied to his

conduct); *United States v. Patterson*, 431 F.3d 832, 836 (5th Cir. 2005); *United*

*States v. Bennett*, 329 F.3d 769, 777 (10th Cir. 2003); *United States v. Purdy*, 264

F.3d 809, 811 (9th Cir. 2001); *United States v. Edwards*, 182 F.3d 333, 335-36 (5th

Cir. 1999). Thus, no circuit court has attempted to answer the questions raised

above or suggested that there could be answers. Instead, those courts held that

whatever "unlawful user" means, it covered the individual defendant.

In sum, "the term 'user' is so open-ended that the ordinary citizen cannot

know when his conduct in using a controlled substance may result in forfeiture of

his rights under the Second Amendment." *See Herrera*, 313 F.3d at 889 (DeMoss,

dissenting).

Because the statute has no standards, it invites arbitrary or discriminatory

enforcement. A vague statute like § 922(g)(3) gives police and prosecutors

immense power to interpret and apply the law according to their "personal predilections." *Kolender*, 461 U.S. at 358. Police and prosecutors can make subjective calls about who among the tens of millions of Americans who admit to being current illicit drug users they consider to be "unlawful users" in need of a felony conviction. Public figures like Bill Maher[34] and Joe Rogan, a podcaster who publicly smoked marijuana and possesses firearms,[35] are not likely to be prosecuted. Erik Harris, a young black man who qualifies for court-appointed counsel, now has a felony conviction on his record and he will never again be permitted to exercise Second Amendment rights. *See* § 922(g)(1) (prohibiting felons from possessing firearms or ammunition).

### D.    The statute is vague as-applied to Mr. Harris.

The government's evidence was that Mr. Harris purchased firearms on February 25, March 8, and March 14, 2019 and filled out the required forms on

---

[34] Bill Maher, The New Stoned Age: Bill Maher on the Greening of America, Rolling Stone (June 10, 2013), https://www.rollingstone.com/culture/news/the-new-stoned-age-bill-maher-on-the-greening-of-america-20130610; Douglas Ernst, Bill Maher urges liberals to 'learn more about guns,' says issue is a loser for Democrats, The Washington Times (June 10, 2019), https://www.washingtontimes.com/news/2019/jun/10/bill-maher-urges-liberals-to-learn-more-about-guns/.

[35] https://www.youtube.com/watch?v=TDKYSLDq6es (Joe Rogan Experience # 1535 (gun); https://www.entrepreneur.com/article/356305 (marijuana).

each of those three days. Appx198-202. The evidence Mr. Harris was an "unlawful user" consisted entirely of his admissions to law enforcement.

During that interview, Erik, a college junior, 00:50, disclosed that he began smoking marijuana when he was a high school freshman. 4:17-:19. Initially, he said he smokes probably every day, including the day of the interview. 4:24; 4:39; 4:54. He clarified that he's been through stages where he stopped smoking entirely, 5:01-06, for months at a time or even a year, 38:30-:32. When specifically asked how often he's smoked during the last year, Eric estimated once every three or four days because he's been through stages when he hasn't smoked at all. 5:11-:20. At the end of the interview, he estimated smoking five of seven days. 38:48. He disputed the government's position that he smoked five to seven days per week but conceded regular use. Appx199,201.

Erik denied using on the days he purchased the firearms. 37:06-37:50, 38:10. At the time of the interview, the .45 was at his apartment at college, 13:10-13:24, and the .40 was in his car in Beaver Falls. 34:57-:58, 1:00:10. *See* 1:01:26 (Erik explaining he had walked to the police station for the interview).

The facts of this case are thus markedly different from those where as-applied challenges were rejected. *See Hasson,* 26 F.4th at 616-17 (at arrest, the defendant tested positive for opioids, possessed a trove of pills, and had an alarming weapons collection); *Cook*, 970 F.3d at 877-78 (defendant had been using

for 10 years, had smoked two blunts the day of his arrest, and his car and person reeked of marijuana when he was stopped and found holding a firearm); *Bramer*, 832 F.3d at 909 (defendant was using marijuana *while* possessing firearms).

