IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 21-3031

UNITED STATES OF AMERICA,
Appellee

v.

ERIK MATTHEW HARRIS,
Appellant

Appeal from a judgment entered
in the United States District Court for the
Western District of Pennsylvania at No. 2:19-cr-00313

REPLY BRIEF FOR APPELLANT

LISA B. FREELAND
Federal Public Defender

RENEE  PIETROPAOLO
Assistant Federal Public Defender

Federal Public Defender for the
Western District of Pennsylvania
1001 Liberty Avenue, Suite 1500
Pittsburgh, PA 15222

(412) 644-6565

# TABLE OF CONTENTS

Table of Authorities ....................................................................................... iv

Arguments in Reply ......................................................................................... 7

I.    Section 922(g)(3)'s prohibition on firearm possession by unlawful
      users of any controlled substance is not rooted in the
      Second Amendment's text and history and does not pass Constitutional
      muster ...................................................................................................... 1

      A.    Erik Harris is among "the people" whom the Second
            Amendment protects ..................................................................... 2

      B.    The government cannot meet its burden of establishing that
            that as of 1791, there was a tradition of prohibiting users of
            intoxicants from possessing firearms. ........................................ 7

            1.    The government fails to identify any historical source from
                  the time of the American Colonies and the early Republic
                  disarming users of intoxicants ............................................ 8

            2.    The 19th- and 20th-century regulations cited by the
                  government, if considered, do not evince a historical
                  tradition for disarming users of intoxicants. ..................... 9

                  i.    To the extent late 19th- and early 20th-century regulations
                        are relevant, they address societal concerns regarding firearm
                        violence by users of intoxicants in a materially different
                        manner. ................................................................... 9

                  ii.   Even if they imposed comparable burdens, regulations from
                        the 1860s-1880s "come too late" to establish a historical
                        tradition of disarming users of intoxicants .............. 12

                  iii.  Even if these regulations are considered, they are not enough
                        to satisfy the government's significant burden to identify a
                        "well-established and representative historical analogue." ...... 14

C.     Section 922(g)(3)'s prohibition on firearm possession by unlawful users of any controlled substance is not sufficiently analogous to purported historical regulations disarming the dangerous to pass Constitutional muster. ..........................................................................14

D.     Section 922(g)(3) is unconstitutional as applied to Erik Harris, an adult recreational user of marijuana. ..................................................20

II.     Section 922(g)(3)'s prohibition on gun possession by "unlawful user[s] of or addict[s] to any controlled substance" is unconstitutionally vague......22

III.     The undisputed facts of this case do not constitute a violation of § 922(a)(6) ............................................................................................28

Conclusion .............................................................................................................31

Certificates

Certificate of Service

# TABLE OF AUTHORITIES

**Cases:**

*Binderup v. Att'y Gen.*,
  836 F.3d 336 (3d Cir. 2016) ...................................................... 1,16,17

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) .............................................. 2-4,6,12,16

*Expressions Hair Design v. Schneiderman*,
  137 S. Ct. 1144 (2017) ....................................................... 24

*Folajtar v. Att'y Gen.*,
  980 F.3d 897 (3d Cir. 2020) ........................................... 4,16,18

*In re Rogers*,
  66 P.2d 1237 (1937) ........................................................ 11

*Johnson v. United States*,
  576 U.S. 591 (2015) ........................................................ 23,24

*Kanter v. Barr*,
  919 F.3d 437 (7th Cir. 2019) ................................................. 4,5,17,18

*Kolendar v. Lawson*,
  461 U.S. 352 (1983) ........................................................ 24

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
  142 S. Ct. 2111 (June 23, 2022) .......................................... 1-3,5-10,12-15,18,20

*People v. Garcia*,
  197 Colo. 550 (1979) ....................................................... 11

*Sessions v. Dimaya*,
  138 S. Ct. 1204 (2018) ..................................................... 23,24

*State v. Kerner*,
  181 N.C. 574 (1921) ....................................................... 15

*State v. Shelby*,
    90 Mo. 302 (1886) ........................................................................10

*United States v. Augustin*,
    376 F.3d 135 (3d Cir. 2004)......................................................20,26

*United States v. Bennett*,
    329 F.3d 769 (10th Cir. 2003) ....................................................48

*United States v. Boyd*,
    999 F.3d 171 (3d Cir. 2021)......................................................1,16

*United States v. Carter*,
    750 F.3d 462 (4th Cir. 2014) ................................................. 18-19

*United States v. Davis*,
    139 S. Ct. 2319 (2019).............................................................22,23

*United States v. Jimenez-Shilon*,
    34 F.4th 1042 (11th Cir. 2022) ....................................................6

*United States v. McGeehan*,
    584 F.3d 560 (3d Cir. 2009)). ....................................................28

*United States v. Meza-Rodriguez*,
    798 F.3d 664 (7th Cir. 2015) ........................................................3

*United States v. Morales-Lopez*,
    2022 WL 2355920 (D.Utah, June 30, 2022)...........................24,25,26

*United States v. Negroni*,
    638 F.3d 434 (3d Cir. 2011)........................................................28

*United States v. Stock*,
    728 F.3d 287 (3d Cir. 2013)........................................................28

*United States v. Verdugo–Urquidez*,
    494 U.S. 259 (1990)....................................................................3

*United States v. Yancey*,
    621 F.3d 681 (7th Cir. 2010) .............................................................15

*Weissman v. United States*,
    373 F.2d 799 (9th Cir. 1967) .............................................................22

**Statutes**:

18 U.S.C. § 922(a)(6)................................................................... 28-30

18 U.S.C. § 922(g)(1)............................................................................4

18 U.S.C. § 922(g)(3)...................................................................passim

General Statutes of Kansas, 1868 ........................................................10

