IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 21-3031

UNITED STATES OF AMERICA,
Appellee

v.

ERIK MATTHEW HARRIS,
Appellant

Appeal from a judgment entered
in the United States District Court for the
Western District of Pennsylvania at No. 2:19-cr-00313

SUPPLEMENTAL LETTER BRIEF FOR APPELLANT
ADDRESSING *RANGE v. ATTORNEY GENERAL*

LISA B. FREELAND
Federal Public Defender

RENEE PIETROPAOLO
Assistant Federal Public Defender

Federal Public Defender for the
Western District of Pennsylvania
1001 Liberty Avenue, Suite 1500
Pittsburgh, PA 15222

(412) 644-6565

# TABLE OF AUTHORITIES

**Cases**

*Atkinson v. Garland*,
　70 F.4th 1018 (7th Cir. 2023) ................................................................................ 8

*District of Colombia v. Heller*,
　128 S. Ct. 2783 (2008) ........................................................................ 1, 2, 4, 5, 6, 7

*Drummond v. Robinson Twp.*,
　9 F.4th 217 (3d Cir. 2021) ................................................................................. 2, 3

*Folajtar v. Att'y Gen'l*,
　980 F.3d 897 (3d Cir. 2020) .............................................................................. 10

*New York Rifle & Pistol Ass'n, Inc. v. Bruen*,
　142 S. Ct. 2111 (2022) ................................................................................ passim

*Parman v. Lemmon*,
　244 P. 232 (Kan. 1926) ........................................................................................ 7

*Range v. Att'y Gen.*,
　69 F.4th 96 (3d Cir. 2023) (en banc) ......................................................... passim

*United States v. Bullock*,
　___ F.Supp.3d. ___, 2023 WL 4232309 (S.D.Miss. 2023) .............................. 2, 5

*United States v. Connelly*,
　___ F.Supp.3d ___, 2023 WL 2806324 (W.D.Tex. 2023) ............................ 6, 7, 9

*United States v. Harrison*,
　___ F.Supp.3d___, 2023 WL 1771138 (W.D.Okla. 2023) ..................... 2, 4, 5, 6, 7

*United States v. Marzzarella*,
　614 F.3d 85 (3d Cir. 2010) ................................................................................. 1

*United States v. Prince*,
　___F.Supp.3d___, 2022 WL 6968457 (S.D.W.Va. 2022) .................................. 4

**Statutes**

18 U.S.C. § 922(g)(1) ................................................................................... 2, 4, 8

18 U.S.C. § 922(g)(3) ...................................................................................*passim*

18 U.S.C. § 922(k) ................................................................................................ 4

18 U.S.C. § 3142(b) ............................................................................................. 9

21 U.S.C. § 844 ................................................................................................... 9

**Other**

Act XII, in 1 William Waller Hening, The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature in the Year 1619, at 401-02 (1823) ................................................................................................... 6

An Act to Prevent the Firing of Guns, Pistols, Squibs and other Fire Works at the Times and Places Therein Mentioned Within this Colony, in 5 The Colonial Laws of New York from the Year 1664 to the Revolution 244 (1894) ................................ 6

2 General Statutes of the State of Kansas 353 (1897) ........................................ 7

W.J. Roraaugh, The Alcoholic Republic: An American Tradition 10 (1979), *available at* https://www.google.com/books/edition/The_Alcoholic_Republic/2AUH0vchHRIC?hl=en&gbpv=1 ................................................................................ 4

