

**U.S. Department of Justice**

Criminal Division

*950 Pennsylvania Avenue N.W., Room 1252*
*Washington, DC 20530-0001*
*Tel: (202) 307-1982*

August 7, 2023

The Honorable Patricia S. Dodszuweit, Clerk of Court
United States Court of Appeals for the Third Circuit
21400 U.S. Courthouse
601 Market Street
Philadelphia, PA 19106

      Re:    *United States v. Erik Matthew Harris*, No. 21-3031
             Supplemental Letter Brief for the United States

Dear Ms. Dodszuweit,

    The government respectfully submits this letter brief in response to the questions posed by the Court in its June 13, 2023 and June 22, 2023 orders.

## INTRODUCTION

    18 U.S.C. § 922(g)(3) prohibits any "unlawful user of" or person "addicted to" controlled substances from possessing a firearm. The statute addresses a societal concern that was unprecedented at the founding, and which presents distinct concerns about a person's engagement in criminal activity not posed by the use of lawful substances, like alcohol. Section 922(g)(3) nevertheless has longstanding historical precursors that, although not identical, situate the statute comfortably within "this Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022). This Court should affirm the district court's conclusion that Section 922(g)(3) is constitutional as applied to Harris, a marijuana user.

### I.    A Remand For Consideration Of *Range*, Or Otherwise, Is Unnecessary

    The Court asked the parties to address the Court's decision in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc); a recent Seventh Circuit decision; and whether the Court should remand for application of *Range* or for further development. The government agrees that remand is unnecessary, but for different reasons.

#### A.    *Range* Has Limited Relevance To *Bruen*'s Application In This Case

    As a threshold matter, *Range* does not control the outcome of this case. *Range* held 18 U.S.C. § 922(g)(1), which prohibits firearm possession by a person convicted of a felony or felony-equivalent offense, unconstitutional as applied to Range, who had a decades-old state-law misdemeanor conviction for making a false statement to obtain food stamps. The *en banc* majority found that the government did not establish a history and tradition of "depriving people like Range" of firearms. *Range*, 69 F.4th at 98, 106. In the government's view, the *en banc* majority's analysis was flawed. But, regardless,

*Range* bears little relevance to this Court's assessment of the distinct prohibition Congress enacted in Section 922(g)(3).[1]  The *Range* majority stressed that its decision was "narrow," *id.* at 106, and its analysis centered on the specific historical evidence the government presented in that case to support disarming individuals convicted of felony offenses.  The Court also declined to resolve whether any particular historical justification for disarmament, such as persons' perceived dangerousness, could be drawn from the historical laws offered in *Range*. 69 F.4th at 104 n.9.

### B.    A Remand Is Unnecessary

*Range* did not address the strength of historical analogues supporting Section 922(g)(3), and because those analogues are plainly strong enough to affirm the statute's constitutionality as applied to Harris, the Court can resolve this case without remanding.

**1.**    Applying *Bruen*'s text-and-history test involves answering a question of law.  *Bruen* makes that clear; the Court stated that the "job of judges is not to resolve historical questions in the abstract" but "to resolve *legal* questions presented in particular cases," and it expressly described its test as a "legal inquiry." 142 S. Ct. at 2130 n.6.  It is well established that "interpretation" of a constitutional provision "is a question of law," *Chandris, Inc. v. Latsis*, 515 U.S. 347, 369 (1995), even when interpretation involves historical work or depends in part on "legislative facts"—that is, facts bearing on "the formulation of a legal principle or ruling by a judge or court," Fed. R. Evid. 201 advisory committee's note.  The Supreme Court has relied on history and tradition in interpreting a range of constitutional provisions.  *See, e.g., Zivotofsky v. Kerry*, 576 U.S. 1, 23-28 (2015); *Marsh v. Chambers*, 463 U.S. 783, 786-92 (1983); *Crawford v. Washington*, 541 U.S. 36, 42-50 (2004).  Courts should follow the same approach under the Second Amendment, particularly because treating *Bruen*'s inquiry as a factual question would produce the very "undesirable practical consequences" that the Supreme Court explained had arisen under common law's treatment of questions of foreign law as questions of fact.  *See Animal Science Prods., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1873 (2018) (quotations omitted).  The historical material would have to be established under the rules of evidence, and because appellate review would be "limited to the record made in the trial court" the Amendment's meaning could (unjustifiably) vary from case to case depending on the particular record compiled in the district court.  *Id.*

