IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 21-3031

UNITED STATES OF AMERICA,
Appellee

v.

ERIK MATTHEW HARRIS,
Appellant

Appeal from a judgment entered
in the United States District Court for the
Western District of Pennsylvania at No. 2:19-cr-00313

SUPPLEMENTAL REPLY LETTER BRIEF FOR APPELLANT

LISA B. FREELAND
Federal Public Defender

RENEE PIETROPAOLO
Assistant Federal Public Defender

Federal Public Defender for the
Western District of Pennsylvania
1001 Liberty Avenue, Suite 1500
Pittsburgh, PA 15222

(412) 644-6565

**Argument in Reply**

Section 922(g)(3) disarms anyone "who is an unlawful user of" "*any* controlled substance." The statute neither defines "unlawful user" nor gives notice of the temporal or spatial nexus between drug use and gun possession. *See* Br. 34-51; Reply Br. 21-26 (arguing statute is unconstitutionally vague). In this Circuit, the government need only prove that the accused "engaged in regular use over a period of time proximate to or contemporaneous with the possession of the firearm"; those atextual limits are not defined. *United States v. Augustine*, 376 F.3d 135, 139 (3d Cir. 2004). The statute does not require possession of a firearm *while* using drugs. *Id.*, 138-39 n.5-6. And it applies even when the use is lawful in the state where it occurs, as where a state authorizes adult recreational marijuana use or medical marijuana use. *But see* Gov't Ltr. Br. (Doc. 55) 8 & 10 (wherein the government baselessly contends that those subject to § 922(g)(3) likely will have a connection to criminality or are more likely to have dangerous confrontations with drug dealers, law enforcement and others). Thus, the statute applies if the user smokes marijuana privately in his home one day while constructively possessing a firearm locked in a gun safe. And it applies if an individual uses one day and possesses a firearm on another.

The government has not met its burden of proving § 922(g)(3)'s broad prohibition is "consistent with the Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 (2022). *See United States v. Daniels*, ___ F.4th ___, 2023 WL 5091317, *1 (5th Cir. 2023) (holding history and tradition do "not justify disarming a sober citizen based exclusively on his past drug use"). Although the government repeatedly identifies those intoxicated by alcohol as the group most analogous to those targeted by § 922(g)(3), it fails to identify founding era regulations (or regulations from any era) disarming users of alcohol. *See Daniels*, 2023 WL 5091317, *5, 14 (concluding that "[d]espite the prevalence of alcohol and alcohol abuse" there were no "restrictions at the Founding that approximate § 922(g)(3); "even as the Founders were disarming Catholics and politically disaffected citizens, they left ordinary drunkards unregulated.").

Because the government has not established a historical tradition of banning individuals who use intoxicants at one time from possessing firearms at another, Section 922(g)(3) is unconstitutional on its face and as applied to Erik Harris, a recreational user of marijuana who was not alleged to have been using or intoxicated at the time of the charged possession.[1]

---

[1] Although the government for the first time in its Letter Brief (Doc.55 4 n.3) questions whether Mr. Harris was using at the relevant time, this belated claim cannot be squared with the record. The indictment charges Erik Harris with three counts of possession of firearms by an unlawful user in violation of § 922(g)(3) occurring on or about February 25, 2019, March 8, 2019, and March 14, 2019, the three days on which he purchased firearms from a Pennsylvania dealer. Appx53. Mr. Harris filed a motion

**Section 922(g)(3) does not address an "unprecedented societal concern."**

As a threshold matter, the government argues that § 922(g)(3) is a modern regulation that was "unimaginable at the founding" addressing "unprecedented societal concerns" and that therefore, its burden is only to identify "relevantly similar" founding era regulations. The government narrowly defines the problem (g)(3) is aimed at as firearm possession by users of only those intoxicants deemed controlled substances, basing that view on its contention that substances other than alcohol "were not widely used as intoxicants in the United States until the late 19th and early 20th centuries." Gov't Ltr. Br. 4.

