

**U.S. Department of Justice**

Criminal Division

*950 Pennsylvania Avenue N.W., Room 1252*
*Washington, DC 20530-0001*
*Tel: (202) 307-1982*

November 15, 2023

The Honorable Patricia S. Dodszuweit, Clerk of Court
United States Court of Appeals for the Third Circuit
21400 U.S. Courthouse
601 Market Street
Philadelphia, PA 19106

      Re:    *United States v. Erik Matthew Harris*, No. 21-3031
             <u>Second Supplemental Letter Brief for the United States</u>

Dear Ms. Dodszuweit,

    The government respectfully submits this letter brief in response to the questions posed by the Court in its September 5, 2023 order.

## INTRODUCTION

    "[D]rugs and guns are a dangerous combination." *Smith v. United States*, 508 U.S. 223, 240 (1993). Handling firearms safely requires care, caution, and self-control—characteristics which are compromised by the psychological and physiological effects of illegal drug use. Drug users also frequently use firearms to commit other crimes—including to fund their drug habit, protect their stash, or prevent apprehension—and may use firearms to commit acts of self-harm. In Section 922(g)(3), Congress sought to address these problems by temporarily disarming regular drug users and drug addicts. An individual can regain his ability to possess firearms by stopping his illegal drug abuse.

    The government maintains that the Second Amendment allows Congress to disarm persons who are not law-abiding, responsible citizens. *See* Gov't Br. 11-13 (filed June 10, 2022); Gov't Supp'l Ltr. Br. 2 n.1 (filed Aug. 7, 2023); *see generally* U.S. Br. 10-27, *United States v. Rahimi*, No. 22-915 (Aug. 14, 2023), *cert. granted*, June 30, 2023. *But cf. Range v. Attorney General*, 69 F.4th 96, 101-03 (3d Cir. 2023) (en banc), *petition for cert pending*, No. 23-374 (filed Oct. 5, 2023).[1] That category includes persons whose possession of firearms would endanger themselves or others. *See* U.S. Br. 27, *Rahimi, supra*. Section 922(g)(3)'s restriction on firearm possession by regular unlawful drug

---

[1] The government has filed a petition for certiorari in *Range*, requesting that the Supreme Court hold the petition pending the Court's decision in *Rahimi*, and then dispose of the petition as appropriate. *See* Pet. 7, 25-28, *Range, supra*. The plaintiff-respondent has agreed that the petition should be granted.

users and drug addicts falls comfortably within that principle. As the government has explained, Section 922(g)(3) is analogous to historical regulations that prohibited firearm possession by individuals who were intoxicated by alcohol or deemed dangerous. *See* Gov't Supp'l Ltr. Br. 4-10. Historical laws restricting or expressly disarming persons with mental illnesses further support Section 922(g)(3)'s constitutionality. This Court should affirm.

## ARGUMENT

### I. Drug Use, Including Marijuana, Causes Significant Cognitive Impairments

The Court requested the parties' views concerning whether "habitual ingestion of regulated substances, including[ ] marijuana, is analogous to or triggers conditions analogous to schizophrenia or other mental illnesses or cognitive impairments." The answer is yes. And for that reason, habitual drug users may lawfully be disarmed for as long as they continue to unlawfully use drugs.