Section 922(g)(3) is both facially vague and vague as-applied.

**III.    The evidence was insufficient to establish Erik Harris knowingly made a false statement as to his legal status when he certified he was not an unlawful user of marijuana or addict given that the phrase is not defined and has no commonly understood meaning; the judgment must be vacated.**

**Standard of Review**:

In reviewing for sufficiency, the Court "view[s] the evidence in the light most favorable to the prosecution," and determines whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

**A.    Erik Harris did not knowingly make a false statement in connection with his firearm purchases.**

When Erik Harris purchased each firearm, he answered "no" to the question

are you an unlawful user of, or addicted to, marijuana:

> Are you an unlawful user of, or addicted to marijuana or any depressant, stimulant, narcotic drug, or any other controlled substance?... [Warning:] The use or possession of marijuana remains unlawful under Federal law regardless of whether it has been legalized or decriminalized for medicinal or recreational purposes in the state where you reside.

Appx199. He thereafter entered a conditional plea to three counts of making false

statements under 18 U.S.C. § 922(a)(6). That statute makes it a crime "for any

person in connection with the acquisition…of any firearm or ammunition from a

licensed… dealer…, knowingly to make any false or

fictitious…statement…intended or likely to deceive such…dealer…with respect to

any fact material to the lawfulness of the sale…" *Id*.

Because knowledge is a specific element of § 922(a)(6), "the maxim that 'ignorance is no defense' has no relevance…" *United States v. Squires*, 440 F.2d 859, 864-65 (2d Cir. 1971); *United States v. Chapman*, 7 F.3d 66, 68 (5th Cir. 1993). In *Squires*, the court explained that "when knowledge of the existence of a particular fact is an element of the offense, such knowledge is established if a person is aware of a high probability of its existence, unless he actually believes that it does not exist." *Squires*, 440 F.2d at 863. There, the defendant signed a form certifying he was not a "prohibited person" under specified statutes. *Id*., 862. Although the defendant had a prior conviction, the term prohibited person was so obscure, he may not have known he qualified. *Id*., 862. The court found that the defendant's ignorance could "negative[] the…knowledge…required to establish a material element" of § 922(a)(6). *Id*., 864.

In case similar to this one, a defendant who had been indicted, tried, and convicted in state court but whose conviction was on appeal, purchased a firearm during the pendency of his appeal and answered "no" the question, are you "under indictment." *Chapman*, 7 F.3d at 67-68. Under state law, which controlled, a defendant remains "under indictment" during appeal. *Id*. To establish Chapman knowingly made a false statement, the government had to prove he ***knew*** he was "under indictment." The government pointed to Chapman's later response to ATF questioning about the form, "Well, I messed up on that one." *Id.,* 68. The Fifth

53

Circuit found that statement shed no light on whether Chapman knew he was under indictment at the time he purchased the firearms. *Id*. In reversing, the Court stressed that when the government charges that a defendant knowingly lied about his legal status, it must offer proof that he knew his status.

Importantly, the Court explained that "ignorance of the law is here a defense because the charged falsity rests on defendant's untrue statement of his legal status." *Id*. "Chapman knew what had happened to him but there was no proof that he knew what the legal label was, and that's the question the government asked and now says he lied about." *Id.*

So too here. The instant prosecution was predicated on a recorded law enforcement interview with Mr. Harris, which interview had previously been submitted to the court, and forms completed in connection with his firearms purchases in which Mr. Harris checked the box "no" in response to the query whether he was "an unlawful user of, or addicted to marijuana….." The form does define the term "unlawful user."

In his statement to law enforcement, Mr. Harris explained that he read the phrase "unlawful user of, or addicted to" to mean addict, and he's not addicted. 36:39-:42, 36:54-:56. Significantly, that is precisely how two jurists on the Fifth Circuit interpreted that same phrase. *See Herrera*, 313 F.3d at 890-91 (DeMoss, dissenting). The dissenters determined the word "or" in § 922(g)(3) was used by

Congress not in a disjunctive sense but to clarify what has already been said. *Id*.