Kansas Ordinance No. 1, Jul. 2, 1877 .................................................10

1883 Mo. Laws 76, An Act to Amend Section 1274, Art. 2, Ch. 24, §1 ...............10

1890 Okla. Laws 495, art. 47 ..............................................................10

1907 Ariz. Sess. Laws 15, ch. 16, §1 ..................................................11

1909 Id. Sess. Laws 6, §1 ...................................................................11

1916 N.J. Laws 275-76, ch.130, §§1-2.................................................11

1931 Mich. Pub. Act 671, Michigan Penal Code, ch. 36, §237 .............11

**Other Authorities**:

U.S. Const. amend. II.....................................................................passim

Paul Aaron and David Musto, Temperance and Prohibition in America: A
    Historical Overview ..........................................................................8

Joseph G. S. Greenlee, The Historical Justification for Prohibiting Dangerous
    Persons from Possessing Arms, 20 Wyo. L. Rev. 249 (2020) ...........18

Lana Harrison & Joseph Gfroerer, The Intersection of Drug Use and Criminal Behavior: Results from the National Household Survey on Drug Abuse, 38 Crime & Delinquency 422 (1992) ..............................................................19

Carlton F. W. Larson, Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit, 60 Hastings L.J. 1371 (2009) ........................17

Evelyn H. Wei, et al., Teasing Apart the Developmental Associations Between Alcohol and Marijuana Use and Violence, 20 J. of Contemp. Crim. Just. 166 (2004) ...............................................................................................................19

**ARGUMENTS IN REPLY**

I.     **Section 922(g)(3)'s prohibition on firearm possession by unlawful users of any controlled substance is not rooted in the Second Amendment's text and history and does not pass Constitutional muster.**

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Supreme Court held, "The Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." 142 S. Ct. 2111, 2156 (June 23, 2022). Until *Bruen*, this Court, and others, applied a two-step inquiry first asking whether a challenged restriction imposes a burden on conduct falling within the scope of the Second Amendment's guarantee and then applying some form of heightened scrutiny. *Bruen* invalidated that test as "one step too many." *Id*., 2127. Under *Bruen*, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*., 2126, 2129-30. To justify its regulation, the government "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. Although this inquiry is "broadly consistent" with *Binderup's* step one, *Bruen* expressly puts the burden on the government to "affirmatively prove" its regulation "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*., 2126-27 (using "*but see*" to introduce *United States v. Boyd*, 999 F.3d 171 (3d Cir.

1

2021), wherein this Court placed the burden on the party challenging the regulation).

Thus, to justify § 922(g)(3)'s prohibition on firearm possession by unlawful users of any controlled substance, the government must identify a Colonial era tradition of disarming users of intoxicants. It cannot. Absent any showing of a historical tradition of disarming users of intoxicants from possessing firearms even in the home for self-defense, this regulation infringes upon individual Second Amendment rights and is unconstitutional.

### A. Erik Harris is among "the people" whom the Second Amendment protects.

The text of the Second Amendment providing "the right of the people to keep and bear Arms shall not be infringed" "guarantee[s] the individual right to possess and carry weapons in case of confrontation" that does not depend on service in the militia. *Bruen*, 142 S. Ct. at 2127 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008)). Mr. Harris is among "'the people' whom the Second Amendment protects." *See id*., 2134. He purchased handguns, which are weapons "in 'common use' for self-defense today." *Id*., 2143. The Constitution presumptively protects that conduct and the burden shifts to the government to demonstrate that a regulation prohibiting gun possession by unlawful users of any controlled substance is consistent with the Nation's historical tradition of firearms regulation. *Id*., 2130.

2

Preliminarily, the government relies on language in *Bruen*—deriving from *Heller*—to argue that the Second Amendment's protections are limited to "ordinary, law-abiding," "responsible" citizens. G.Ltr. (Doc. 42) filed July 7, 2022. The government continues, an unlawful drug user is not law abiding and so not protected. G.Br.8,14. The government's argument finds no support in the Second Amendment's text and is at odds with *Heller* and *Bruen*.

*Heller* began its analysis of the Second Amendment's "operative" clause with the phrase "right of the people" and concluded the phrase "the people" meant the same thing in the Second Amendment as in other parts of the Constitution. *Heller*, 544 U.S. at 580-81. *See also United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015) (relying on *Heller* to give the phrase "the people" in the Second Amendment the same meaning as it carries in other amendments passed as part of the Bill of Rights and to reach noncitizens). In the other six Constitutional provisions "that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset" like those serving in organized militia. *Heller*, 544 U.S. at 580-81 (quoting *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990)). The Court characterized "the people" as a "term of art" referring to "persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered

3

part of that community." *Id.*, 580. *Heller* concluded, the Second Amendment belongs to "all Americans." *Id.*, 581.

While *Heller* made passing reference to "law-abiding, responsible citizens," 554 U.S. at 635, it was not in the context of defining the term "the people." Only Justice Stevens' dissent described it as such. *Id.*, 644. Indeed, to restrict "the people" falling within the Second Amendment's protections to only the law-abiding is inconsistent with *Heller's* decision to give the phrase "the people" in the Second Amendment the same meaning it carries in other amendments passed at the same time. For "even felons (and presumably irresponsible citizens as well) may invoke the protections" of the First and Fourth Amendments. *Heller*, 554 U.S. at 644 (Stevens, dissenting).