# ARGUMENT

The Second Amendment's plain text covers Erik Harris's conduct (possessing a handgun) and therefore presumptively protects him. *New York Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2126 (2022); *Range v. Att'y Gen.*, 69 F.4th 96, 103 (3d Cir. 2023) (*en banc*). Under *Bruen*, the government bears the burden of establishing 18 U.S.C. § 922(g)(3)'s ban on the possession of firearms by recreational users of marijuana "is consistent with the Nation's historical tradition of firearms regulation." *Bruen*, 142 S.Ct. at 2130. *Range* holds that the government cannot satisfy its burden by broadly analogizing to historical regulations disarming distrusted groups; a precise historical analogue is required. Here, the government has not identified any, let alone a robust tradition of, founding era regulations stripping persons of the right to possess firearms solely because they use intoxicants. *See United States v. Marzzarella*, 614 F.3d 85, 93 (3d Cir.2010) (observing "no restrictions on possession by substance abusers existed at the time of ratification"). Indeed, the government conceded "no similar prohibition" and "no restriction on substance abusers" "existed at the time of ratification," and acknowledged "[t]he absence of a direct analogue at the founding." Response Brief ("G.Br.") 17-18 & n.5. Applying the methodology of *Bruen* and *Range*, and given these admissions, the convictions must be vacated; remand is not required.

***Range* holds that the Second Amendment protects all Americans.**

This Court in *Range* held that "'the people' as used throughout the Constitution 'unambiguously refers to all members of the political community, not an unspecified subset.' [] So the Second Amendment right [] presumptively 'belongs to all Americans.'" *Range*, 69 F.4th at 101-03 (quoting *District of Colombia v. Heller*, 128 S.Ct. 2783, 2791 (2008) ("the people" is a term of art referring to all members of the "national community")). And it explicitly rejected the government's position "that only 'law-abiding, responsible citizens' are counted among 'the people' protected by the Second Amendment." *Id.*, 102 (criticizing "law-abiding, responsible" as "hopelessly vague" standard); *ibid*, 109-10 (Ambro, concurring) (Range "is among 'the people'"); 138 (Roth, dissenting) (same). Thus, this Court has conclusively rejected the government's principal argument here, that Mr. Harris's recreational marijuana use makes him not law-abiding and thus not among "the people" protected by the Second Amendment. *See* Gov't Letter filed July 7, 2022 ("Doc.42") 1-2; G.Br.14.

***Range* holds that the government cannot satisfy its burden of establishing a historical tradition by broadly analogizing the challenged regulation to laws purportedly disarming those deemed untrustworthy.**

The Second Amendment's plain text covers Erik Harris's conduct (possessing a handgun), and therefore presumptively protects him. *Bruen*, 142 S. Ct. at 2126; *Range*, 69 F.4th at 103. To rebut the presumption of unconstitutionality, the government

must demonstrate that the challenged regulation "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2130.

*Range* recognizes that the nature of the government's burden varies depending on whether the problem a statute is designed to address is old or new. *See Range*, 69 F.4th at 103. When "a challenged regulation addresses a general societal problem that has persisted since the 18th century," the government must identify a robust tradition of "distinctly similar" founding-era regulations. *Bruen,* 142 S.Ct. at 2131. When considering regulations "that were unimaginable at the founding" implicating "unprecedented societal concerns," courts ask whether the modern regulation is "relevantly similar" to a historical analogue. *Id.*, 2132; *Range*, 69 F.4th at 103. *Range* does not explicitly say which test it is applying, but it ultimately concluded that § 922(g)(1) is not even "relevantly similar" to those laws disarming certain "distrusted" groups because the connection is too general. *Id.*, 69 F.4th at 105.

More specifically, the *Range* Court rejected the government's attempt to analogize § 922(g)(1)'s ban on felons to purported historical measures disarming "groups they distrusted like Loyalists, Native Americans, Quakers, Catholics and Blacks" (*i.e.,* those who evinced a "disrespect for the rule of law") as "far too broad[]." *Range*, 69 F.4th at 104-05 (quoting *Bruen*, 142 S.Ct. at 2134). *See generally United States v. Harrison*, __ F.Supp.3d __, 2023 WL 1771138, *19 n.134 (W.D.Okla.2023), *appeal filed*, 23-6028 (summarizing the government's faulty methodology as follows: "Take a historical example that applied to a distinct class of persons (*e.g.*, dangerous lunatics), extract from it a broad principle (*e.g.*, concerns about people "lacking self-control"), and then fit into that broad category whole new classes of people (*e.g.*, marijuana users), even if they aren't remotely the sort of persons that were historically regulated."). As Judge Krause explained, the majority's test for what constitutes an adequate historical analogue commits this Court to require a precise historical analogue to justify a contemporary regulation restricting the right of armed self-defense. *Id.*, 118 & 129-30 (Krause, dissenting).