**2.**    In this circumstance of this case, a remand is not necessary.  Because *Bruen* requires answering a question of law, the district court is not required to take evidence, receive expert testimony, or resolve factual disputes.  This Court, moreover, may rely on historical sources identified for the first time on appeal, because "[o]nce a federal claim is properly presented," a party "can make any argument" to support the claim and is "not limited to the precise arguments" made below.  *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992); *see* Fed. R. Evid. 201 advisory committee's note (permitting "an

---

[1] To the extent *Range* suggests that the Amendment's text protects Harris's conduct, the government preserves its claim that the "*pre-existing* right" the Second Amendment codified, as historically understood, allows the government to disarm those who are not law-abiding, responsible citizens. *Bruen*, 142 S. Ct. at 2130-31.

independent search for persuasive data" to resolve "content or applicability of a rule of domestic law" (quotations omitted)). Given the record in this case, this Court is well-positioned to decide this appeal without remanding to the district court.

The Seventh Circuit's decision in *Atkinson v. Garland* does not support remand in this particular case. There, a divided panel remanded a challenge to Section 922(g)(1) to allow the district court to apply *Bruen* "in the first instance." 70 F.4th 1018, 1020 (7th Cir. 2023). In the government's view, Judge Wood's dissent in *Atkinson* was correct to conclude that the district court's judgment should have been affirmed without need for a remand. *Id.* at 1025 (Wood, J., dissenting). Regardless, the record and briefing in *Atkinson*, which the majority construed as failing to "grapple with" *Bruen*, *id.* at 1022, bear little resemblance to the record (including this letter brief) here, which establishes that Section 922(g)(3) is consistent with this Nation's tradition of firearm regulation.

If the panel nevertheless deems the historical materials insufficient to establish Harris can be disarmed, it does not follow that history settles the issue in Harris's favor. The government has not had an opportunity to submit a full-length supplemental brief post-*Bruen* that could expound fully on the relevant history, and the cataloging of historical laws in this letter brief necessarily is illustrative, not comprehensive. If the Court is not prepared to affirm, further proceedings in the district court would be warranted.[2]

**3.** Finally, Harris correctly disclaims (Ltr.8) the necessity of any individualized inquiry into his personal history and characteristics. History plainly supports, at a minimum, "the proposition that the state can take the right to bear arms away from a category of people" and "'is not limited to case-by-case exclusions.'" *Kanter v. Barr*, 919 F.3d 437, 464 (7th Cir. 2019) (Barrett, J., dissenting); *accord United States v. Jackson*, 69 F.4th 495, 504 (8th Cir. 2023). Allowing a defendant to seek case-specific exemptions from generally applicable criminal laws based on an assessment about his personal circumstances would create "an arbitrary patchwork of decisions—as far from the rule of law as one could imagine," *Atkinson*, 70 F.4th at 1027 (Wood, J., dissenting), and "present serious problems of administration, consistency and fair warning," *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011).

Such an analysis, moreover, would be procedurally inappropriate at this stage of this criminal case. In pleading guilty, Harris preserved the right to appeal the denial of his pre-trial motion to dismiss the indictment under Federal Rule of Criminal Procedure 12. Such motions must present claims that "can be determined without a trial on the merits," Fed. R. Crim. P. 12(b)(3); the rule does not permit pre-trial resolution of individualized, offender-specific facts, *United States v. Rodríguez-Rivera*, 918 F.3d 32, 35 (1st

---

[2] Whether to remand in light of changed precedent is necessarily a case-specific analysis. For the reasons detailed in the government's letter brief submitted today in *Pitsilides v. Attorney General*, No. 21-3320, the considerations in that case favor remanding for further proceedings. Unlike this case (but like *Range*), *Pitsilides* involves an as-applied challenge to Section 922(g)(1). As the government explains, although Pitsilides's challenge ultimately should be rejected, the analysis that would be called for under *Range* may be quite different from the one previously conducted.