But the government's own authority recounts Colonial and Founding-era use of opium for its euphoric and intoxicating effects at least as early as 1701. *See* Elizabeth Kelly Gray, *Habit Forming: Drug Addiction in America, 1776-1914*, Part I, Ch. 1 (2023) (recounting Dr. John Jones' 1701 and Dr. James Ramsay's 1780 testimonials both describing euphoric effects of opium and Dr. Samuel Bard's 1765 report that opium "induce[s] hilarity"; discussing Molly Carroll's problematic laudanum use beginning in 1776 and Elizabeth Powell's reference to laudanum in 1785 as "that heavenly Medicine"; quoting 1770s writer's description of pervasive opium use among the women of Nantucket to "preserve…cheerfulness"; highlighting Dr. Benjamin Rush's 1805 reflections that after 1760 a "new species of intoxication from opium has found its way into our city."). *See also The Life of Benjamin Franklin, Written by Himself*, Volume 3 (letters from 1789 describing Franklin's recourse to opium to treat pain).

Assuming *arguendo* drugs like marijuana and opium were not *widely* used as intoxicants at the founding does not mean that their use for such purposes was

---

to dismiss the indictment, and the government asked the court to resolve the motion on the "undisputed" facts. Appx161,167. In that regard, the parties agreed the substance involved was marijuana and Erik Harris was a recreational user, not an addict, who used marijuana every three days at the relevant time. Appx52,61,161. There was never any claim or allegation that Mr. Harris was using or intoxicated on the charged dates; had he been intoxicated it is inconceivable he would have been permitted to complete any of the three purchases.

In the district court, while seeking to illustrate why marijuana users should not be trusted with guns (—pre-*Bruen* the question was whether § 922(g)(3) was sufficiently tailored to serve a public safety interest—), the government described an extra-indictment occasion where Erik Harris was "purportedly" careless. The government speculated that Harris "evidently brought" his gun to a celebration involving drinking and smoking and that it was stolen that night. Appx52,61,161; *see also* Appx172 (defense agreeing one of the firearms ultimately ended up in someone else's possession).

"unimaginable at the founding." *Bruen*, 142 S. Ct. at 2132. Nor does it mean firearms use by the intoxicated, whatever the intoxicant, was unimaginable.

Americans would at least have read about the use of such substances as intoxicants. *See generally* Elizabeth Kelly Gray, *Habit Forming: Drug Addiction in America, 1776-1914* (2023) (noting "Americans' knowledge of compulsive drug use gained from reading about habitual use abroad"); *see also The History of the Opium Problem, The Assault on the East, ca. 1660-1950*, Ch. 3 (identifying 1598 and 1563 as the first published mentions by Westerners of opium use as a problem). American newspaper articles headlined a 1799 report that hemp can be intoxicating. *See Extract from Sonnini's Travels in Egypt, Respecting the Use of a Preparation of Hemp, as a Narcotic*, Farmers' Museum, Or Literary Gazette, May 26, 1801, at 4 (quoting renowned botanist Charles-Nicolas-Sigisbert Sonnini de Manoncourt's report: "For want of intoxicating liquors, the Arabs and the Egyptians compose several preparations from this plant, with which they procure for themselves a sort of pleasing drunkenness, a state of reverie which inspires gaiety, and produces agreeable dreams."); *Intoxicating Quality of Hemp*, Charleston Courier, May 20, 1803, at 2 (same quote).

In short, the government's identification of the problem (g)(3) is aimed at as firearm possession by users of *controlled substance intoxicants* rather than firearm possession by users of intoxicants, is too narrow. Section 922(g)(3) addresses a problem that was not "unimaginable" at the founding—possession of firearms by users of intoxicants. *See United States v. Harrison,* __ F.Supp.3d ___, 2023 WL 1771138, *6 (W.D.Ok., 2023) ("the societal problem addressed by § 922(g)(3), possession of firearms by users of substances with the potential for abuse,"[] is not new").