Marijuana, the substance at issue in this case, "is a psychoactive drug" that "derives its psychoactive properties from delta-9-tetrahydrocannabinol (THC), which exists in varying concentrations in the [hemp] plant." *Nat'l Org. for the Reform of Marijuana Laws v. Bell*, 488 F. Supp. 123, 128 (D.D.C. 1980). When a user smokes or ingests marijuana, an intoxicating effect may "develop[ ] within minutes" and last "about 3 to 4 hours." Michael L. Alosco et al., *Neuropsychology of Illicit Drug Use and Impulse Control Disorders*, in *Clinical Neuropsychology: A Pocket Handbook for Assessment* 605, 608 (Michael W. Parsons et al., eds., 3d ed. 2014). Those effects include cognitive impairments like altered "perception of time," "decreased short-term memory," and "impaired perception and motor skills." Nat'l Academies of Sciences, Engineering, and Medicine, *The Health Effects of Cannabis and Cannabinoids: The Current State of Evidence and Recommendations for Research* 53 (2017) (*Health Effects*); *see generally Cannabis (Marijuana) DrugFacts*, Nat'l Institute on Drug Abuse, (last visited Nov. 15, 2023), https://nida.nih.gov/publications/drugfacts/cannabis-marijuana. Marijuana intoxication also causes mood fluctuations and feelings of euphoria, decreased inhibition, impaired decision making, and inhibited attention and concentration. Alosco et al., *supra*, at 608. When "very high blood levels" of THC are achieved, a person "may experience panic attacks, paranoid thoughts, and hallucinations." *Health Effects*, at 53. Following regular high-dosage usage, withdrawal symptoms also may include irritability, anxiety, aggressive behavior, and anger. Alosco et al., *supra*, at 608; *see* Ivan Urtis, et al., *Cannabis Use and its Association with Psychological Disorders*, Psychopharmacology Bulletin, Vol. 50 No. 2, at 58-59 (May 15, 2020) ("Like schizophrenia, cannabis use is associated with positive symptoms such as euphoria and paranoia and negative symptoms such as memory loss.").

More generally, there is a demonstrated correlation between marijuana use and certain mental illnesses, although the association is not necessarily causal. Urtis, *supra*, at 59-61 (explaining that "cannabis use and the development of psychosis" may be

"linked by an underlying genetic vulnerability" but that, "[d]espite the association that has been frequently observed between cannabis use and schizophrenia, less has been done to prove a causal relationship"); *see also* Nora D. Volkow et al., *Adverse Health Effects of Marijuana Use*, 370 New Eng. J. Med. 2219, 2221 (2014). "[C]annabis use disorder (CUD) is much more prevalent in individuals with mental illnesses like schizophrenia, anxiety disorder, post-traumatic-stress disorder, and personality disorders." Urtis, *supra*, at 58. Indeed, about "one in every four individuals with schizophrenia has a concurrent diagnosis of CUD." *Id.* at 58-59.

In addition, as the government has noted, despite limiting his claim to Section 922(g)(3)'s application to marijuana, accepting Harris's arguments necessarily would cast doubt on the statute's constitutionality as applied to other controlled substances. *See* Gov't Supp'l Ltr. Br. 7. And although their respective effects differ, it cannot be disputed that other controlled substances likewise cause serious cognitive and other impairments that inhibit individuals' ability to safely use firearms.

For example, cocaine intoxication can cause, in addition to serious physical effects, feelings of euphoria, hypervigilance, interpersonal sensitivity, anxiety, and grandiosity. Alosco et al., *supra*, at 610. When used regularly, cocaine "commonly results in paranoid ideation, aggressive behavior, anxiety, [and] depression." *Id.* And chronic users "frequently exhibit impairments on neuropsychological tests assessing attention and executive function, including problem solving, working memory, mental flexibility, moral judgment, and information-processing speed." *Id.* The use of amphetamines causes similar symptoms, and chronic use "may cause aggressive and violent behavior in addition to intense anxiety, paranoid ideation, and schizophrenia-type traits." *Id.* at 611. Long-term abuse of heroin has also been found to result in deficits in "aspects of executive function, learning and memory, attention, and psychomotor speed." *Id.* at 613. Studies note the significant co-occurrence of mental illness among individuals who regularly use illicit drugs. Substance Abuse & Mental Health Servs. Admin., *Key Substance Use and Mental Health Indicators in the United States: Results from the 2016 National Survey on Drug Use and Health* 45 (Sept. 2017) (finding that 43.4% of adults with a substance abuse disorder also had a co-occurring mental illness).