"Since Congress defined the term 'addicted to' but did not define the term

'unlawful user' in any way, shape or form," the two terms must viewed as part and

parcel of each other and defined synonymously. *Id*.

When specifically directed by officers to the term "unlawful user," Mr.

Harris admitted long-time marijuana use but denied being untruthful on the form,

explaining that he interprets that to mean using at the time of purchase. 37:06-

37:50, 38:10. He denied using at that time. *Id*.

After additional questioning, Erik accepted the legally incorrect view that

anyone who uses marijuana is an unlawful user and anyone who uses it "in the

past" is an unlawful user. 38:02-:07. When asked again if he was truthful on the

form, Erik responded that it depends on how you look at it. 38:55-39:58.[36] The

ATF agent —the same agent who assured Erik "I don't care about marijuana,"

58:39-:40— soothed, "Erik no one's trying to [trip you up?] This is how we gauge

---

[36] Section 922(g)(1) similarly criminalizes possession by anyone who's been "convicted" of a crime punishable by more than a year. The meaning of the term "convicted" is not obvious; section 921(a)(2) defines that term. In *United States v. Davies,* the defendant pled guilty in state court but not yet been sentenced when he purchase a firearm. 942 F.3d 871, 874 (8th Cir. 2019). Under state law, he was "convicted" though he had not been sentenced. *Id*., 872-73. The Eighth Circuit reversed the § 922(g)(1) conviction (on plain-error review), finding that although Davies would have known he'd pled guilty, he may not have known he'd been "convicted" so as to implicate § 922(g)(1). *Id., 874.*

if you're cooperating with us." 39:01-:07. Eric then acknowledged his answer was not truthful but again qualified it depended how you looked at it. 39:07-:12.

The officer explained to Eric that had he checked the box stating he was an unlawful user, the dealer could not have sold him that gun. 40:28-:42. Eric asked if that was permanent. 40:42. The officer responded the dealer could not sell the gun that day—the day you check yes on the box—suggesting Eric's interpretation— that a person who is not using on the day of purchase is not an unlawful user and can purchase a firearm—was correct. 40:42-40:54.

What happens at the close of the interview serves to illustrate Erik's lack of guilty knowledge. Approximately one hour into the interview, agents advised Mr. Harris they needed to seize his guns. Mr. Harris expressed surprise asking, "Why can't I possess my guns anymore?" 58:42-58:44. And when the officer responded, "because you're an unlawful user," Mr. Harris persisted, "How am I an unlawful user right now?" 58:44-49.

Because Mr. Harris' interpretation was reasonable and consistent with the ordinary understanding of the term, his answer was not knowingly false even if this Court, "by some process of interpretation" gives a different meaning to the term. *See United States v. Isaacs*, 539 F.2d 686 (9th Cir. 1976) (because the word had two meanings and defendant's answer to a question was literally true under one meaning, "the answer cannot be said to be false because, by some process of

interpretation, including the determination of congressional purpose, a second meaning might be given to the word").[37]

Thus, the evidence is insufficient to prove Mr. Harris falsely certified on the ATF form he was not an unlawful user of marijuana knowing that certification was false when he made it.

## B.    The judgment must be vacated.

The Fourteenth Amendment's Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Here, there was no evidence on the essential element of knowledge—that Mr. Harris' statement on the ATF forms was knowingly false and

---

[37] Parenthetically, the evidence was insufficient as a matter of law because it rested entirely on the accused's uncorroborated admission to knowingly making a false statement to a firearms dealer. *See United States v. Rodriguez-Soriano*, 931 F.3d 281 (4th Cir. 2019). In *Rodriguez-Soriano*, the accused checked the box indicating he was the actual buyer. *Id*., 284. After that firearm was used in a crime, police interviewed Soriano as a suspected straw purchaser. Soriano claimed the gun had been stolen. He later said he purchased the gun for a friend and lied on the form. *Id*., 285-86. The Fourth Circuit reversed his conviction, explaining that the only evidence of the corpus delecti was an uncorroborated confession and that without substantial independent evidence corroborating that statement, the conviction could not stand. *Id*., 290. *See also United States v. Fearn*, 589 F.2d 1316 (7th Cir. 1978) (for the non-tangible offense of making a false statement in connection with a loan application, there was no independent evidence corroborating the accused's admission). *See Smith v. United States*, 348 U.S. 147, 152 (1954); *Wong Sun v. United States*, 371 U.S. 471, 488-89 (1963) (explaining "confessions and admissions of guilt require extrinsic corroboration").