Various courts and judges agree. According to then-Judge Barrett, *Heller* "interpreted the word 'people' as referring to 'all Americans.'" *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, dissenting). So too Judge Bibas: "The text does not define 'the people' as 'the virtuous' or 'non-felons.'" *Folajtar v. Att'y Gen.*, 980 F.3d 897, 923 (3d Cir. 2020) (Bibas, dissenting). Discussing § 922(g)(1), Judge Bibas elaborated, "[f]elons are more than the wrongs they have done. They are people and citizens who are part of 'We the People of the United States.' U.S. Const. pmbl. So they too share in the Second Amendment "right of the people to keep and bear Arms," subject only to the historical limits on that right." *Id.*, 912.

4

Rejecting the view that those with a criminal record or engaged in criminal conduct (failing to pay taxes) are not among "the people" falling within the Second Amendment, the Seventh Circuit similarly explained, "[m]any people, citizens and noncitizens alike, raising Fourth Amendment claims are likely to have a criminal record, but we see no hint in [Supreme Court precedent] that this is a relevant consideration….Not only would this test be difficult to implement; it would also create the potential for a noncitizen to lose constitutional rights she previously possessed simply because she began to behave in a criminal or immoral way. The Second Amendment is not limited to such on-again, off-again protection." *Meza-Rodriguez*, 798 F.3d at 671. Judge Barrett similarly observed, "[t]o say that certain *people* fall outside the Amendment's scope" means that "a person could be in one day and out the next…." *Kanter,* 919 F.3d at 452.

Thus, that someone is a felon, or otherwise non-law-abiding, does not make him "categorically excluded from our national community," *i.e.*, "the people." *Kanter*, 919 F.3d at 453 (Barrett, dissenting).

*Bruen* is not to the contrary. In *Bruen*, the Court held that the right to bear arms extends outside the home, in part, because "nothing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." 142 S. Ct. at 2134. Just as the text of the Second Amendment does not "draw[] a home/public distinction with respect to the right to keep and bear

5

arms," *id*., it does not draw a drug-user/non-drug-user distinction. "[N]othing in the Second Amendment's text" suggests drug users are not among "the people" entitled to the amendment's protection. *See id. See also United States v. Jimenez-Shilon,* 34 F.4th 1042, 1044-45 (11th Cir. 2022) (citing founding-era dictionaries and recognizing that felons and the mentally ill "are indisputably part of 'the people'").

Whether "the people" refers only to "ordinary, law-abiding, adult citizens," was not at issue in *Bruen,* making any passing statement to that effect *dicta*. *Bruen,* 142 S. Ct. at 2134. Before addressing the question presented, *Bruen* simply explained that there was no dispute that petitioners—who alleged in "pleadings below" that they were "ordinary, law-abiding, adult citizens"—are part of "the people" whom the Second Amendment protects. *Id*., 2124, 2134 (citing *Heller,* 544 U.S. at 580). It did not hold that non-law-abiding people are unprotected. Again, that question was not presented. Notably, in closing *Bruen* reiterated, "[t]he Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." *Id*., 2156.

In short, the Second Amendment presumptively protects Mr. Harris' possession of handguns. The question becomes whether the government can show its regulation barring adult recreational marijuana users from possessing firearms is

consistent with the nation's historical tradition of firearms regulation. *See Bruen*,

142 S. Ct. at 2135. It cannot.

**B. The government cannot meet its burden of establishing that as of 1791, there was a tradition of prohibiting users of intoxicants from possessing firearms.**

To justify § 922(g)(3)'s severe restriction on firearm possession, the

government must demonstrate that this modern regulation is consistent with the

Nation's historical tradition of firearm regulation. *Bruen*, 142 S. Ct. at 2131.

Justice Thomas opined that this historical analysis might sometimes be

straightforward. For example, "when a challenged regulation addresses a general

societal problem that has persisted since the 18th century, the lack of a distinctly

similar historical regulation addressing that problem is relevant evidence that the

challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S.

Ct. at 2131. "Likewise, if earlier generations addressed the societal problem, but

did so through materially different means, that also could be evidence that a

modern regulation is unconstitutional." *Id*. When faced with an "unprecedented

societal concern[]" and considering "modern regulations that were unimaginable at

the founding," courts are to reason by analogy, considering whether the modern

regulation is "relevantly similar" to an historical analogue. *Id*., 2132.

Section 922(g)(3) addresses a problem that existed in 1791—firearm

violence by those, who by virtue of intoxication, are likely to demonstrate

disinhibition or lack of self-control—and it employed a regulation—a flat ban on possession of firearms by users of intoxicants even in the home and when not intoxicated—that is not analogous to any founding period restrictions. Because historical precedent does not evince a comparable tradition of regulation, § 922(g)(3)'s ban is unconstitutional. *See Bruen*, 142 S. Ct. at 2131.

> 1.    **The government fails to identify any historical source from the time of the American Colonies and the early Republic disarming users of intoxicants.**

The government claims this societal problem was unprecedented at the founding. Its sole support for this claim is the idea that controlled substances were not widely used as intoxicants until the late nineteenth and early twentieth centuries. G.Br.17-18. While controlled substance is a modern term, intoxicants are not new. Indeed, "the colonists brought with them from Europe a high regard for alcoholic beverages. Distilled and fermented liquors were considered important and invigorating foods, whose restorative powers were a natural blessing. People in all regions and of all classes drank heavily," from morning into the evening. Paul Aaron and David Musto, Temperance and Prohibition in America: A Historical Overview, 131, *available at*

https://www.ncbi.nlm.nih.gov/books/NBK216421/pdf/Bookshelf_NBK216421.pdf

Because § 922(g)(3) addresses a general societal problem that has persisted since the 18th century, the government must come forward and identify a

"distinctly similar historical regulation." *Bruen*, 142 S. Ct. at 2131. It has not met

its burden: The government fails to identify a single historical source from the time

of the American Colonies and the early Republic disarming citizens, in the home

or elsewhere, based on being a user of intoxicants. *See Bruen*, 142 S. Ct. at 2135.