The government here, as it did in *Range*, posits that there's a historical tradition of disarming the "unvirtuous" and that such regulations serve as the appropriate analogue to justify (g)(3). Doc.42, 2. *Range* makes plain that to rebut the presumption of unconstitutionality the government cannot operate at that high level of generality. *See United States v. Bullock*, __ F.Supp.3d. __, 2023 WL 4232309, *2 (S.D.Miss.2023) (the *Bruen* standard (as applied in *Range*) "is the law of the land" and "must be enforced.").

Indeed, *Range* followed the approach *Bruen* modeled.[1] While acknowledging that the right to keep and bear arms in public has traditionally been subject to

---

[1] *Range's* test is also consistent with this Court's earlier opinion in *Drummond*, which was cited with approval in *Bruen*, 142 S.Ct. at 2133. There this Court explained that "[t]he key to implementing *Heller* is deciding how closely a contemporary rule

2

certain "well-defined restrictions," *Bruen* rejected New York's argument that its collection of discrete historical regulations amounted to a tradition of broadly prohibiting public carry, or of conditioning it on a special need for self-defense. 142 S.Ct. at 2156. More specifically, the Court read each of the proffered laws narrowly and refused to treat them as more than the sum of their parts: the Statute of Northampton regulated public carry only to the extent that someone was "bearing arms in a way that spread[] 'fear' or 'terror' among the people"; antebellum courts upheld public concealed-carry bans only insofar as "they did not similarly prohibit *open* carry"; and surety statutes "presumed" individuals had a general right to public carry that could be burdened only in limited circumstances. *Id.*, 2145-48. New York's cited laws suggested the constitutionality of certain narrow, "well-defined" public-carry restrictions: those that limited "the intent for which one could carry arms" (to terrorize), "the manner of carry" (concealed vs. open), and "the exceptional circumstances under which one could not carry arms" (if a surety statute applied). *Id.*, 2138. But that's all—these disparate regulations of discrete forms of public carry did not add up to a legislative power to "broadly" regulate public carry in whatever way a legislature saw fit. *Id.* From the fact that founding-era laws prohibited "particular mode[s]" of public carry, the Court declined to conclude that legislatures may enact a "*general* prohibition" on *all* modes of public carry or may "ban public carry altogether." *Id.*, 2146-47 & n.19 (emphasis altered).

Thus, *Range* (applying *Bruen's* methodology) requires a precise historical analogue to justify § 922(g)(3)'s sweeping restrictions on the right of armed self-defense.[2]

---

must resemble its traditional counterparts" and acknowledged that the Supreme Court's history and tradition test requires that restrictions on the Second Amendment be "'well-defined and narrowly limited.'" *Drummond v. Robinson Twp.*, 9 F.4th 217, 228 n.11, 226-27 (3d Cir.2021) (Krause) (explaining "each challenged rule triggers an inquiry into a distinct "*type* of regulation"; to justify a challenged regulation restricting rifle practice to rim-fire rifles, the Court required historical analogues barring training with common weapons in areas where firearms practice was otherwise permitted, and to justify a challenged regulation requiring non-profit ownership of gun club, the Court required historical analogues prohibiting commercial operation of gun ranges in areas where they were otherwise allowed).