3

Cir. 2019); *see also United States v. Pope*, 613 F.3d 1255, 1261-63 (10th Cir. 2010) (Gorsuch, J.) (as-applied Second Amendment challenge could not be considered pretrial where, to prevail, "disputed facts outside the indictment must be found in [defendant's] favor").[3]

## II.     Section 922(g)(3) Is Constitutional Under The Second Amendment

In *Bruen*, the Supreme Court explained that judicial review of gun laws should focus on the Second Amendment's text and historical tradition. A law complies with the Second Amendment if it regulates conduct that falls outside the Amendment's "plain text" or comports with "this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126-27. "[C]ases implicating unprecedented societal concerns or dramatic technological changes" require an especially "nuanced approach," and the government need only "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2132-33. Analogical reasoning under the Second Amendment thus is not "a regulatory straightjacket," and a modern law can satisfy *Bruen*'s historical standard even if it is not "a dead ringer for historical precursors."[4] *Id.* When evaluating Section 922(g)(3)'s historical precursors, the Court should focus on "two metrics": "how and why the regulations burden" the right to armed self-defense—and must uphold the statute if historical precursors imposed "comparable burden[s]" and were "comparably justified." *Bruen*, 142 S. Ct. 142 at 2132-33.[5]

Congress acted consistently with the Second Amendment when enacting Section 922(g)(3). Although Section 922(g)(3) addresses a concern that was unprecedented at the founding, the statute's precursors include laws restricting gun possession by those intoxicated by alcohol and by those the legislature deemed dangerous. Each is a sufficient historical analogue and, at a minimum, when taken together they make plain that Section 922(g)(3) is consistent with our Nation's history and tradition.

### A.     The Statute Addresses An Unprecedented Societal Concern

The unlawful use of controlled substances was unprecedented at the founding. As the government has explained, through much of the 19th century there was no need for firearm prohibitions addressing drugs other than alcohol because such substances were not widely used as intoxicants in the United States until the late 19th and early 20th centuries. *See* Gov't Br.17-18; David F. Musto, *Drugs in America: A Documentary History* 188-192 (NYU 2002); Erik Grant Luna, *Our Vietnam: The Prohibition Apocalypse*, 46 DePaul L. Rev. 483, 487 (1997) ("[N]arcotics addiction was a negligible phenomenon in the eighteenth and nineteenth centuries."). Only in 1877 did Nevada became the

---

[3] The government in any event contests Harris's claim (Ltr.9) that the facts show he was not using marijuana at the time of his purchase or possession. *See* Gov't Br.4-7.

[4] Harris repeatedly contends (*e.g.*, Ltr.1-3, 8) that *Range* requires what he terms a "precise historical analogue." But any suggestion that a historical law must be on all-fours with a modern one is flatly inconsistent with *Bruen*'s admonition that the analysis requires neither a historical "dead ringer" nor "a historical *twin*." 142 S. Ct. at 2133.

[5] Since this Court issued *Range*, the Supreme Court has granted certiorari in *United States v. Rahimi*, No. 22-915, to consider the constitutionality of 18 U.S.C. § 922(g)(8) under the Second Amendment.

first state to require a prescription for the purchase of any drug (in that case, opium). Elizabeth Kelly Gray, *Habit Forming: Drug Addiction in America, 1776-1914* 25 (2023). Because of this history, "[i]llegal drug trafficking," in particular, "is a largely modern crime." *United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023) (upholding under *Bruen* sentencing enhancement for possessing dangerous weapon during drug offense).

Marijuana is no exception. Although Harris suggests (Br.14) the founding-era agricultural use of hemp shows otherwise, there are essentially "no accounts or reports" of "cannabis being used as an intoxicant during the period when the plant was widely cultivated as an agricultural commodity." John Rublowsky, *The Stoned Age: A History of Drugs in America* 98 (1974). Nor is there evidence that enslaved persons used cannabis as an intoxicant, despite its use in Africa. Gray, *supra*, at 73. Even by the 1930s, Americans lacked "any lengthy or broad experience" with marijuana, Musto, *supra*, at 192, and prohibitions did not emerge until the early 20th century, *see* Gov't Br.17-18.