Whether the problem is old or new, the government has not met its burden of identifying a robust tradition of founding-era regulations that are "distinctly" or "relevantly similar" to § 922(g)(3).[2]

**The government cannot meet its burden of establishing § 922(g)(3)'s sweeping ban on the possession of firearms by those who use of controlled substances is consistent with our nation's history and tradition.**

Following the roadmap laid out in *Bruen*, this Court is tasked with assessing the proposed historical analogues identified by the Government using two metrics to determine if they are "relevantly similar": "how" and "why" the historical regulations burden the right to armed self-defense as compared to the challenged regulation.

---

[2] The *Daniels* Court appeared to view the problem as new based on its misunderstanding that analogical reasoning is restricted to the relevantly similar inquiry. *Id.*, 2023 WL 5091317, *4. Whether looking for "distinctly" or "relevantly similar" historical regulations, courts may apply analogical reasoning. The "distinctly similar" test simply requires a tighter fit between the historical and modern regulations.

3

*Bruen*, 142 S. Ct. at 2132-33. Section 922(g)(3)'s flat ban on possession of firearms, including constructive possession and including possession in the home for self-defense, by users of intoxicants, including those who are not actively using and not intoxicated, is inconsistent with history and tradition.

The government first posits three colonial era laws (including the 1655 Virginia and 1771 New York laws already discussed, *see* Supp. Ltr. Br. (Doc. 53) 5-7) as the relevant comparators.[3] The government never disputes that in addition to being short-lived, the colonial-era laws did not impose a comparable burden and were not comparably justified. Gov't Ltr. Br. 6. But from these three regulations, the government discerns a tradition of disarming those "likely" to become intoxicated. They do not.

As explained, the cited regulations prohibit *inter alia* (1) shooting "at drinking," excepting funerals and marriages, for the purpose of preserving gun powder and warding off Indian attacks while penalizing a violation through tobacco forfeiture not a loss of firearms and (2) discharging firearms for three days out of the year in a single county in New York for a short time. The 1731 Rhode Island law cited, *see* Gov't Ltr. Br. 5-6, fined anyone who fired "any Gun or pistol" in any tavern at night in Rhode Island; it did not restrict possessing or carrying firearms anywhere and it did not require intoxication or use of intoxicants. Acts and Laws, Of His Majesty's Colony of Rhode-Island, And Providence-Plantations, In New-England, In America 165 (1745).

"Given the prevalence of drinking at the Founding," that the government could not come forward with more than these laws puts its argument "on shaky footing." *Daniels*, 2023 WL 5091317, *6.

The government next identifies three 18th century militia laws, which it describes as disarming or confining intoxicated militia members. Gov't Ltr. Br. 6. A 1746 New Jersey militia law allowed a "Captain or Commanding Officer to disarm" a soldier who "appear[ed] in Arms disguised in Liquor," and forbade the sale of "any strong liquor" to militiamen before training was completed on training days, "without Leave from the Captain or Commanding Officer." 2 Backgrounds Of Selective Service: Military Obligation: The American Tradition, Part 8, at 25, 35 (Arthur Vollmer ed., 1947). A 1780 Pennsylvania militia law provided that if "any non-commissioned officer or private," who "on any occasion of parading the company to which he belongs" was "found drunk," he would "be disarmed and put under guard by order of the commanding officer present until the company is dismissed." *Id.*, Part 11, at 97. Additionally, the law provided that "[n]o company or battalion shall meet at a tavern on any of the days of exercise, nor shall march to any tavern before they are

---

[3] *See also* Gov't Ltr. Br. 5 (identifying 1658 Massachusetts law allowing constables to apprehend those "overtaken with drink" while making no mention of firearms).

4

discharged; and any person who shall bring any kind of spiritous liquor to such place of training shall forfeit such liquors….” *Id.*, 100.

Such laws were intended to ensure that militiamen competently fulfilled their training duties. Had they been intended to prevent intoxicated people from carrying arms, the restrictions would not have been lifted as soon as training was over. What is more, the laws did not apply to ordinary citizens, but applied only to militiamen while training.

The government also points to a 19th century Rhode Island statute (1844) that exempted "common drunkards" from required militia service. It did not prevent them from enrolling voluntarily. Moreover, this law did not prevent "common drunkards" from keeping or bearing arms.