## II. History Justifies Disarming Individuals At Risk Of Such Impairment

Given the impairments caused by marijuana and other illegal drugs, the temporary disarmament of individuals who regularly use or are addicted to such drugs fits comfortably within "this Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022).

Section 922(g) "is no minor provision"; indeed, it "probably does more to combat gun violence than any other federal law." *Rehaif v. United States*, 139 S. Ct. 2191, 2201 (2019) (Alito, J., dissenting). And Section 922(g)(3) is one of the most frequently applied of the law's disqualifications. Since the federal background-check system was created in 1998, Section 922(g)(3) has resulted in more than 218,000 denials of firearms transactions. *See* Crim. Justice Info. Servs. Div., Fed. Bureau of Investigation, U.S.

Dep't of Justice, *Federal Denials: Reasons Why the NICS Section Denies, November 30, 1998 – October 31, 2023* (last visited Nov. 15, 2023).[2] Indeed, in 2020 and 2021 (the most recent years for which data is available), the provision resulted in nearly 35,000 denials—more than any other provision apart from Section 922(g)(1)'s disarmament of convicted felons. *See* Crim. Justice Info. Servs. Div., Fed. Bureau of Investigation, U.S. Dep't of Justice, *National Instant Criminal Background Check System Operational Report 2020-2021*, at 19 (Apr. 2022).[3]

The Court asked the parties to address "whether historical precedents . . . support disarming those with" habitual drug "habits, addictions, impairments or mental illnesses." Historical practices which authorized legislatures to disarm categories of persons whose possession of firearms would endanger themselves or others—including precedents permitting the disarmament of those intoxicated by alcohol or those deemed dangerous, as well as those with mental illnesses—provide ample support for Section 922(g)(3)'s constitutionality.

### A. Historical Laws Disarming The Intoxicated And Other Dangerous Individuals Justify Section 922(g)(3)

As the government has explained, legislatures historically restricted gun possession by those intoxicated by alcohol and those deemed dangerous. *See* Gov't Supp'l Ltr. Br. 4-10. Those historical practices justify disarming individuals, described in the Court's order, whose drug use impairs their cognition and otherwise renders them a potential danger to themselves or others if armed.

Drug users may mishandle firearms—or use firearms to commit crimes—because of "drug-induced changes in physiological functions, cognitive ability, and mood." *Harmelin v. Michigan*, 501 U.S. 957, 1002 (1991) (Kennedy, J., concurring in part and concurring in the judgment); *see Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 332 (2012) ("The use of drugs can embolden [individuals] in aggression."). Indeed, illegal drug users often "commit crime in order to obtain money to buy drugs," and thus pose a danger of using firearms to facilitate such crime.[4] *Harmelin*, 501 U.S. at 1002 (Kennedy, J.). In the years before Section 922(g)(3)'s enactment, President Lyndon B.

---

[2] *Available at:* https://www.fbi.gov/file-repository/federal_denials.pdf/view.

[3] *Available at:* https://www.fbi.gov/file-repository/nics-2020-2021-operations-report.pdf/view.

[4] *See also, e.g., Ramirez v. Collier*, 595 U.S. 411, 458 (2022) (Thomas, J., dissenting) ("the brutal slaying of a working father during a robbery spree to supply a drug habit"); *Wong v. Belmontes*, 558 U.S. 15, 15-16 (2009) (per curiam) ("bludgeoned [the victim] to death, . . . stole [her] stereo, sold it for $100, and used the money to buy beer and drugs"); *Smith v. Texas*, 543 U.S. 37, 41 (2004) (per curiam) ("regularly stole money from family members to support a drug addiction"); *Buford v. United States*, 532 U.S. 59, 62 (2001) ("robberies had been motivated by her drug addiction").