made with intent to deceive. The district court therefore erred in denying the motion to dismiss, and the convictions must be vacated. *See* Appx50,134,145 (arguing "the government cannot prove the offenses charged under section 922(a)(6)" because Mr. Harris cannot know what "unlawful user" means and therefore "cannot have made false statements about being an 'unlawful user'"). *See United States v. Pressler*, 256 F.3d 144, 157 (3d Cir. 2001) (vacating where evidence was insufficient).

Notably, the result would be the same had Mr. Harris not preserved his request to dismiss the § 922(a)(6) counts for lack of knowledge. "[A]ffirming a conviction where the government has failed to prove each essential element of the crime beyond a reasonable doubt 'affect[s] substantial rights,' and seriously impugns 'the fairness, integrity and public reputation of judicial proceedings.'" *United States v. Johnson*, 19 F.4th 248, 256 (3d Cir. 2021) (a conviction based on insufficient evidence would result in a fundamental miscarriage of justice); *United States v. Castro*, 704 F.3d 125, 138 (3d Cir. 2013) (overturning conviction despite appellate waiver given the "complete failure of proof on an essential element"; allowing conviction to stand would seriously impugn "the fairness, integrity, and public reputation of our courts" and constitute a miscarriage of justice); *United States v. Repella*, 359 F.App'x 294 (3d Cir. 2009) (vacating and remanding under

plain error standard where factual basis for plea did not include evidence of an

intent to defraud).

## CONCLUSION

The district court's denial of the motion to dismiss indictment must be reversed and the case remanded. Because the evidence was insufficient to support the § 922(a)(6) convictions, the judgment must be vacated.

Respectfully submitted,

*/s/ Renee Pietropaolo*
Renee Pietropaolo
Assistant Federal Public Defender
Counsel for Appellant

Federal Public Defender's Office for the
Western District of Pennsylvania
1001 Liberty Avenue, Suite 1500
Pittsburgh, PA 15222

(412) 644-6565

# CERTIFICATES

**Membership in Bar**

I, Renee Pietropaolo, Assistant Federal Public Defender, certify that I am a member of this Court's Bar.

**Virus check and identical compliance of briefs**

I, Renee Pietropaolo, Assistant Federal Public Defender, hereby certify that the electronic version of the attached brief was automatically scanned by Symantec Endpoint Protection, version 14.3, and found to contain no known viruses. I further certify that the text in the electronic copy of the brief is identical to the text in the paper copies of the brief filed with the Court.

**Compliance with word count and type-face limitations**

I, Renee Pietropaolo, Assistant Federal Public Defender, hereby certify that this document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 12,999 words, excluding any part of the document exempted by Fed. R. App. P. 32(f). This document also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6)  because it has been prepared in a proportionally spaced typeface using Word 2016 for Windows 10 word count software in font size 14, type style Times New Roman.

*/s/ Renee Pietropaolo*
Renee Pietropaolo
Assistant Federal Public Defender

April 6, 2022

## CERTIFICATE OF SERVICE

I, Renee Pietropaolo, Assistant Federal Public Defender, hereby certify that I have electronically filed the Opening Brief for Appellant and Appendix and served copies upon Filing User Laura S. Irwin, Assistant United States Attorney, through the Third Circuit Court of Appeals' Electronic Case Filing (CM/ECF) system.

*/s/ Renee Pietropaolo*
Renee Pietropaolo
Assistant Federal Public Defender

April 6, 2022