Indeed, the government acknowledges that "no similar provision" to § 922(g)(3)'s

prohibition on firearm possession by an "unlawful user" of any controlled

substance or addict "existed at the time of ratification." G.Br.17-18. The lack of a

distinctly similar historical regulation prohibiting users of intoxicants from

possessing firearms establishes that § 922(g)(3) is inconsistent with the Second

Amendment.

> **2.    The 19th- and 20th-century regulations cited by the government, if considered, do not evince a historical tradition for disarming users of intoxicants.**

i.    To the extent late 19th- and early 20th-century regulations are

relevant, they address this societal concern in a materially different manner as they

prohibit carrying or using a firearm publicly while intoxicated (or possessing while

an addict or under the influence), not possessing a firearm in the home while

having the status of a user. *See Bruen*, 142 S. Ct. at 2131.

The *Bruen* Court explained that when determining whether a modern

regulation is sufficiently analogous to a historical restriction, courts are to consider

how and why the regulations burden the core right to self-defense: "[W]hether

9

modern and historical regulations impose a comparable burden on the right of

armed self-defense [*i.e.*, the 'how'] and whether that burden is comparably

justified [*i.e.,* the 'why'] are '*central'* considerations when engaging in an

analogical inquiry."142 S. Ct. at 2132-33. Section 922(g)(3) is not "relevantly

similar" to the 19th-century statutes using either of those two metrics.

The government identifies one late 19th century case prohibiting carrying

firearms while intoxicated.[1] G.Br.13,15. Independent research has revealed a

smattering of statutes from that era bar ***carrying*** or ***using*** firearms ***while*** under the

influence, some applicable only to public or peace officers:

> **General Statutes of Kansas 1868:** Prohibiting "any person under the
> influence of intoxicating drink" from "carrying… [a] deadly weapon."
>
> **Ordinance No. 1, Jul. 2, 1877, reprinted in THE MINING ECHO,
> Jul. 7, 1877, at 1 (Empire City, Kansas):** "Any person who shall,
> while exercising the right to carry firearms, not concealed, be
> intoxicated…shall be deemed guilty of a misdemeanor…."
>
> **1883 Mo. Laws 76, An Act to Amend Section 1274, Art. 2, Ch. 24,
> §1**: Prohibiting persons from "carry[ing] certain weapons "upon or
> about his person when intoxicated or under the influence…."
>
> **1890 Okla. Laws 495, art. 47: "**Public officers while in the discharge
> of their duties…shall be permitted to carry arms…Provided, however,
> That if any public officer be found carrying such arms while under the

---

[1] *State v. Shelby*, 90 Mo. 302 (1886) (addressing 1883 Missouri statute
prohibiting carrying a firearm "when intoxicated, or under the influence of
intoxicating drinks."). *See* 1883 Mo. Laws 76, An Act to Amend Section 1274,
Art. 2, Ch. 24, §1 (Prohibiting persons from carrying certain weapons "upon or
about his person when intoxicated or under the influence….").

influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person."

**1907 Ariz. Sess. Laws 15, ch. 16, §1:** "It shall be unlawful for any constable or other peace officer in the Territory of Arizona, while under the influence of intoxicating liquor…to carry or have on his person a…firearm…."

**1909 Id. Sess. Laws 6, §1:** Prohibiting persons from carrying certain weapons "when intoxicated, or under the influence…."

**1916 N.J. Laws 275-76, ch.130, §§1-2:** "It shall be unlawful for any person to go into the woods…with a gun…when intoxicated or under the influence of any drug…."

**1931 Mich. Pub. Act 671, Michigan Penal Code, ch. 36, §237**: "Any person under the influence of intoxicating liquor or any exhilarating or stupefying drug who shall carry, have in possession or under control, or use… any firearm within this state, shall be guilty of a misdemeanor."

The government additionally cites two 20th century cases that reach possession, but these regulate possession by an addict[2] or while intoxicated.[3] G.Br.13,15.

The 19th-century statutes also do not evince a "comparable" burden to that of § 922(g)(3). *Bruen*, 142 S. Ct. at 2131-32. The latter denies the right to possess any gun at all, in any setting, and for any purpose. It thus represents a total infringement of the core right to possess guns in the home for self-defense. By

---

[2] *See In re Rogers*, 66 P.2d 1237 (1937) (addressing 1931 California statute prohibiting possession of a firearm by an ***addict*** of narcotic drugs).

[3] *See People v. Garcia*, 197 Colo. 550 (1979) (addressing 1973 Colorado misdemeanor statute prohibiting possessing a firearm while under the influence of intoxicating liquor or narcotic).

contrast, the burden imposed by the 19th-century statutes is much more modest. It applies only outside the home, and only when someone is carrying or using a firearm while actually intoxicated. It therefore leaves intact the core right recognized by *Heller*.

That post-ratification generations addressed the societal problem "through materially different means" is further evidence the modern regulation is unconstitutional. *Bruen*, 142 S. Ct. at 2131.

ii.    Even if they imposed comparable burdens, regulations from the 1860s-1880s "come too late" to establish a historical tradition of disarming users of intoxicants. *Id.*, 2137.

Justice Barrett's *Bruen* concurrence, like the opinion itself, suggests that 1791 (when the Bill of Rights was ratified) is the correct date for assessing the scope of permissible *federal* regulation of an individual right. *Bruen*, 142 S. Ct. at 2137-39; *ibid*, 2163 (Barrett). Sources from "75 years after the ratification of the Second Amendment" provide little insight into original meaning. The Court viewed 19th-century evidence as relevant only insofar as it provided "confirmation" of earlier sources, *id.*; here, there are no earlier sources.