[2] The opinions of Judges Krause and Shwartz recognize the breadth of *Range's* holding. *Range's* test for what constitutes an adequate historical analogue commits this Court to require a precise historical analogue to justify a contemporary regulation restricting the right of armed self-defense and, if the government fails to identify a precise historical tradition, the regulation cannot stand. *Range*, 69 F.4th at 118 & 129-

3

**Section 922(g)(3)'s sweeping ban on possession of firearms even in the home for self-defense based on the use of intoxicants lacks any "well-established and representative historical analogue" from the founding era and is unconstitutional.**

Section 922(g)(3) addresses a societal problem that was not "unimaginable at the founding"—possession of firearms by users of intoxicants—, and it does so through a regulation—a total prohibition on the possession of firearms by users of intoxicants even in the home for self-defense and even when not under the influence of intoxicants—that is not analogous to any founding era restriction. *See* Reply Br.7-19. The government's failure to identify a single historical law that is "distinctly similar" to § 922(g)(3) is dispositive under *Bruen*. *Bruen*, 142 S.Ct. 2131, 2156; *Harrison*, 2023 WL 1771138, *6.

The government has conceded "no similar prohibition" and "no restriction on substance abusers" "existed at the time of ratification," G.Br.17, 18 n.5, and acknowledged "[t]he absence of a direct analogue [to § 922(g)(3)] at the founding." *Id.* It blames the absence of founding era regulations on its view that the problem of possession of firearms by users of intoxicants was unimaginable at the founding because drugs were not widely used as intoxicants at the founding. G.Br.17.

The government's characterization of gun possession by users of intoxicants as an "unprecedented societal concern" or a problem "unimaginable at the founding," cannot be squared with history or *Bruen*. The laws challenged in *Heller* (banning handgun possession in the home) and *Bruen* (New York's proper-cause requirement) were aimed at a problem—"handgun violence, primarily in urban areas"—that existed at the founding, and the Court therefore required a tight fit between those laws and historical precursors. *Bruen*, 142 S.Ct. at 2131. *See also United States v. Prince*, ___ F.Supp.3d ___, 2022 WL 6968457 (S.D.W.Va.2022) (explaining 18 U.S.C. § 922(k)'s restriction on firearms with obliterated serial numbers addresses the longstanding societal problem of "crime").

So too here. Controlled substance scheduling is a modern conception, but intoxicants are not new. *See* W.J. Roraaugh, *The Alcoholic Republic: An American Tradition*

---

30 (Krause, dissenting) (under the majority's test "*any* difference between a historical law and contemporary regulation defeats an otherwise-compelling analogy"); *id.*, 113, 116 & n.5 (Shwartz, dissenting) ("While my colleagues state that their opinion is narrow, the analytical framework they have applied…renders most, if not all, felon bans unconstitutional."). Judge Ambro's concurrence takes the view that *Range* was a narrow opinion and that historical regulations disarming religious dissenters and loyalists can serve as appropriate analogues for § 922(g)(1). Of the nine judges signing onto Judge Hardiman's majority opinion, only Judge Greenaway joined this concurrence, meaning eight judges in the majority rejected that view.

10 (1979)[3] (discussing high rates of alcohol consumption from colonial period to the early 19th century and the Founding Fathers' fear that the republic would be destroyed "in a flood of alcohol"). *See also* Appellant's Opening Brief ("Br.") 14-18; Reply Br.8-9. Consequently, regulations addressing possession of firearms by users of intoxicants were not "unimaginable at the founding," as the panel's identification of the two colonial-era regulations discussed *infra* makes plain. *See Harrison*, 2023 WL 1771138, *8 ("the societal problem addressed by § 922(g)(3), possession of firearms by users of substances with the potential for abuse,[] is not new.").

Whether the problem of gun possession by users of intoxicants is old or new, the result is the same: the government has failed to provide a robust tradition of founding era regulations that are "distinctly" or "relevantly" similar to § 922(g)(3). There is no historical law stripping people of their Second Amendment right to possess firearms in self-defense merely because they use (or have used) an intoxicating substance. The statute is unconstitutional as applied to Mr. Harris and on its face.