Contrary to Harris's claim (Ltr.4-5; Reply Br.7-9), founding-era laws addressing firearm use by those intoxicated by alcohol do not demonstrate that concerns about users of *unlawful drugs* have persisted since the founding. Alcohol, with certain exceptions, has been legal throughout American history; indeed, the Controlled Substances Act excludes from the definition of controlled substances "distilled spirts, wine, [and] malt beverages." 21 U.S.C. § 802(6). Alcohol use does not present the same societal concerns about criminal association as do the purchase and use (not to mention trafficking) of unlawful drugs. *See, e.g.*, Appx.91-94, 110; *cf. United States v. Carter*, 750 F.3d 462, 467-70 (4th Cir. 2014). Although alcohol-related statutes are relevant historical analogues supporting Section 922(g)(3)'s constitutionality, differences in the laws' scope are readily explained by distinct concerns posed by the use of *unlawful* substances.

**B.     The Statute Is Analogous To Laws Disarming The Intoxicated**

Historical laws regulating firearm possession and use by those under the influence of alcohol provide a sufficiently close analogy to justify Section 922(g)(3).

**1.** The founding generation recognized that those who regularly became intoxicated threatened the social and political order. *See, e.g.*, Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits Upon the Human Body and Mind* 6 (1812) (describing drunkenness as a "temporary fit of madness"). A 1658 Massachusetts law, for example, allowed constables to apprehend those "overtaken with drink" and keep them "in close custody" until brought before a magistrate. *The Charters & General Laws of the Colony and Province of Massachusetts Bay* 82 (1814). Founding-era legislatures also adopted specific measures to separate firearms and alcohol, including laws regulating firearm use by individuals deemed likely to become intoxicated. A 1655 Virginia law prohibited "shoot[ing] any gunns at drinkeing [events]," regardless of whether attendees actually became intoxicated. 1 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* 401-02 (1823). A 1771 New York law similarly barred firing guns during the New Year's holiday, a restriction that "was aimed at preventing the 'great Damages … frequently done on [those days] by persons … being often intoxicated with Liquor.'" *District of Columbia v. Heller*, 554 U.S. 570, 632 (2008) (quoting 5 *Colonial Laws of New York* 244-46 (1894)). And a 1731 Rhode Island law forbade firing guns or pistols

5

in any tavern at night. *See Acts & Laws of the English Colony of Rhode-Island & Providence-Plantations* 120 (Hall, 1767). Harris notes (Ltr.6-7) that these laws did not restrict firearm possession outright, were short-lived, or may have been enacted for other public safety reasons. But they nevertheless show a tradition of limiting firearm use by specific groups viewed as *likely* to become intoxicated.

Perhaps more instructive are 18th-century militia laws, which reflect legislatures' significant authority to separate firearms and alcohol. New Jersey, Pennsylvania, and South Carolina disarmed or authorized the confinement of intoxicated militia members. *See* 2 Arthur Vollmer, U.S. Selective Serv. Sys., *Military Obligation: The American Tradition*, pt. 8, New Jersey, at 25-26 (1947) (1746 law disarming those who appeared "in [a]rms disguised in [l]iquor"); *id.* pt. 11, Pennsylvania, at 97 (1780 law disarming those "found drunk"); *id.* pt. 13, South Carolina, at 96 (1782 law allowing officers to be cashiered or "confined till sober").[6] Similar laws persisted into the 19th century, *see, e.g.*, James Dunlop, *The General Laws of Pennsylvania* 405-06 (2d ed. 1849) (1822 law)—by which time at least three states outright excluded "common drunkards" from the militia, *see* 1844 R.I. Pub. Laws 503; 1837 Me. Laws 424; 1837 Mass. Acts 273.

Despite the pervasiveness of alcohol at the founding, early laws understandably focused on the militia because social norms "had an important restraining effect on intemperance" and there thus was "little public outcry against alcoholism." Mark Edward Lender & James Kirby Martin, *Drinking in America: A History* 14-16 (1987). The community "held drinking excesses largely in bounds." *Id.* at 15. And the cumbersome nature of 18th-century firearms also mitigated the general risk created by intoxicated individuals. *See* Randolph Roth, "Why Guns Are and Are Not the Problem," *in* Jennifer Tucker, et al., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 116-17 (2019). As those circumstances changed during the 19th century, *see, e.g.*, Lender, *supra*, at 45-46, however, states and territories began imposing criminal penalties on intoxicated members of the public who carried, used, or received firearms or pistols.[7] *See* 1867 Kan. Sess. Laws 25 (prohibiting those "under the influence of intoxicating drink" from carrying a pistol or other deadly weapon); 1878 Miss. Laws 175-76 (prohibiting selling weapons to a "person intoxicated"); Mo. Rev. Stat.