As set forth, the militia regulations imposed different and more limited burdens on Second Amendment rights of a limited class (the militia), for different reasons (to ensure a competent military). These limitations on militiamen did not speak to their ability "to carry outside of their military service" and "tell us little about the limits acceptable for the general public." *Daniels*, 2023 WL 5091317, *7.

Further, it is unclear to what extent such laws were enforced. *See Daniels*, 2023 WL 5091317, *6 n. 16. "Founding-era militias were notorious for imbibing heavily." *Id.* During the Whiskey Rebellion of 1794, President Washington depended on volunteers including Pennsylvania and New Jersey volunteers, among whom "[d]runkenness was widespread." Stephen E. Ambrose, Undaunted Courage, 38-48 (1996). Writing in 1803, Bishop Francis Asbury describe encountering a drunk mob of militiamen returning from a muster "drunk, and staggering along the lanes and paths." 3 The Journal Of The Rev. Francis Asbury, Bishop Of The Methodist Episcopal Church, From August 7, 1771, To December 7, 1815, at 121 (1821). Writing about his militia career, a retired officer who served in the War of 1812 later wrote that his "habit of drinking" was then "less thought of, since it was the universal custom, in all regiments of the militia, with which I had any acquaintance, for the officers, on every muster day, to get gloriously drunk in their country's service." 3 The New-England Magazine 110, 111 (1832).

Next, the government cites four reconstruction era statutes, Gov't Ltr. Br. 6-9, several of which were already discussed by Mr. Harris, *see* Reply Br. 9-13; Supp. Ltr. Br. 7.[4] This sprinkling of reconstruction era regulations both "come[s] too late" and is

---

[4] In a footnote the government baldly asserts that purported historical limits imposed on the mentally ill also justify § 922(g)(3). Gov't Ltr. Br. 9 n.9. *See* Supp. Ltr. Br. 5. The government has the burden to find and explicate the historical sources. A footnote allusion to unidentified and undescribed regulations is plainly insufficient to satisfy that burden or indeed to preserve this argument. This is particularly so where the government similarly fails to connect the recreational use of marijuana, or even temporary marijuana intoxication, to mental illness. This Court should reject this

5

insufficient to establish a robust historical tradition of disarming ordinary citizens who use intoxicants at some point. *See* Reply Br.12-13. Moreover, these 19th century laws did not evince a comparable burden on the right of armed self-defense. Three apply outside the home to a person who is *carrying* or *using* a firearm *while* intoxicated. The fourth is even further attenuated: it prohibited *selling* a firearm to a person actually intoxicated. "At most, the[se] postbellum statutes support []banning the *carry* of firearms *while under the influence." Daniels,* 2023 WL 5091317, *5, 8 ("Although a few states after the Civil War prohibited carrying weapons while under the influence, none barred gun possession by regular drinkers.").

By contrast, "Section 922(g)(3) bans all possession, and it does so for an undefined set of 'user[s],' even if they are not under the influence." *Daniels,* 2023 WL 5091317, *8. "By regulating citizens like [Mr. Harris] based on a pattern of drug use, § 922(g)(3) goes further [than any historical regulation identified]. Our history and tradition do not support the leap." *Daniels*, 2023 WL 5091317, *9. *Accord Alston*, 2023 WL 4758734, * 16 (compared to the historical regulations, § 922(g)(3)'s sweep is "staggering" and "far more punitive": "Unlike the colonial laws, which sought to prohibit the active combination of liquor and firearms, [§ 922(g)(3)] completely prohibits individuals from possessing firearms based solely on their status as an 'unlawful user'").