Johnson and both Houses of Congress recognized that drug use often motivates crime.[5] Violent crime "may occur as part of the drug business or culture," *id.*, and involve drug dealers and customers alike. Drug users and addicts are more likely "to have hostile run-ins" with law enforcement and frequently threaten officer safety, particularly "when guns are involved." *United States v. Carter*, 750 F.3d 462, 469 (4th Cir. 2014) (quotation omitted). And armed drug users may also endanger themselves. *See Health Effects*, at 311 (noting that drug users, including marijuana users, pose a higher risk of suicide than ordinary citizens). In each of these circumstances, guns increase the likelihood and lethality of such violence.

In his Supplemental Reply Letter Brief, Harris relies significantly on the Fifth Circuit's recent decision in *United States v. Daniels*, which found Section 922(g)(3) unconstitutional as applied to a marijuana user. 77 F.4th 337, 343-55 (5th Cir. 2023), *petition for cert pending*, No. 23-376 (filed Oct. 5, 2023);[6] Reply Ltr. Br. 4-8 (filed Aug. 21, 2023). The *Daniels* panel correctly observed that, despite the Founding era's familiarity with intoxication by alcohol, the Founders "were not familiar with widespread use of marihuana as a narcotic, nor the modern drug trade" and thus "had no occasion to consider the relationship between firearms and intoxication via cannabis." 77 F.4th at 343-44. But the panel was mistaken in finding that history and tradition do not, by analogy, support Section 922(g)(3)'s validity.

The Fifth Circuit suggested that the historical tradition of prohibiting gun possession by persons intoxicated with alcohol and by persons with mental illnesses would support modern laws disarming drug users who are "currently under an impairing influence." *Daniels*, 77 F.4th at 349. But the *Daniels* panel and Harris both err in arguing that the lack of Founding-era laws disarming intoxicated individuals generally, even during intermittent periods of sobriety, undermines the constitutionality of Section 922(g)(3). *Id.* at 347-48; Reply Ltr. Br. 5-6. The danger to society posed by an armed drug user extends beyond the risk that he will mishandle firearms while under the influence of drugs; as explained, drug users are also more likely to use firearms to commit crimes to fund their drug habit, engage in violence as part of the drug business or culture, attack police officers who are investigating their drug crimes, and commit suicide. Those risks justify disarming habitual drug users even "between periods" of drug intoxication. *Daniels*, 77 F.4th at 349. Indeed, even if a court were to consider

---

[5] *See* H.R. Doc. No. 89-407, at 7 (1966) (presidential message) ("Drug addiction . . . drives its victims to commit untold crimes to secure the means to support their addiction."); H.R. Rep. No. 89-1486, at 8 (1966) ("Narcotic addicts in their desperation to obtain drugs often turn to crime in order to obtain money to feed their addiction."); S. Rep. No. 89-1667, at 13 (1966) (observing that drug users can be driven "to commit criminal acts in order to obtain money with which to purchase illegal drugs").

[6] The government has filed a petition for certiorari in *Daniels*, requesting that the Supreme Court hold the petition pending the Court's decision in *Rahimi*, and then dispose of the petition as appropriate. *See* Pet. 5, 19-21, *Daniels*, *supra*.

only the risk that a person will misuse firearms while under the influence of drugs, Section 922(g)(3) complies with the Second Amendment because drug users who possess firearms are apt to retain possession while under the influence. This case is an example: Harris claimed to lose one of his firearms (potentially at a bar) on the same evening that he smoked marijuana and was drunk. *See* Gov't Br. 5-6. Users are unlikely to put their guns away before using drugs and retrieve them only after regaining lucidity. And it is unclear how the government could reasonably administer a regime that permitted confiscation only during the several-hour period a person is intoxicated.