The government also cites present-day statutes, but it does not identify a majority of states that even now prohibit possession of firearms in the home based on having the status of user. Gov't Br.16 n.3. Regardless, *Bruen* declined to

address any of the 20th-century evidence, explaining that it too "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154 & n.28.[4]

iii.    Even if these regulations are considered, they are not enough to satisfy the government's significant burden to identify a "well-established and representative historical analogue." *Id*., 2133.

The *Bruen* majority "doubt[ed]" that "*three* colonial regulations" proffered by respondents were sufficient to show a tradition of public carry regulation. *Id*., 2142. Here, the government proffers ***no*** colonial regulations prohibiting users of intoxicants from possessing guns. As for the few 19th- and 20th-century restrictions, none restricts firearm possession by users of intoxicants comparable to § 922(g)(3). These statutes are exactly the kinds of "outliers" on which the *Bruen* Court refused to rely. *Id*., 2153.

---

[4] The government's claim that over half of states and the District of Columbia currently prohibit unlawful drug users or addicts from possessing firearms is both irrelevant and flawed. G.Br.16. Many of the cited provisions restrict addicts or those with controlled substance-related convictions or recent residential drug treatment. Some apply to conceal-carry permitting, not possession, and may exclude marijuana. It appears that only three of the cited statutes restrict possession by unlawful users (though not necessarily of marijuana).

**C.    Section 922(g)(3)'s prohibition on firearm possession by unlawful users of any controlled substance is not sufficiently analogous to purported historical regulations disarming the dangerous to pass Constitutional muster.**

As noted, the government contends that societal concerns of firearm violence by users of intoxicants was "unprecedented" at the founding, Gov't Ltr. (Doc. 42), such that § 922(g)(3)'s restrictions "were unimaginable at the founding." *see Bruen*, 142 S. Ct. at 2132. It then asserts that § 922(g)(3)'s prohibition on firearm possession by users of any controlled substance is analogous enough to purported historical regulations disarming the unvirtuous to pass constitutional muster. G.Ltr. (Doc. 42). According to the government, those who commit crimes—felons and unlawful users alike—are unvirtuous and so not entitled to Second Amendment protections.[5]

Again, the government does not and cannot offer any support for the idea that firearm violence by users of intoxicants was "unimaginable" at the founding. Assuming *arguendo* this is so, the government has not shown that in the founding

---

[5] The government places great weight on an out-of-circuit decision finding (g)(3) has the same (presumed but unproven) historical pedigree as (g)(1)'s prohibition on felons and likewise withstands constitutional challenge. G.Br.18 (citing *United States v. Yancey*, 621 F.3d 681, 683 (7th Cir. 2010)). *Yancey* does not survive *Bruen* as it skipped over the historical inquiry. It acknowledged (g)(3)'s recent vintage, 1968, and proceeded directly to means-ends balancing. *See also* Br.30-33 (also explaining how *Yancey* and other out-of-circuit authority conflict with Third Circuit precedent).

era statutes disarming unvirtuous people were widespread.[6] It has not identified a single founding period regulation, let alone widespread regulations, disarming people based on "virtue" or shown that § 922(g)(3) is relevantly similar to such regulations.[7] Even assuming virtue is the proper metric, therefore, the government cannot, under *Bruen*, justify § 922(g)(3) on virtuousness grounds.

In any event, the government's focus on virtue is misplaced, as the founding generation did not view virtuousness as a limit on the right to keep and bear arms. To the extent this Court has concluded that the right to bear arms was tied to the concept of a virtuous citizenry, *but see Folajtar*, 980 F.3d at 913, 915 (Bibas, dissenting) (explaining it was the *Binderup* plurality that espoused the virtue theory); *Boyd*, 999 F.3d at 185-86 (discussing historical limitations tied to dangerousness without referencing virtue), *Bruen* demands this Court revisit such conclusion. *Bruen*, 142 S. Ct. at 2126-28 ("the government must affirmatively prove that its firearms regulation" is consistent with the historical tradition of

---

[6] Regardless, there is no reason to count adult recreational marijuana users among the unvirtuous. *See* Br.18-20 (discussing widespread support for movement to decriminalize adult marijuana use).

[7] The government cites a single case invalidating a 1919 North Carolina law prohibiting the carrying of concealed weapons outside the home while acknowledging as reasonable regulations on carrying "in a manner calculated to inspire terror." *State v. Kerner*, 181 N.C. 574 (1921). Gov't Br.15.

firearms regulation by pointing to analogous regulations that preceded and immediately followed ratification).

As Judge Bibas explains in his *Folajtar* dissent, the virtue theory of disarmament "is not supported by history." *Folajtar*, 980 F.3d at 915; *see also Binderup v. Att'y Gen.*, 836 F.3d 336, 371-73 (3d Cir. 2016) (Hardiman, concurring) ("We have found no historical evidence" "indicating that 'virtuousness' was a limitation on one's qualification for the right—contemporary insistence to the contrary falls somewhere between guesswork and *ipse dixit*."). It derives from the *Binderup* plurality, which itself relied on "academic sources" and out-of-circuit decisions lacking any historical foundation. *Folajtar,* 980 F.3d at 915-20 (Bibas, dissenting). "The focus on virtue rests on strained readings of colonial laws and ratifying conventions perpetuated by scholars and courts' citing one another's faulty analyses. The only piece of historical evidence that comes close to endorsing a ban of all former felons is a Pennsylvania *minority* proposal that was rejected. None of this proves that the Founders limited the Second Amendment right to virtuous citizens…." *Id*. (explaining that although a *minority* of the Pennsylvania ratifying convention proposed to guarantee the right of arms "unless for crimes committed," the minority "failed to persuade its own state, let alone others"; a "single failed proposal is too dim a candle to illuminate the Second Amendment's scope."). *See also* Carlton F.W. Larson, *Four Exceptions in Search*

*of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings

L.J. 1371, 1375 (2009) (the strongest support offered for felon-dispossession is the

minority report by Pennsylvania Anti-Federalists, "opponents of the Constitution,

and its text is not reflected in the Second Amendment").