1.  The government primarily argues that § 922(g)(3) is analogous to laws prohibiting possession by felons and the mentally ill, and from there relies on *Heller's* assurances that "longstanding prohibitions on the possession of firearms by felons" are presumptively lawful. G.Br.11-12,18 (arguing that § 922(g)(3) and (g)(1) share the same (presumed but unproven) historical pedigree such that (g)(3) is likewise presumptively lawful). S*ee* Br.31 (explaining that analogizing to felons is particularly inapt as in Pennsylvania possession of a small amount of marijuana for personal use is a misdemeanor punishable by a maximum of 30 days).

*Range* dismissed as *dicta Heller's* assurances about "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Range*, 69 F.4th at 101. *Accord Bullock*, 2023 WL 4232309, *18. Applying *Range*, the government cannot rely on *Heller's* assurances about presumptively lawful "longstanding prohibitions" to carry its burden. *Range*, 69 F.4th at 103-04 ("we are confident that a law passed in 1961—some 170 years after the Second Amendment's ratification…—falls well short of 'longstanding'…"). *See* Br.15 (detailing § 922(g)(3)'s more belated enactment history).

2.  The Panel directed the parties to two colonial era and one 19th century regulation. These regulations materially differ from § 922(g)(3)'s application to Mr. Harris in that they do not impose a comparable burden on the right of armed self-defense and are not comparably justified. Further, if considered, these regulations are not enough to satisfy the government's significant burden to identify a "well-established and representative historical analogue." *Bruen*, 142 S.Ct. at 2131, 2133 ("we doubt that *three* colonial regulations could suffice to show a tradition"). *See* Reply Br.9-13 (explaining this and other 19th- and 20th-century intoxicated-carry regulations

---

[3] https://www.google.com/books/edition/The_Alcoholic_Republic/2AUH0vchHRIC?hl=en&gbpv=1

5

"come too late," impose materially different and narrower restrictions, and are insufficient to amount to a "well-established and representative historical analogue").

First, the laws identified impose a narrower burden than that imposed by § 922(g)(3), leaving ample room for the exercise of the right to armed self-defense.

For example, the 1655 Virginia law prohibited "shooting" "at drinking" though not at funerals or weddings. Act XII, in 1 William Waller Hening, The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature in the Year 1619, at 401-02 (1823). According to the *Harrison* Court, "[l]ittle is known about the 1655" law but shooting "at drinking" is believed to refer to social activity. 2023 WL 1771138, *7 n.37. The regulation did not prohibit Virginia colonists from possessing arms, even those who used intoxicants or were intoxicated. And it didn't prohibit all shooting "at drinking"; it simply restricted the practice to weddings and funerals.

The Virginia statute was also not comparably justified as it had nothing to do with avoiding dangers associated with intoxication or any purported danger posed by a person who had been intoxicated at some point in time. *Harrison*, 2023 WL 1771138, *8. Rather, Colonists feared that the "frequent shooting of guns in drinking" would inhibit their ability to defend against Indian attacks by drowning out warning shots and by wasting gun powder. 1655 Va.Laws at 401.

The New York law, enacted in 1771 and expiring in 1773, levied a fine of 20 shillings on anyone who "fire[d] or discharge[d] any Gun…in any House Barn or other Buildifg or before any Door or in any Garden, Street, Lane or other Inclosrue on" "the eve of the last Day of December, and on the first and second Days of January." An Act to Prevent the Firing of Guns, Pistols, Squibs and other Fire Works at the Times and Places Therein Mentioned Within this Colony, in 5 The Colonial Laws of New York from the Year 1664 to the Revolution 244 (1894). Importantly, the regulation did not restrict the ability of users of intoxicants or the intoxicated to use firearms; it applied to "any" person of any age. *Id.* Nor did it restrict firearm *possession. Harrison*, 2023 WL 1771138, *9 & n.47. The New York law thus left room for the exercise of the right to armed self-defense in the home and even during the holiday without regard for the use of intoxicants. *United States v. Connelly*, ___ F.Supp.3d ___, 2023 WL 2806324, *7 (W.D.Tex.2023), *appeal filed*, No 23-50313. "It is inconceivable that this law would have been enforced against a person exercising his right to self-defense on New Year's Day…." *Heller*, 128 S.Ct. at 2820. In short, the New York law is simply not analogous to § 922(g)(3). *Harrison*, 2023 WL 1771138, *9. If analogous, "it is difficult to see how this law could indicate any sort of 'well-established,' constitutionally relevant tradition of regulation": The law was in effect for only two years, applied to a limited area in two counties, and restricted the discharge of firearms for only three days a year. *Id.*; *Connelly*, 2023 WL 2806324, *8.