---

[6] Many other laws forbade selling "any Strong Liquor" near the locations where militias mustered and trained. *See, e.g.*, 2 Vollmer, *supra*, pt. 5, Maryland, at 93 (1756 law); *id.* pt. 3, Delaware, at 13 (1756 law); *id.* pt. 8, New Jersey, at 31 (1746 law) *id.* pt. 11, Pennsylvania, at 100 (1780 law); *id.* pt. 13, South Carolina, at 30 (1721 law).

[7] Harris's overreads (Ltr.7) *Parman v. Lemmon*, 244 P. 227 (Kan. 1926) in suggesting that decision shows Kansas's law did not reach long guns. *Parman* held as a matter of statutory construction (and on rehearing only after first endorsing a contrary conclusion) that the term "dangerous weapons," as used in a separate law prohibiting giving weapons to minors, did not encompass shotguns. *Id.* at 233. Nothing in *Parman*, however, suggests the legislature lacked *authority* to enact a broader prohibition, had it spoken clearly. Nor is it obvious that the court's analysis would apply to the intoxication statute, which instead used the term "deadly weapon." *See* 1867 Kan. Sess. Laws 25.

§ 1274 (1879) (prohibiting carrying "any kind of firearms" "when intoxicated or under the influence of intoxicating drinks"); 1883 Wis. Sess. Laws 290 (prohibiting person in "state of intoxication" from going "armed with any pistol or revolver"); 1909 Idaho Sess. Laws 6 (prohibiting "hav[ing] or carry[ing]" any "deadly or dangerous weapon" when "intoxicated, or under the influence of intoxicating drinks"). Such statutes were considered "in perfect harmony with the constitution" and "a reasonable regulation of the use of such arms" even where state constitutions were understood to secure an individual's right to bear arms. *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886).

Contrary to Harris's claim (Reply Br.12, Ltr.7), this 19th-century evidence remains instructive. As *Bruen* reiterated, evidence of the Second Amendment's interpretation "'through the end of the 19th century' represent[s] a 'critical tool of constitutional interpretation.'" 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 605). And such evidence is particularly helpful where, as here, it supplies "'confirmation of'" earlier history. *Id.* at 2137. Laws regulating the general public's firearm possession while intoxicated largely arose later, but they were consistent with earlier militia-specific laws. Tellingly, Harris identifies nothing in pre-19th-century practice demonstrating that legislatures were considered to *lack* authority to preclude the intoxicated public from using firearms. *Cf. id.* at 2133 (noting lack of "disputes regarding the lawfulness of [sensitive-place] prohibitions"). Concluding otherwise would unjustifiably deem legislatures' earlier silence as reflecting a *constitutional* limit, on the unfounded assumption that founding-era legislatures invariably regulated to the outer limit of their authority irrespective of popular demand or perceived need for particular laws.

**2.** Section 922(g)(3)'s temporary prohibition imposes "a comparable burden" that is "comparably justified" to intoxication statutes. *Bruen*, 142 S. Ct. at 2133.

In terms of *why* Section 922(g)(3) restricts the Second Amendment right, the provision, like intoxication statutes, limits firearm use at times an individual is deemed unlikely to use them responsibly. Intoxication-related statutes were enacted to prevent the "mischief" threatened by intoxicated persons "going abroad with fire-arms," *Shelby*, 2 S.W. at 469, and Congress likewise enacted Section 922(g)(3) to "keep firearms away from the persons [it] classified as potentially irresponsible and dangerous," *Barrett v. United States*, 423 U.S. 212, 218 (1976). For confirmation, this Court need only consider the parity with which legislatures historically treated alcohol and drugs once illegal drugs proliferated in the 20th century. At least one jurisdiction, Michigan, simply extended its by-then common restriction on carrying firearms while intoxicated to cover those under the influence of "any exhilarating or stupefying drug." 1929 Mich. Pub. Acts 55. Other jurisdictions elected to regulate more indirectly by prohibiting the *delivery* or *sale* of firearms to certain persons, but extended such laws to drug addicts and habitual drunkards alike. *See* 1927 N.J. Laws 745; 1931 Pa. Laws 499; 1935 Ind. Acts 161; 1935 S.D. Sess. Laws 356; 1935 Wash. Sess. Laws 601; 1936 Ala. Acts 52; 47 Stat. 650, 652 (1932).