Finally, the government newly contends that § 922(g)(3) is relevantly similar to a collection of disparate historical regulations of discrete groups from which it deduces a tradition of prophylactically disarming "persons who *would pose* a threat to the safety of others if armed." Gov't Ltr. Br. 9-10.[5]

First, and as already explained, Supp. Ltr. Br. 1-3, the *en banc* Court in *Range* rejected "as far too broad" the government's attempt to draw historical analogies at

---

undeveloped argument flagged in a footnote as waived. *See John Wyeth & Brother Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n. 6 (3d Cir.1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived."); *see also Odd v. Malone*, 538 F.3d 202, 207 n.2 (3d Cir.2008). Were this Court to reach this waived argument, it should reject it for the reasons persuasively marshaled by other courts. *See Daniels*, 2023 WL 5091317, *9-10; *United States v. Alston*, No. 5:23-cr-21, 2023 WL 4758734, *12-15 (E.D.N.C., July 18, 2023) (rejecting argument that purported laws regulating the mentally ill may serve as proper historical analogues to § 922(g)(3): English and Colonial traditions, putting aside their very significant differences, were not shown to have been enforced, addressed different societal problems, targeted different subsects of the people, and bore little resemblance to § 922(g)(3) including by failing to regulate firearms).

[5] The government has abandoned its position that there's a historical tradition of disarming the "unvirtuous." Doc.42, 2.

6

excessively high levels of generality. *Range v. Att'y Gen'l*, 69 F.4th 96, 104-05 (3d Cir. 2023) (quoting *Bruen*, 142 S.Ct. at 2134). This Court need go no further to grant relief.

Second, assuming for purposes of argument there is evidence for the underlying principle that there is a historical tradition of disarming based on abstract notions of danger, that principal has no application here.[6]

Courts must ask, "*Why* was the group considered dangerous at the Founding and therefore disarmed? And *why* does the modern law classify a person as presumptively dangerous?.... Furthermore, *how* did the historical regulation limit the rights of the dangerous class? And *how* does the modern regulation do so?" *Daniels*, 2023 WL 5091317, at *14. The cited English and early American laws passed during wartime or periods of political turmoil disarmed the disaffected, that is, political or religious dissidents disloyal or perceived to be disloyal to the Crown or party in power. *See* Reply Br. 17-18. Such groups were classified as presumptively dangerous because they were perceived as potential insurrectionists or rebels. By contrast, drug users are disarmed because Congress made a policy judgment that they lack self-control and can't be trusted with firearms. *See Daniels*, 2024 WL 5091317, *14-15 (reviewing proffered analogues to § 922(g)(3) and concluding "the government's theory of danger-based disarmament falls apart").

Without expanding on how and why these regulations burden the right of armed self-defense, the government offers a string cite to the Statute of Northhampton and various laws disarming religious minorities. Gov't Ltr. Br. 9. Notably, the Supreme Court has already dismissed the Statute of Northhampton's prohibition as a statute as having "little bearing on the Second Amendment adopted in 1791." *Bruen*, 142 S. Ct. at 2138-40 (cautioning against placing undue emphasis on English law, particularly those long pre-dating the founding, and explaining the statute's "prohibition on going or riding 'armed'" "appears to have been centrally concerned with the wearing of armor").

While the Militia Act of 1662 permitted disarming those adjudged to be "dangerous to the Peace of the Kingdom," this referred to disaffected persons, political and religious dissidents perceived as disloyal to the crown, not to those posing public safety threats. *See generally* Joseph G.S. Greenlee, *The Historical Justification*

---

[6] For this reason, this Court as it did in *Range* should refrain from deciding whether the historical laws cited establish a tradition of disarming the "dangerous" or otherwise. *Range*, 69 F.4th at 104-05 & n.9 (declining to decide this question because the government did not successfully analogize historical restrictions on Loyalists, Native Americans, and the like to Range and his individual circumstances). This restraint makes jurisprudential sense as the government's new position is summarily advanced in two paragraphs. And because this Court can assume there is a tradition of disarming based on danger and still rule in Mr. Harris' favor, he has not comprehensively addressed this question in the limited supplemental briefing ordered.