The *Daniels* panel also contended that historical limitations on the militia were of limited relevance in assessing "the limits acceptable for the general public." 77 F.4th at 346; *see also* Reply Ltr. Br. 5. But as the government has explained, early laws understandably focused on the militia because social norms at the time restrained intemperance, there was little public outcry against alcoholism, and the cumbersome nature of firearms mitigated risks posed by intoxicated individuals who were not members of the militia. *See* Gov't Supp'l Ltr. Br. 6. As those conditions changed, limitations on the general public, understandably, emerged. *Id.* at 6-7.[7]

Finally, Harris seeks to cabin historical analogues disarming those deemed dangerous to "political or religious dissidents." Reply Ltr. Br. 7-8. But as *Heller*'s express reference to "longstanding prohibitions" on possession "by felons and the mentally ill" suggests, legislatures' authority to disarm individuals was not historically limited to disarming political dissidents. *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). Instead, historical practice supports a broader authority to disarm not only politically disaffected persons, but also those considered dangerous, more generally. *See, e.g.*, 13 & 14 Car. 2, c.3, § 13 (1662) (those judged "dangerous to the Peace of the Kingdom"); *Calendar of State Papers, Domestic Series, 1670*, at 237 (May 26, 1670) (Mary Anne Everett Green ed., 1895) (instructions to disarm "dangerous and disaffected persons"); 1692-1694 Mass. Acts 11-12 (addressing "affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively" (capitalization altered)); 1696-1701 N.H. Laws 15 (same).

### B.     Historical Limitations On The Mentally Ill Also Support Section 922(g)(3)'s Constitutionality

Independently, because regular illegal drug use poses a risk of impairment, historical restrictions placed on persons with mental illnesses also establish "a well-established and representative historical analogue" to justify Section 922(g)(3). *Bruen*, 142 S. Ct. at 2132-33 (emphasis omitted).

**1.**     Harris rightfully concedes (Opening Br. 14 (filed Apr. 6, 2022)) that

---

[7] The *Daniels* panel also hypothesized that such militia laws may not have been strictly enforced. 77 F.4th at 346 n.16. But however rigorously local officials ultimately enforced those laws, their widespread adoption supports the Founding-era view that such restrictions did not trench upon the right to keep and bear arms.

prohibitions on firearm possession by "the mentally ill date back to the founding." The Supreme Court has approved of such restrictions, *Heller*, 554 U.S. at 626; *see Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring), and restrictions on those deemed a threat to public safety because of mental illness—including firearm restrictions—have a venerable history.

In England, the Vagrancy Act of 1744 allowed justices of the peace to lock up and seize the property of those "who by lunacy, . . . are furiously mad, or are so far disordered in their senses that they may be dangerous."[8] *See* 17 Geo. 2, c.5 (capitalization altered); Richard Moran, *The Origin of Insanity as a Special Verdict: The Trial for Treason of James Hadfield (1800)*, 19 Law & Soc'y Rev. 487, 509-10 (1985). And in colonial and Founding-era America, those afflicted with mental illnesses "were generally treated as if they had been . . . stripped of all . . . their rights and privileges." Albert Deutsch, *The Mentally Ill in America: A History of their Care and Treatment from Colonial Times* 41 (1949).

Colonial America was more rural and dispersed than England, and "lacked large urban areas and complex institutional arrangements characteristic of" England. Gerald N. Grob, *The Mad Among Us: A History of the Care of America's Mentally Ill* 5, 13-14 (1994). Some areas even lacked "the luxury of a jail in the early days." Deutsch, *supra*, at 41. Because the "proportionately small number of 'distracted' persons did not warrant the creation of special facilities," persons with mental illnesses initially "were cared for on an ad hoc and informal basis either by the family or community."[9] Grob, *supra*, at 6. Given these societal conditions, early "legislation usually concerned itself more with [the mentally ill's] property than their persons." Deutsch, *supra*, at 53; *see also* Mary Ann Jimenez, *Changing Faces of Madness: Early American Attitudes and Treatment of the Insane* 51 (1987) (describing 1694 Massachusetts law which "empowered justices of the peace to dispose of the estates of distracted persons and use the proceeds to support their families"). By the end of the 18th century, multiple jurisdictions had enacted laws that charged those appointed as guardians for mentally ill persons to "take care" of the person and his "estates, both real and personal"—thus including any firearms the person possessed—and provided that such property "shall be delivered[ ] and returned" to the person if he is "restored to [his] right mind." 1776-1789 N.H. Laws 235-237 (1776 law); *see also* 1737 Mass. Laws. 9-10; 1780-1788 Mass. Laws 135-136 (1784 law); 1788 N.Y. Laws 617; 1700-1797 Del. Laws 1055-1056 (1793 law); William Paterson, *Laws of the State of New-Jersey* 125 (1800) (1794 law); 1799 Miss. Laws 35-38