Drawing on then-Judge Barrett's *Kanter* dissent and Judge Hardiman's

*Binderup* concurrence, Judge Bibas marshaled historical evidence showing that

English and early American restrictions on firearm possession were tied to

dangerousness, "not some vague notion of 'virtue.'" *Id*., 914-20. *See* Br.10-13

(summarizing). The few colonial and early American regulations cited as support

disarm (at least temporarily) those who refused to swear a loyalty oath (while at

times exempting weapons for defense of house and self). *See Kanter*, 919 F.3d at

457-58 (Barrett, dissenting). People loyal to another sovereign were disarmed

because they posed a danger to the government in power. In short, dangerousness

throughout English and early American history was tied to disloyalty, *e.g.*, those

sympathetic to the Crown during the Revolution. *Folajtar*, 980 F.3d at 913 (Bibas,

dissenting); *ibid*, 914-15. *See Kanter*, 919 F.3d at 455-56 (Barrett, dissenting). *See

also* Joseph G.S. Greenlee, *The Historical Justification For Prohibiting Dangerous

Persons From Possessing Arms*, 20 Wyo. L. Rev. 249, 263-65 (2020). Section

922(g)(3)'s burden on drug users is not "comparably justified" and thus not

"relevantly similar to those regulations. *See Bruen,* 142 S. Ct. at 2133.

The government takes the position that if there is a tradition of disarming the dangerous, that tradition included those who pose a threat to public safety. Gov't Br.21-22. Again, the government does not satisfy its burden to show that in the founding era statutes disarming those posing a threat to public safety were widespread. But even assuming for sake of argument that "dangerousness" sweeps in persons who commit non-political acts of violence, users of intoxicants don't fall within that category.

Although the government asserts that users of controlled substances pose a threat to public safety, it fails to support that assertion. It instead speculates users are "lawless" and might misuse firearms, G.Br.19, and posits a correlation (not causal connection) between drug use and crime, G.Br.27-28, which correlation Mr. Harris has already addressed, *see* Br.22-29; *see also United States v. Carter*, 750 F.3d 462, 469 (4th Cir. 2014) (in conducting the now-repudiated means-ends scrutiny, the Court explained that the government was not required to prove a causal link between drug use and violence). The government asserts that Mr. Harris significantly misrepresented the Harrison study's conclusions regarding drug use and crime. G.Br.27. To the contrary, the Harrison study does not find that drug use causes crime. Appx94. It posits a correlation between drug (including alcohol) use, age, race, and education and violent crime, which correlation supports a general deviance theory. And it cites a contemporaneous study linking violence

18

to drug *trafficking.* Harrison, 424, 439, 441. *See also* Wei 170, 178-80 (concluding the association between frequent marijuana use and violence [including a ***single*** act of violence] [is] spurious" as "the majority of marijuana users do not engage in violence"; "frequent marijuana use and violence co-occur because they share common risk factors (e.g., race/ethnicity, hard drug use)," supporting general deviance theory).

The government's discussion of the potential danger arising from carrying a firearm while impaired is inapposite as § 922(g)(3) does not require the actual possession of a firearm while under the influence. *See* G.Br.14-16,21-26. Rather, the challenged regulation prohibits "unlawful users" of any controlled substance from possessing firearms even in the home for self-defense and does not require users be under the influence of a controlled substance or in actual possession of a firearm. *See United States v. Augustin*, 376 F.3d 135, 139 (3d Cir. 2004) (explaining (g)(3) does not forbid possession of a firearm *while* unlawfully using a controlled substance).

A final word. This debate about whether drug users are dangerous in a way that would have justified disarming them in 1791 feels a lot like the "judge-empowering interest-balancing inquiry" that *Bruen* expressly disavowed. *Bruen*, 142 S. Ct. at 2129. After explaining its metrics for "relevantly similar," *Bruen* cautioned, "[t]his does not mean that courts may engage in independent means-end

scrutiny under the guise of an analogical inquiry." *Id.*, 2133 n.7. But that's what's happening here. When the government defines "dangerousness" at a high level of generality, as it does here, it's attempting to embroil courts in exactly the kind of means-ends balancing *Bruen* rejected. That approach cannot be right.

In sum, the government fails to identify a Colonial era tradition of prohibiting users of intoxicants from possessing firearms. Further, section 922(g)(3)'s broad prohibition is not relevantly similar to purported historical laws as those statutes, in addition to being of comparatively recent vintage and not widespread, do not impose "comparable" burdens and are not comparably justified. Section 922(g)(3) does not pass Constitutional muster.

### D.    Section 922(g)(3) is unconstitutional as applied to Erik Harris, an adult recreational user of marijuana.

Even if § 922(g)(3)'s prohibition on firearm possession by unlawful users of any controlled substance is constitutional on its face, it is unconstitutional as applied to Erik Harris, an adult recreational user of marijuana. *See* Br.18-20 (arguing the movement to decriminalize adult marijuana use would not enjoy such broad support were marijuana tied to dangerousness). *See also* Br.26-29 (discussing empirical evidence showing marijuana users are not prone to violence and that cannabis users experience reduced levels of aggression).