In addition, the aim of this law was to prevent the "great Damages…frequently done on [those days] by persons going House to House, with Guns and other Fire

6

Arms and being often intoxicated with Liquor." *Heller*, 128 S.Ct. at 2820. To a degree "this law focuses on maintaining public order and preventing firearm-related injuries….But [it] addressed the *specific* dangers posed by New Year's Eve partygoers in certain parts of the []colony, rather than the *general* dangers posed by armed [users and addicts] across the country." *Connelly*, 2023 WL 2806324, *7. "The New York law thus bears a closer similarity to restrictions on the use of firearms 'in sensitive places' than it does to categorical restrictions on firearm possession by classes of people." *Id.*

Finally, the Panel cites a Kansas Reconstruction era law, prohibiting any person "under the influence of intoxicating drink" from carrying on his person "a pistol, bowie-knife, dirk, or other deadly weapon." 2 General Statutes of the State of Kansas 353 (1897). The Kansas Supreme Court, interpreting a substantially similar provision, held that "deadly weapon" did not include shotguns. *Parman v. Lemmon*, 244 P. 232, 233 (Kan.1926). Thus, in addition to "com[ing] too late," *Bruen*, 142 S.Ct. at 2137, the Kansas law does not evince a comparable burden on the right to armed self-defense: The regulation prohibited *carrying* certain guns (pistols) *while intoxicated*. It did not prohibit possession at all, and it did not apply to long guns. *See also* Reply Br.9-13.

In sum, the smattering of historical laws are not relevantly similar to § 922(g)(3) in how and why they regulate firearms. Where the foregoing regulations "took a scalpel to the right of armed self-defense—narrowly carving out exceptions but leaving most of the right in place—§ 922(g)(3) takes a sledgehammer to the right." *Harrison*, 2023 WL 1771138, *8.

"Recall that § 922(g)(3) imposes the most severe burden possible: a total prohibition on possessing any firearm, in any place, for any use, in any circumstance—regardless of whether the person is actually intoxicated or under the influence of a controlled substance." *Id.* "It is a complete deprivation of the core right to possess a firearm for self-defense, turning entirely on the fact that an individual is a user of marijuana. Section 922(g)(3)'s burden on the right of armed self-defense is thus not 'comparable' to the historical intoxication laws cited." *Id.*

While § 922(g)(3) is theoretically temporary, the deprivation imposed is significantly greater than the historical intoxication laws because one who stops using could be deprived of his right to armed self-defense for up to a year. *Harrison*, 2023 WL 1771138, *8 n.40 (citing 27 C.F.R. § 478.11 ("[a]n inference of current use may be drawn from evidence" of *e.g.,* "a conviction for use or possession of a controlled substance within the past year" or a positive drug test "administered within the past year"); *Connelly*, 2023 WL 2806324, at *7 (prohibiting those who have used drugs sometime in the last year from possessing firearm in their homes for self-defense is a much more burdensome infringement on the Second Amendment than preventing people from shooting their guns while intoxicated). Moreover, § 922(g)(3) does not temporarily disarm; it's punished as a felony and can result in lifetime forfeiture of Second Amendment rights.