Critically, although Harris presents his challenge as limited to the use of marijuana, his argument seemingly would cast doubt on Congress's ability to disarm unlawful users of any controlled substance, including cocaine, fentanyl, or methamphetamines.

7

The Court's order asks the parties to address the strength of the particular analogy between alcohol intoxication and the effects of frequent marijuana use. Alcohol and marijuana, to be sure, have different effects. Marijuana can reduce aggressive behavior if used in limited doses, but it can also cause aggressive behavior when used in high dosages. *See* Sharon M. Boles & Karen Miotto, *Substance abuse and violence: A review of the literature*, 8 Aggression & Violent Behavior 155, 161-62, 165-66 (2003); Norman S. Miller, *et al.*, *A Review of Cases of Marijuana and Violence*, 17 Int'l J. of Envtl. Res. & Pub. Health, no. 5, at 1-2, 8-9 (2020). Marijuana use also can cause disinhibition; impaired motor skills and reaction time; impaired judgment; panic attacks, paranoia, anxiety, and other psychiatric effects; and hallucinations. Miller, *supra*, at 8-9; 81 Fed. Reg. 53,688, 53,693-94, 53,749 (Aug. 12, 2016). Legislatures appropriately have viewed alcohol and marijuana as posing similar concerns, despite their differing effects. Reinforcing that assessment is the fact that legislatures have long prohibited driving under the influence of both alcohol and marijuana (among other drugs). *See, e.g.*, 75 Pa. Stat. § 3802(d).

In terms of *how* Section 922(g)(3) burdens the right to self-defense, the statute—like historical intoxication laws—is a *temporary* restriction on possession that lasts only during the period an individual is deemed unlikely to use firearms responsibly. If a person ceases unlawfully using controlled substances, he may again possess firearms.[8] *See United States v. Yancey*, 621 F.3d 681, 687 (7th Cir. 2010). Harris notes (Ltr.6-7) that Section 922(g)(3) prohibits *possession* of firearms, while alcohol statutes historically were limited to prohibiting *carrying* or *use*. That difference, however, is readily explained by the fact that controlled substances, unlike alcohol, are *unlawful*. An individual who regularly obtains and uses those substances likely will have connection with criminality for which gun possession presents public safety risks. *See infra* at 10. Indeed, as early as 1931, California prohibited outright firearm *possession* by drug addicts, not just use during periods of intoxication. 1931 Cal. Stat. 2316-17. Other states later followed suit, *see, e.g.*, 1951 Ala. Acts 1379; 1955 Kan. Sess. Laws 400. Because alcohol, by contrast, has generally been lawful, laws understandably allowed alcohol drinkers to *possess* firearms, limiting their use only during periods of intoxication. Given this clear distinction between unlawful drugs and alcohol, to demand a more exact "dead ringer" for Section 922(g)(3) would be inconsistent with *Bruen*'s assurances that the Second Amendment is not "a regulatory straightjacket" for modern legislatures. *Bruen*, 142 S. Ct. at 2133.

### C. Laws Disarming Those Deemed Dangerous Justify Any Reach Beyond The Historical Scope Of Intoxication Statutes

The statute's full scope is further justified by other historical analogues, including

---

[8] Harris wrongly claims (Ltr.7) that Section 922(g)(3)'s prohibition is not temporary. He argues that an ATF regulation establishes that a person is an unlawful user for up to a year after last using drugs, but the regulation simply lists circumstances that can *contribute* to raising a (rebuttable) inference of a "pattern" of "present" use. 27 C.F.R. § 478.11. And to the extent Harris suggests that he cannot possess firearms following a Section 922(g)(3) conviction, that prohibition results from 18 U.S.C. § 922(g)(1), which is not before the Court in this case.