*for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 261 (2020). The Militia Act was initially promulgated by Charles II to consolidate power and quell potential revolts after the English Civil War and Oliver Cromwell's interregnum. *United States v. Rahimi*, 61 F.4th 443, 456 (5th Cir. 2023). Disarmament "escalated under the Catholic James II…." *Id.* Following the Glorious Revolution in 1688, which enthroned Protestants Williams and Mary, a Convention of elected representatives drafted the Declaration of Rights—a predecessor to the Second Amendment codified as the English Bill of Rights—which qualified the Militia Act by guaranteeing that "the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by law." *Rahimi*, 61 F.4th at 456; *see Heller*, 554 U.S. at 593; Alice Ristroph, *The Second Amendment in a Carceral State*, 116 Nw. U. L. Rev. 203, 228 (2021). "'This right,' which *restricted* the Militia Act's reach to prevent the kind of politically motivated disarmaments pursued by Charles II and James II, 'has long been understood to be the predecessor to our Second Amendment.'" *Rahimi*, 61 F.4th at 456 *(quoting Heller*, 554 U.S. at 593). Thus, authorities find that the Militia Act did not survive the Second Amendment. *Daniels*, 2023 WL 5091317, *12 (citing *Rahimi* for the proposition that the Militia Act was not incorporated into American law). Accordingly, it is not an appropriate analogue for § 922(g)(3). *Id.*

Early American laws disarming distrusted groups like those who refused to swear loyalty oaths fall into this bucket of laws disarming groups viewed as potential threats to the government. *See Alston*, 2023 WL 4758734, *18-19 (to the extent founding-era laws provide guidance, they reflect "at most" danger in the form of threats to state security; noting that the government identified no founding-era gun law that supports disarming "based on general public safety concerns rather than the threat of armed rebellion.").

The government does not explain how those who use controlled substances are analogous to political or religious dissidents. "Marijuana users are not a class of political traitors, as British Loyalists were perceived to be. Nor are they like Catholics and other religious dissenters who were seen as potential insurrectionists. And even if we consider the racially discriminatory laws at the Founding, [recreational marijuana users are] not like the minorities who the Founders thought threatened violent revolt." *Daniels*, 2023 WL 5091317, *13-14. *See also* Reply Br. 16-17 (challenging reliance on two minority proposals that did not make their way into the Second Amendment and failed to persuade a majority of their state's conventions); *Daniels*, 2023 WL 5091317, *14 & n.43 (at the founding, "that notion referred specifically to violence or rebellion, not generalized public harm."); *Alston*, 2023 WL 4758734, *20.

Nor does the government grapple with the reality that slaves, Native Americans, and disloyal people were excluded from the political community altogether, that is, they were "written out of 'the people.'" *Rahimi*, 61 F.4th at 457; *Alston*, 2023 WL 4758734, *19. More importantly, the government ignores that the Second Amendment, ratified in 1791, was a repudiation the English tradition of

8

disarming political opponents. *See Heller*, 554 U.S. at 592-95, 598; *ibid.*, 606-08 (discussing Commentary immediately following ratification taking the position that certain restrictions from the English Restoration, specifically the Game Act, which disarmed those who did not own property, particularly in Protestant regions, were inconsistent with the right that was ultimately codified in the Second Amendment).

The government's leap from its assertion of a tradition of disarming the dangerous to its speculation that users of controlled substances (even adult recreational users of marijuana who are not using or intoxicated at the time of the firearm possession) pose a serious risk of danger to others if armed, is nothing more than invitation to means-ends scrutiny "under the guise of an analogical inquiry." *Bruen*, 142 S. Ct. at 2133 n.7. *See* Gov't Ltr. Br. 10 ("the legislature reasonably could find that a group, like unlawful drug users, poses [dangers]"). *See also* Reply Br. 19-20. "Stripping a person's fundamental rights based on projected crimes *untethered from past dangerous actions* is a risky game indeed." *Folajtar v. Att'y Gen'l*, 980 F.3d 897, 923 (3d Cir.2020) (Bibas, dissenting).

Essentially, the government's position is that Congress has authority to declare a group (unlawful users) dangerous and to disarm them without judicial review. *See* Gov't Ltr. Br. 10 (arguing the government can take arms from a category of people it deems dangerous). This cannot be squared with *Bruen*, *Range*, and Second Amendment jurisprudence. Indeed, this Court already explicitly rejected the idea that Congress can simply designate a particular group not "law-abiding" or here "dangerous" and thereby eliminate their Second Amendment rights without judicial review:

> We reject that approach because such "extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label." *Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting). And that deference would contravene *Heller*'s reasoning that "the enshrinement of constitutional rights necessarily takes certain policy choices off the table."… *see also Bruen*, 142 S. Ct. at 2131 (warning against "judicial deference to legislative interest balancing").