---

[8] Solely for accuracy, when directly quoting historical and secondary source material, the government retains the use of outdated and in some cases discriminatory language used to describe the mentally ill.

[9] The first general hospital in America did not open until the 1750s (in Philadelphia) and the first asylum dedicated to care of the mentally ill did not open until 1773 (in Williamsburg, Virginia). Deutsch, *supra*, at 58-60, 66; *see* Grob, *supra*, at 18-20.

(law of Mississippi territory); *see also* 1804 Ohio Laws 163-165; 1805-1821 Mich. Territory Laws 376-378 (1818 law).

The English tradition of restricting a mentally ill person's liberty also carried into 18th-century America, albeit in a more decentralized way. "Local officials" typically dealt with the mentally ill "on an ad hoc basis," and the issue was not "perceived as a *social* problem requiring formal public policies." Grob, *supra*, at 15; *accord* Deutsch, *supra*, at 41 (explaining that "individual cases were considered and decided on as they arose"). Frequently, jurisdictions enacted laws aimed at particular individuals, which specified the care (including confinement) that their family or the community was charged with undertaking. *See, e.g.*, Deutsch, *supra*, at 42-43 (citing examples, including a 1676 Pennsylvania law directing that persons be hired "to build a little block-house at Amesland" to confine a mentally-ill person and a 1689 Massachusetts law directing a man to "build a little house . . . to secure his Sister good wife"); Grob, *supra*, at 15-16 (citing these and other examples).

Statutes of general applicability did eventually emerge. Some colonies authorized justices of the peace to "lock[ ] up" "lunatics" considered "dangerous to be permitted to go abroad." Henry Care, *English Liberties, or the Free-Born Subject's Inheritance* 329 (6th ed. 1774). By around the time the Second Amendment was ratified, jurisdictions had enacted laws—tracking the language of the English Vagrancy Act—permitting the commitment of persons determined by justices of the peace, magistrates, or selectmen to be "[l]unatics" or of "unsound mind." *See, e.g.*, 1769 Va. Acts 13; 2 William Littell, *The Statute Law of Kentucky* 578 (1810) (1787 law); 1 Samuel Shepherd, *Statutes at Large of Virginia from October Session 1792, to December Session 1806, Inclusive* 163 (1835) (1792 law); 1798 Mass. Acts 813; 1 *The Public Statute Laws of the State of Connecticut* 386 (1808) (1793 law). Such laws were used, among other things, to combat firearm-related threats: in one instance, a man in Massachusetts whose "wealth and social standing in the town" otherwise generally "protected him from disgrace" was confined after he "became dangerous" by "firi[ing] a pistol at a curious onlooker." Jimenez, *supra*, at 93.