**II.    Section 922(g)(3)'s prohibition on gun possession by "unlawful user[s] of or addict[s] to any controlled substance" is unconstitutionally vague.**

Section 922(g)(3) disarms anyone "who is an unlawful user of or addicted to any controlled substance." The statute neither defines "unlawful user" nor gives notice of the temporal nexus between drug use and gun possession. Mr. Harris maintains the statute is unconstitutionally vague on its face, and as-applied, because it fails to properly notify ordinary people of what conduct constitutes a violation. *See generally Weissman v. United States*, 373 F.2d 799, 802-03 (9th Cir. 1967) (construing statute prohibiting unregistered entry or exit into the United States by any citizen "who is addicted to or ***uses narcotic drugs***" and holding that the phrase "user of narcotic drugs" is unconstitutionally vague: the phrase "has no definite meaning, either technically or at common law," has no temporal restrictions, and fails to inform ordinary people what conduct will render them liable). The statute also invites arbitrary or discriminatory enforcement and undermines the separation of powers by handing responsibility for defining crimes to police, prosecutors, and judges. *See United States v. Davis*, 139 S. Ct. 2319, 2325 (2019). *See also Weisman*, 373 F.2d at 803 ("To thus elaborate upon the scanty words of the statute would be the most inexcusable kind of judicial legislation.").

The government initially responds that the facial challenge is barred.

Facial challenges to criminal statutes are not categorically prohibited. The Supreme Court in *Johnson v. United States* explained that a statute may be unconstitutionally vague on its face even if it is not vague in all its applications. 576 U.S. 591, 602 (2015) ("although statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp."). Following *Johnson*, a criminal defendant no longer must show that a statute is unconstitutional as applied to every possible set of facts to succeed on a facial vagueness challenge. *See Johnson*, 576 U.S. at 624-25, 636-37 (Alito, dissenting) (recognizing that the majority's expansion of the vagueness doctrine had upended the "well-established rule" that vagueness challenges to statutes which do not involve the First Amendment must be examined on an as-applied basis). *See also Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (considering facial challenge without requiring as-applied challenge). *See* Br.37-42.

The government relies on out-of-circuit decisions limiting *Johnson's* reach to statutes requiring application of the categorical approach. G.Br.31,37-38. A district court recently considered and flatly rejected that argument concluding, "[n]othing in *Johnson*—or the subsequently decided opinions in *Davis* or *Dimaya*—purported to limit *Johnson's* holding to only statutes that require a

'categorical approach.'" *United States v. Morales-Lopez*, 2022 WL 2355920, \*2-\*7 (D.Utah, June 30, 2022). The lone case cited by the government for the proposition that the Supreme Court after *Johnson* continues to disallow facial challenges unless a petitioner shows the statute is vague as applied to his case says nothing of the sort. G.Br.38 (citing *Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144 (2017)). The petitioners there presented an as-applied challenge and disclaimed a facial challenge. *Id*., 1149.

The government next argues that § 922(g)(3) is not vague because *courts* have identified an ascertainable "core" of conduct (g)(3) prohibits, notwithstanding the possible existence of marginal cases. G.Br.40-42. The question is not whether courts can fashion workable definitions in a particular case; it's whether ordinary people can understand how to avoid breaking the law. *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Regardless, that some conduct might be clearly prohibited by a statute does not render that statute constitutional. As set forth, under *Johnson*, a statute need not be vague in all its applications to be facially vague. *See Dimaya*, 138 S. Ct. at 1214 n.3 (rejecting Justice Thomas' view that § 16(b)'s residual clause was not vague as applied because respondent's conviction fell comfortably within its scope and explaining that *Johnson* had already "anticipated and rejected" that position: "*Johnson* made clear that our decisions 'squarely contradict the theory that a vague provision is constitutional merely

because there is some conduct that clearly falls within the provision's grasp.'"). *See Morales-Lopez*, 2022 WL 2355920, *11.

Mr. Harris urges this Court to follow *Morales-Lopez'* well-reasoned opinion holding, "[Section] 922(g)(3) is unconstitutionally vague both because it fails to give ordinary people fair notice of what conduct it prohibits and because it invites courts, rather than the legislature, to decide what constitutes a crime." *Morales-Lopez*, 2022 WL 2355920, *8. Judge Parrish explained that the statute fails to give notice of the conduct it prohibits by failing to define both "user" and the requisite temporal proximity. *Id.*, *8-*9. Applying various canons of construction, the court explained that "unlawful user" must cover something more than single use but something less than the distinct alternate category "addict." *Morales-Lopez*, 2022 WL 2355920, *8, *11. The statute provides no further guidance for defining covered conduct within that "chasm." *Id.*, *8. Resort to dictionary definitions is futile as "user" connotes neither regular nor irregular use, "rendering it impossible for ordinary persons to understand when the statute might apply to their level of drug use." *Id.* (explaining if the government were correct that the word "user" connotes "regular use" "then the term 'irregular user' would be a paradox[.] One may be described in plain English as an 'irregular user.' Likewise, it would not be necessary to use the term 'regular user' if 'user' captured the idea of regular use, yet it is perfectly normal to refer to someone as a 'regular user.'"). And "[b]ecause

the term 'user' does not connote regular and ongoing use," the ordinary person cannot know at what point he may lawfully possess a firearm after using a controlled substance. *Id*., *9. In sum, the statute provides "no guidance regarding what frequency of use qualifies a person as a 'user,' what temporal proximity to use qualifies one as a 'user,' nor what period of sobriety renders a person no longer a 'user.'" *Id*., *11.

The government relies on *United States v. Augustine*, wherein this Court held that the government must prove the accused "engaged in regular use over a period of time proximate to or contemporaneous with the possession of the firearm." 376 F.3d 135 (3d Cir. 2004). As set forth, Br.45-47, subjective adjectives like "regular" and "contemporaneous" that are not statutorily defined only add to the confusion.