7

**There is no need for remand.**

Application of *Range's* test for what constitutes an adequate historical analogue confirms that remand is unnecessary. All the United States needed to show to obtain a conviction and deprive Mr. Harris of his right to armed self-defense was that he is a user of marijuana. *See* Br.7. The government has acknowledged that "no similar provision" to § 922(g)(3), disarming persons solely because they use intoxicants, existed at the time of ratification. G.Br.17-18. In *Range,* the majority explained that because the government had not met its burden of identifying a well-established and representative historical analogue from the founding era disarming those with prior convictions, there was no need to decide whether any such historical laws were founded in dangerousness or not. *Range*, 69 F.4th at 104 n.9.[4] So too here. Accordingly, remand for additional record development, including concerning Mr. Harris's personal history and characteristics or the nature of the offense, *see* Br.4-6,18-19, 49-50, is unnecessary.

If this Court were to determine that Mr. Harris's personal history and characteristics are relevant to the Second Amendment argument, contrary to the test in *Bruen* and *Range*, the resulting inquiry would further support Mr. Harris's separate argument that § 922(g)(3) is unconstitutionally vague because it provides no reasonable notice as to when someone who has used a controlled substance at some point may possess a firearm and because it invites arbitrary enforcement. *See* Br.34-51; Reply Br.21-26. *See Range,* 69 F.4th at 118, 129 (Krause, dissenting).[5]

---

[4] The Seventh Circuit in *Atkinson v. Garland*, 70 F.4th 1018 (7th Cir.2023), like this Court in *Range*, was presented with a Second Amendment challenge to § 922(g)(1) in a case where *Bruen* issued while the appeal was pending. The *Range* Court resolved the constitutional challenge in a way that requires the instant convictions be vacated: As explained, *Range* holds that Mr. Harris is among "the people" protected and demands a precise historical analogue to justify a contemporary regulation restricting core Second Amendment protections. By contrast, the Seventh Circuit remanded to allow the district court to apply *Bruen* in the first instance. The *Atkinson* Court criticized the government's briefing as sidestepping *Bruen* and remanded to give the government another chance to satisfy its burden. It's worth noting that the appellant there had requested remand. Appeal No. 22-1557 at Doc. 26.

[5] *Bruen* provides additional support for this argument. The Supreme Court made plain that Second Amendment rights are equally as important as First Amendment rights, 142 S.Ct. at 2127, 2130, 2156, meaning a defendant may complain of the vagueness of the law regardless of whether his conduct falls within the statute's scope and making further consideration of the underlying facts of this case on remand unnecessary.

8

In any event, to the extent further record development is pertinent to a consideration of dangerousness (—as already explained, this is not the appropriate inquiry under *Range's* analytical framework—), the district court has already determined that Mr. Harris did not pose a danger to the public. Following his initial appearance, Mr. Harris was released on an unsecured bond, and at sentencing, bond was continued to permit his self-surrender. *See* ECF14; 18 U.S.C. § 3142(b) (authorizing pretrial release unless *inter alia* it "will endanger the safety of any other person or the community"); *id.*, § 3143(a) (allowing release where the judicial officer finds by clear and convincing evidence the person is not likely to flee or pose a danger to any person or the community). In that regard, it was undisputed that on the dates Mr. Harris purchased the firearms (the conduct underlying the charged offenses, Appx26-31), he had no history of violence and no disqualifying prior convictions, and he was not shown to have been using marijuana. *See generally* Br.14-18,19-20,22-30 (arguing marijuana users are neither dangerous nor unvirtuous).[6]

**An assessment of the strength of analogy between intoxication by alcohol and the effects of frequent marijuana use on antisocial and aggressive behavior would embroil the Court in exactly the kind of means-ends balancing *Bruen* rejected.**

The Panel directed the parties to assess the strength of analogy between intoxication by alcohol and the effects of frequent marijuana use on antisocial

---

[6] In *Connelly*, the district court questioned whether the founding generation would consider homebound drug use or intoxication "unvirtuous." 2023 WL 2806324, *9. The modern generation also likely would not view adult recreational marijuana use as unvirtuous or a threat to the orderly functioning of society: Sixty-eight percent of adults in the U.S. support legalization of marijuana and seventy percent now consider smoking marijuana to be morally acceptable. *See* http://bitly.ws/KX3m. Twenty-one states allow adult recreational marijuana use. http://bitly.ws/KX3u.