8

those disarming persons who would pose a threat to the safety of others if armed.[9]

**1.** English common law established the government's authority to disarm individuals posing a threat to the safety of others. Common law prohibited individuals from "go[ing] armed to terrify the King's subjects." *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K.B. 1686); Statute of Northampton, 2 Edw. 3, c.3 (1328). The Militia Act of 1662 later authorized crown officers to seize the arms of those "judge[d] dangerous to the Peace of the Kingdom.'" 13 & 14 Car. 2, c.3, § 13 (1662). The 1689 English Bill of Rights declared subjects' right to possess arms, but limited the right to *Protestant* subjects, 1 W. & M. c.2, § 6, and did not purport to repeal the Militia Act, which was employed into the 18th century, *see, e.g.*, *Calendar of State Papers, Domestic: William III, 1700-1702*, at 233-34 (Edward Bateson ed., 1937). Before, contemporaneous with, and after the Bill of Rights' enactment, Parliament also enacted statutes disarming Catholics in England and Ireland. 3 Jac. I, c.5, §§ 16-18 (1605-06); 1 W. & M. c.15, §§ 3-4 (1688); 7 Will. III, c.5 (1695) (Ireland). And in the first half of the 18th century, statutes disarmed Scottish persons believed to be loyal to James II. *See, e.g.*, 1 George I, c.54 (1715); 11 George I, c.26 (1724); 19 George II, c.39 (1746).

The tradition continued in early American legislatures. Some laws disarmed those who carried arms in a manner that spread fear or terror. *See* 1692-1694 Mass. Acts 11-12; 1696-1701 N.H. Laws 15. Others disarmed entire groups deemed dangerous or untrustworthy, including those who refused to swear allegiance to the colony[10] or the Revolution's cause[11]; enslaved persons[12]; and Native Americans.[13] These laws indisputably would be unconstitutional today under the Equal Protection Clause or because the legislature would lack any basis for categorically deeming such persons dangerous. But for *Second Amendment* purposes, they remain instructive. As repugnant as these laws are, they demonstrate that the Amendment was not historically understood to pose an obstacle to disarming, as a class, certain persons. *See, e.g.*, *Jackson*, 69 F.4th at 503. Second Amendment precursors proposed in state ratifying conventions likewise

---

[9] Limitations historically imposed on the mentally ill also justify Section 922(g)(3), as the government has had occasion to explain in greater depth elsewhere. *See, e.g.*, Gov't Br. 43-53, *United States v. Harrison*, No. 23-6028 (10th Cir. filed June 26, 2023).

[10] 1 *Records of Governor & Company of the Massachusetts Bay in New England* 211-12 (Nathaniel B. Shurtleff ed., 1853) (1637 order disarming Anne Hutchinson's followers).

[11] *See, e.g.*, 4 *Journals of the Continental Congress* 201-06 (1906) (1776 resolution); 1775-1776 Mass. Acts 479; 1777 Pa. Laws 63; 1777 N.C. Sess. Laws 231; 1776-1777 N.J. Laws 90; 9 William Waller Hening, *Statutes at Large; Being a Collection of All the Laws of Virginia* 281-83 (1821) (1777 law); 15 *The Public Records of the Colony of Connecticut from May, 1775, to June, 1776, Inclusive* 193 (Charles J. Hoadly ed., 1890) (1775 law).

[12] *See, e.g.*, 1700-1797 Del. Laws 104; 1692-1720 Md. Laws 117-18; 1715-1760 N.Y. Laws 162; 1715-1755 N.C. Sess. Laws 64; 1731-1743 S.C. Acts 168.