*Range*, 69 F.4th at 102-03. As *Range* recognized, judicial deference to such legislative policy judgments flies in the face of *Bruen. Id.*

In short, the government's speculation regarding dangers posed by marijuana users is misplaced. *Bruen* repudiated judicial deference to legislative policy judgments that a particular group may pose a danger if armed and requires courts to assess whether a modern regulation and historical regulations impose comparable burdens by considering "how and why" the regulations burden the right of armed self-defense. *Id.*, 2132-33. As explained, the modern and historical regulations are not sufficiently comparable considering these metrics.

Even if the idea of dangerousness sweeps in persons convicted of non-political acts of violence, users of intoxicants don't fall within that category. The government simply repeats its speculation that users of controlled substances pose a threat to

9

public safety if armed. As explained, the government's "mere assertions" would not have satisfied even the now-abrogated strict or intermediate scrutiny review. *See* Br.18-20, 21-22, 22-29, 32-33; Reply Br.18-20; Supp.Ltr.Br.9 & n.6.

The only Court of Appeals to have decided the question presented following *Bruen* held that § 922(g)(3) is unconstitutional as applied to a recreational user of marijuana who was not intoxicated at the time of his arrest after finding no historical restrictions from the founding era barring ordinary citizens from possessing firearms based on their use of intoxicants. *Daniels,* 2023 WL 5091317, *1, 15. The Fifth Circuit's search for historical analogues came up empty despite its solicitation of amicus briefing on the matter. *Id.*, *5 n.8.

According to the government, the absence of founding-era laws preventing users of intoxicants from possessing firearms, irrespective of whether they are actively intoxicated, does not mean that legislatures lacked the power to disarm on that basis: "Harris identifies nothing in pre-19th-century practice demonstrating that legislatures were considered to *lack* authority to preclude the intoxicated public from using firearms." Supp. Ltr. Br. 7 & n.6. The government gets the analysis backwards while misplacing the burden. *Bruen* places the burden on the government to demonstrate that this modern regulation disarming sober citizens based on past drug use is consistent with the nation's history and tradition of firearms regulation. Because it has not identified any comparable tradition of disarming individuals who used intoxicants at one time from possessing firearms at another, § 922(g)(3) "fails constitutional muster under the Second Amendment." *Daniels*, 2023 WL 5091317, *15.[7]

Applying *Bruen* and *Range,* § 922(g)(3) violates the Second Amendment on its face or as applied; the judgment must reversed and the indictment dismissed.

Respectfully submitted,
*/s/ Renee Pietropaolo*
Renee Pietropaolo
Assistant Federal Public Defender

---

[7] The government maintains remand for application of *Bruen* is unnecessary. Hedging its bets, the government suggests that if this Court concludes it failed to meet its burden, it could remand to allow it a second bite at the apple. Gov't Ltr. Br. 3. *Bruen* expressly puts the burden on the government to "affirmatively prove" its regulation "is part of the historical tradition…" and admonishes judges to answer questions about the constitutionality of modern firearm regulations "based on the historical record compiled by the parties." *Bruen*, 142 S. Ct. at 2126-27, 2130 n.6. Thus, where, as here, the government fails to meet its burden, the remedy is to declare the statute unconstitutional on its face or as applied.

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2023, I electronically filed the foregoing Supplemental Reply Letter Brief for Appellant pursuant to the Court's Order dated June 13, 2023, using the Third Circuit Court of Appeals' Electronic Case Filing (CM/ECF) system. I also certify that I served copies upon Filing User Andrew C. Noll, through the appellate CM/ECF system.

>  */s/ Renee Pietropaolo*
>  Renee Pietropaolo
>  Assistant Federal Public Defender

August 21, 2023