Given these well-established practices, no historical evidence suggests that anyone in the Founding-era believed the government lacked authority—consistent either with the preexisting right to keep and bear arms or the Second Amendment—to specifically disarm the mentally ill. And, as this Court has explained, greater restrictions on the liberty and property of persons who were mentally ill made firearm-specific restrictions unnecessary at the time. *Beers v. Attorney General*, 927 F.3d 150, 157 (3d Cir. 2019), *vacated on other grounds*, 140 S. Ct. 2758 (2020). The absence of any Founding-era laws specifically disarming such persons thus is readily explained by social and technological factors that have nothing to do with the Second Amendment. It was not until the 19th century that a "dramatic growth in population was accompanied by a proportionate increase in the number of [mentally ill] persons," which caused such persons to be "more visible, and public concern about security increased" particularly in "densely populated areas." Grob, *supra*, at 24. Nor would the specific combination of mental illness and firearms have posed the same threat in the 18th century that it did

8

during subsequent decades because 18th-century guns generally fired only one shot, often misfired, took a long time to load, and could not be kept loaded for long periods. *See* Randolph Roth, *Why Guns Are and Are Not the Problem*, *in* Jennifer Tucker et al., eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 117 (2019). Accordingly, the absence of 18th-century regulations specifically addressing mental illness and firearm use does not reflect any doubt about such measures' constitutionality. The Supreme Court has dismissed as "bordering on the frivolous" the argument that the Second Amendment protects "only those arms in existence in the 18th century," *Heller*, 554 U.S. at 582, and the notion that the Amendment permits only those specific regulations that existed in the 18th century has no more merit. *Cf. McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 373 (1995) (Scalia, J., dissenting) ("Quite obviously, not every restriction upon expression that did not exist in 1791 or 1868 is *ipso facto* unconstitutional.").

Tellingly, as relevant societal conditions changed, so too did the nature and specificity of mental-illness-related firearm regulations. As the 19th century wore on, several states banned the sale of guns to the mentally ill. *See* 1881 Fla. Laws 87; 1883 Kan. Sess. Laws 159; 1899 N.C. Pub. Laws 20-21; *see also* Sam Kimble, *Revised Ordinances of the City of Manhattan and Rules of the Council* 49 (1887). In the 20th century, new regulations on the delivery or sale of firearms were similarly extended to the mentally ill as well as drug addicts. *See, e.g.*, 1927 N.J. Laws 745; 1931 Pa. Laws 499; 1935 Ind. Acts 161; 1935 S.D. Sess. Laws 356; 1935 Wash. Sess. Laws 601; 1936 Ala. Acts 52; 47 Stat. 650, 652 (1932).[10]

In short, although regulations addressing firearm possession by the mentally ill have evolved with societal and technological conditions, history confirms that "longstanding prohibitions on the possession of firearms" by "the mentally ill," *Heller*, 554 U.S. at 626, have a "well-established" historical tradition, *Bruen*, 142 S. Ct. at 2133.

**2.** Section 922(g)(3)'s temporary prohibition on firearm possession while an individual is an unlawful user of or addicted to a controlled substance imposes "a comparable burden" that is "comparably justified" to historical restrictions on firearm possession by the mentally ill, both in "how and why the regulations burden" the Second Amendment right. *Bruen*, 142 S. Ct. at 2133.

In terms of *why* Section 922(g)(3) limits the right, the provision—like similar restrictions on the mentally ill and intoxicated persons—limits firearm possession by

---

[10] The government's earlier supplemental letter brief cited the 1927 New Jersey law and the 1932 federal statute (applicable to the District of Columbia) as among those laws prohibiting the delivery and sale of firearms to both drug addicts and habitual drunkards. *See* Gov't Supp'l Ltr. Br. 7. Although those laws did encompass "drug addict[s]"—as well as persons "not of sound mind"—they did not address intoxicated individuals. 1927 N.J. Laws 745; 47 Stat. 650, 652 (1932). The government regrets the inadvertent error.

persons who would pose a danger to themselves or others if armed. In the Founding era, drunkenness was equated with mental illness. *See, e.g.*, Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits Upon the Human Body and Mind* 6 (1812) (describing drunkenness as a "temporary fit of madness"); Carl Erik Fisher, *The Urge: Our History of Addiction* 47 (2022) (noting that "eighteenth-century writers" understood "habitual drinking" as a form of "insanity"). That view persisted into the 19th century, with many states enacting statutes that allowed "habitual drunkards" to be committed to asylums or placed under guardians in the same manner as "lunatics." *Kendall v. Ewert*, 259 U.S. 139, 146 (1922) (quotation omitted).