*Morales-Lopez* criticized various circuit decisions affirming (g)(3) convictions as applying an "I know it when I see it" approach. *Id*., 2022 WL 2355920, *9. "Rather than insisting that the legislature enunciate a clear standard to which an ordinary person can conform her behavior, these courts determine *ex post* that the defendant's behavior violated the statute." *Id*. *See* Br.18. And it criticized judicial efforts to add narrowing elements to the statute as implicating separation-of-powers principles. *Id*., *10.

As set forth more fully in the opening brief, § 922(g)(3)'s prohibition on gun possession by unlawful drug users is void for vagueness.

Although this Court need not reach the as-applied challenge given the facial unconstitutionality of the statute, the statute is also vague as applied to Mr. Harris' conduct. Br.49-51.

**III.    The undisputed facts of this case do not constitute a violation of §
922(a)(6).**

Should this Court determine that § 922(g)(3)'s prohibition on firearm

possession by unlawful users violates the Second Amendment or is

unconstitutionally vague, then his convictions for being an unlawful user in

possession of a firearm cannot stand. And if Mr. Harris cannot constitutionally be

adjudged an "unlawful user," he could not have made a knowing false statement

regarding his status as an "unlawful user" in connection with his acquisition of the

firearms. *See* 18 U.S.C. § 922(a)(6). Thus, the § 922(a)(6) convictions must

necessarily be vacated as part of the remedy at Issue I or II, making independent

consideration of Issue III unnecessary.

Section 922(a)(6) makes it unlawful for any person knowingly to make a

false statement in connection with the purchase of a firearm. Here, the indictment

alleges that the "essential facts" of the offense involved the "knowing" making of a

false statement, that is, on the date of purchase Mr. Harris checked "no" to the

form question, are you an "unlawful user" of a controlled substance. Appx28-30.

Presenting a question of statutory interpretation, Mr. Harris argued that because the

undefined term "unlawful user" is unconstitutionally vague and reasonably

susceptible to different meanings (as his police interview illustrates), his answer on

the form cannot have been knowingly false.

Mr. Harris has consistently maintained that the agreed-upon facts are insufficient to satisfy the elements of § 922(a)(6), in other words, that the indictment is facially insufficient. *See* Br.2,52 (explaining where issue preserved). *See also United States v. Stock*, 728 F.3d 287, 293 (3d Cir. 2013) (explaining that the sufficiency of an indictment may be challenged on the ground that the specific facts alleged fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation) (quoting *United States v. McGeehan*, 584 F.3d 560, 565 (3d Cir. 2009)). That is, as a matter of law, Mr. Harris cannot have made a *knowing* false statement regarding his status as an unlawful user if the law does not make clear how and when someone becomes an unlawful user.

The government correctly observes that undersigned counsel mistakenly labeled this claim in the opening brief one of factual insufficiency.[8] To be clear, Mr. Harris did not preserve in the district court, and does not argue here, that if § 922(g)(3) is deemed constitutionally valid, this Court should nevertheless vacate the (a)(6) counts based on factual insufficiency. To the contrary, the (a)(6)

---

[8] This Court has declined to find waiver where an issue was argued in the briefs but mislabeled. *United States v. Negroni*, 638 F.3d 434, 445 & n.9 (3d Cir. 2011) (where the government in its statement of issues and argument mislabeled its challenge as contesting the substantive reasonableness of the sentence but the argument included challenges to procedural reasonableness, this Court declined to deem waived any challenge to procedural reasonableness). Regardless, any question of waiver is irrelevant because, as explained, if § 922(g)(3) is unconstitutional, the remedy necessarily includes vacating the § 922(a)(6) convictions that were a direct consequence of the purported (g)(3) violation.

convictions will only be vacated if § 922(g)(3) is found to be unconstitutional—as part of the remedy required by such a determination.

In sum, if this Court agrees that the term "unlawful user" is unconstitutionally vague or that § 922(g)(3)'s prohibition on firearm possession by unlawful users violates the Second Amendment, then it must necessarily vacate the § 922(a)(6) convictions and need not otherwise address the instant challenge to the indictment's facial sufficiency.

## CONCLUSION

The district court's denial of the motion to dismiss indictment must be

reversed and the case remanded.

Respectfully submitted,

*/s/ Renee Pietropaolo*
Renee Pietropaolo
Assistant Federal Public Defender
Counsel for Appellant

Federal Public Defender's Office for the
Western District of Pennsylvania
1001 Liberty Avenue, Suite 1500
Pittsburgh, PA 15222

(412) 644-6565

# CERTIFICATES

**Virus check and identical compliance of briefs**

I, Renee Pietropaolo, Assistant Federal Public Defender, hereby certify that the electronic version of the attached brief was automatically scanned by Symantec Endpoint Protection, version 14.3, and found to contain no known viruses. I further certify that the text in the electronic copy of the brief is identical to the text in the paper copies of the brief filed with the Court.

**Compliance with word count and type-face limitations**

I, Renee Pietropaolo, Assistant Federal Public Defender, hereby certify that this document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii) because it contains 6,469 words, excluding any part of the document exempted by Fed. R. App. P. 32(f). This document also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6)  because it has been prepared in a proportionally spaced typeface using Word 2016 for Windows 10 word count software in font size 14, type style Times New Roman.

*/s/ Renee Pietropaolo*
Renee Pietropaolo
Assistant Federal Public Defender

July 22, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2022 I electronically filed the foregoing

Reply Brief for Appellant using the Third Circuit Court of Appeals' Electronic

Case Filing (CM/ECF) system. I also certify that I served copies upon Filing User

Andrew C. Noll, through the appellate CM/ECF system.

*/s/ Renee Pietropaolo*
Renee Pietropaolo
Assistant Federal Public Defender


July 22, 2022