The *Connelly* court also disputed that any purported historical tradition of disarming the non-law-abiding would support disarming someone like Mr. Harris for adult recreational marijuana use, if proven. The court observed that "[u]nder federal law, [Harris's] alleged simple marijuana possession would subject [him] to a misdemeanor charge at most. *See* 21 U.S.C. § 844." *Connelly*, 2023 WL 2806324, *9. *See also* 35 P.S. §§ 780-113(a)(31), (g) (possession of a small amount of marijuana for personal use is a misdemeanor punishable by 30 days). Even if Harris had been convicted, "that conviction would be expunged by the blanket presidential pardon of all such marijuana possessions that, like [Harris's], took place before October 6, 2022." *Connelly*, 2023 WL 2806324, *9. *See* Br.6 (instant charges predicated on firearm possession on February 25, March 8, and March 16, 2019).

9

and aggressive behavior. Doc.51 ¶4. Answering this question will inevitably devolve into the "judge-empowering interest-balancing inquiry" *Bruen* expressly disavowed. 142 S.Ct. at 2125-31. *See* Reply Br.19-20.

Before *Bruen*, courts asked whether a regulation that burdens the core of the Second Amendment (possession of arms in self-defense) was narrowly tailored to serve a compelling government interest (strict scrutiny) or reasonably tailored to serve an important interest (intermediate scrutiny). Bound by now-abrogated precedent, Mr. Harris argued that the government failed to meet its burden of showing (g)(3)'s total prohibition on firearm possession by recreational users of marijuana even in the home and without regard for intoxication was sufficiently tailored to serve its interest in public safety. He exposed the flaws in the government's off-point studies and highlighted evidence showing there is no statistically significant correlation between marijuana use and violence. Br.21-30,32-33; *ibid*. 27-28 (summarizing studies concluding that "the relationship between frequent marijuana use and violence…was spurious," that "violent behavior is either decreased or unaffected by marijuana use," and that alcohol and cannabis "have opposite psychopharmacological associations vis-à-vis aggression" with alcohol intoxication increasing and cannabis reducing levels of aggression); Reply Br.18-19.

*Bruen* rejected mean-ends scrutiny. Whether the government believes a certain class of people (marijuana users) pose a greater or lesser threat to public safety is no longer relevant. "Stripping a person's fundamental rights based on projected crimes *untethered from past dangerous actions* is a risky game indeed." *Folajtar v. Att'y Gen'l*, 980 F.3d 897, 923 (3d Cir.2020) (Bibas, dissenting). That is why *Bruen* rejected an "interest-balancing inquiry that 'asks whether the statute burdens a protected interest'" in a way that is out of proportion with the government's interests. *Bruen*, 142 S.Ct. at 2129.

The government's burden is not to show that a regulation is properly tailored to its interest but to show that the challenged regulation is consistent with the nation's historical tradition. It has failed to satisfy its burden; the regulation is facially unconstitutional and unconstitutional as applied to Mr. Harris, an adult recreational user of marijuana who was not using at the time of the charged firearm possession. The district court's denial of the motion to dismiss indictment must be reversed and the case remanded.

Respectfully submitted,
*/s/ Renee Pietropaolo*
Renee Pietropaolo
Assistant Federal Public Defender

## CERTIFICATE OF SERVICE

 I hereby certify that on July 10, 2023, I electronically filed the foregoing Supplemental Letter Brief for Appellant pursuant to the Court's Order dated June 13, 2023, using the Third Circuit Court of Appeals' Electronic Case Filing (CM/ECF) system. I also certify that I served copies upon Filing User Andrew C. Noll, through the appellate CM/ECF system.

           */s/ Renee Pietropaolo*
           Renee Pietropaolo
           Assistant Federal Public Defender

July 10, 2023