[13] *See, e.g.*, 1723-1730 Conn. Acts. 292; *Charter & General Laws of Massachusetts Bay* 133 (1814) (1633 law); 6 *Statutes at Large of Pennsylvania from 1682 to 1801* 319-20 (WM Stanley Ray ed., 1898) (1763 law); 1 Hening, *supra*, at 219 (1633 Virginia law).

confirmed that legislatures may disarm certain categories of individuals, including for "crimes committed, or real danger of public injury." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) (discussing Pennsylvania proposal). Accordingly, as one early scholar wrote, the government may restrict a person's right to carry firearms when there is "just reason to fear that he purposes to make an unlawful use of them." William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829). And that understanding persisted after the Civil War. In 1866, for example, a federal Reconstruction order applicable to South Carolina provided that, although the "rights of all loyal and well-disposed inhabitants to bear arms will not be infringed," "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. 908-09 (1866).

**2.** This history at a minimum "support[s] the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous," *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting)—although the government's authority to disarm certain groups is not *limited* to such persons, *see, e.g.*, *Range*, 69 F.4th at 105 (describing disarming "distrusted" groups); *id.* at 110 (Ambro, J., concurring) (describing disarming those who "pose a threat to the orderly functioning of society"). And Congress had ample reason to conclude that gun possession by unlawful drug users, as a class, poses a serious risk of danger to others. As the government's response brief explained, common sense and numerous studies establish a clear link between drug use (including marijuana) and criminal behavior. *See* Gov't Br.23-26. Because of the *unlawful* nature of their activities, drug users are more likely than law-abiding citizens to have dangerous confrontations (particularly if guns are involved) with drug dealers, law enforcement officers, and others—raising a concern of danger even beyond periods of actual intoxication. *See, e.g.*, Appx.72, 110. It thus is no surprise that individual judges have suggested that "drug dealing" is "dangerous because [it] often lead[s] to violence," *Folajtar v. Attorney General*, 980 F.3d 897, 922 (3d Cir. 2020) (Bibas, J., dissenting), and that Section 922(g)(3) aligns with a historically justified interest in "keeping guns out of the hands of those who are likely to misuse them," *Kanter*, 919 F.3d at 465-66 (Barrett, J., dissenting). The government does not cite the materials canvassed in its response brief to invite this Court to engage in the interest balancing *Bruen* rejected. *Cf.* Ltr.10. Instead, as *Bruen* itself explained, the Second Amendment inquiry requires reasoning by analogy. 142 S. Ct. at 2132. And that "commonplace task for any lawyer or judge," *id.*, necessarily requires evaluating the similarity between the historical justification for disarming certain persons with the present-day dangers the legislature reasonably could find that a group, like unlawful drug users, poses.

Finally, in terms of *how* Section 922(g)(3) restricts the right, the statute is no more restrictive than historical laws disarming certain groups. As a *temporary* prohibition, Section 922(g)(3) prohibits firearm possession only during the period users of unlawful controlled substances are considered to present a risk of dangerousness.

## CONCLUSION

For the foregoing reasons, and those detailed in the Government's response brief addressing Harris's other claims, the judgment should be affirmed.

10

| | |
|---|---|
| August 7, 2023 | Respectfully submitted, |
| ERIC G. OLSHAN<br>United States Attorney<br>Western District of Pennsylvania | NICOLE M. ARGENTIERI<br>Acting Assistant Attorney General<br><br>LISA H. MILLER<br>Deputy Assistant Attorney General |
| LAURA S. IRWIN<br>Chief, Appellate Section<br>Western District of Pennsylvania | /s/ Andrew C. Noll<br>ANDREW C. NOLL |
| ADAM N. HALLOWELL<br>Assistant United States Attorney<br>Western District of Pennsylvania | Criminal Division, Appellate Section<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, N.W.<br>Washington, DC 20530<br>(202) 307-1982<br>Andrew.Noll@usdoj.gov |

## CERTIFICATE OF COMPLIANCE

1. This letter brief complies with the Court's June 13, 2023 order because it contains 10 single-spaced pages, excluding the parts of the brief exempted under Federal Rule of Appellate Procedure 32(f).

2. This letter brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), the typestyle requirements of Rule 32(a)(6), and the formatting requirements of Third Circuit Local Appellate Rule 32.1, and has been prepared in a proportionally spaced, 14-point serif typeface using Microsoft Word.

/s/ Andrew C. Noll
Andrew C. Noll

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2023, I electronically filed the foregoing with the Clerk of the Court of the U.S. Court of Appeals for the Third Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

/s/ Andrew C. Noll
Andrew C. Noll