Although many modern narcotics and psychoactive drugs were unknown at the Founding, *see* Gov't Supp'l Ltr. Br. 4-5, it is "beyond dispute that illegal drug users"—like alcoholics or those with mental illnesses—"are likely . . . to experience altered or impaired mental states that affect their judgment and that can lead to irrational or unpredictable behavior." *Wilson v. Lynch*, 835 F.3d 1083, 1094 (9th Cir. 2016). As the Supreme Court has explained, suspicionless drug testing of federal employees who carry firearms is justified by "the extraordinary safety . . . hazards that would attend the promotion of drug users to positions that require the carrying of firearms," including concerns that employees "may suffer from impaired perception and judgment." *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 671, 674 (1989). "[E]ven a momentary lapse of attention [while carrying a firearm] can have disastrous consequences." *Id.* at 670 (quotation omitted). Similar hazards justify Section 922(g)(3).

Moreover, it has long been understood that a person with a mental illness does not necessarily exhibit symptoms all the time. Blackstone thus defined a "lunatic" as "one that hath lucid intervals; sometimes enjoying his senses, and sometimes not." 1 William Blackstone, *Commentaries on the Laws of England* 294 (1765); *see* Edward Coke, *The First Part of the Institutes of the Lawes of England, or, a Commentarie upon Littleton* § 405, at 247 (1628) (same). The Supreme Court has nonetheless approved "longstanding prohibitions on the possession of firearms by . . . the mentally ill" and has never suggested that the validity of such laws fluctuates with the remission and relapse of a person's symptoms. *Heller*, 554 U.S. at 626. Just as Congress may disarm persons with mental illnesses even during their lucid intervals, it may disarm habitual drug users even during their sober intervals.

In terms of *how* the law burdens the right to self-defense, Section 922(g)(3)'s temporary restriction is no more restrictive than historical laws that dispossessed mentally ill individuals of their property until they were deemed to have recovered. *See supra* at 7-8. Section 922(g)(3)'s restriction extends no longer than necessary to accomplish its purpose of preventing firearms from "fall[ing] into the hands of the lawless or those who might misuse them." S. Rep. No. 89-1866, at 1 (1966).

## CONCLUSION

For the foregoing reasons, and those detailed in the government's response brief and previous supplemental letter brief, the judgment should be affirmed.

10

<table>
<tr><td>

November 15, 2023

ERIC G. OLSHAN
United States Attorney
Western District of Pennsylvania

LAURA S. IRWIN
Chief, Appellate Section
Western District of Pennsylvania

ADAM N. HALLOWELL
Assistant United States Attorney
Western District of Pennsylvania

</td><td>

Respectfully submitted,

NICOLE M. ARGENTIERI
Acting Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

/s/ Andrew C. Noll
ANDREW C. NOLL
Criminal Division, Appellate Section
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
(202) 307-1982
Andrew.Noll@usdoj.gov

</td></tr>
</table>

## CERTIFICATE OF COMPLIANCE

1.　This letter brief complies with the Court's September 5, 2023 order because it contains 10 single-spaced pages, excluding the parts of the brief exempted under Federal Rule of Appellate Procedure 32(f).

2.　This letter brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), the typestyle requirements of Rule 32(a)(6), and the formatting requirements of Third Circuit Local Appellate Rule 32.1, and has been prepared in a proportionally spaced, 14-point serif typeface using Microsoft Word.

/s/ Andrew C. Noll
Andrew C. Noll

**CERTIFICATE OF SERVICE**

I hereby certify that on November 15, 2023, I electronically filed the foregoing with the Clerk of the Court of the U.S. Court of Appeals for the Third Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

/s/ Andrew C. Noll  
Andrew C. Noll
