November 15, 2023

The Honorable Patricia S. Dodszuweit, Clerk of Court
United States Court of Appeals for the Third Circuit
21400 U.S. Courthouse
601 Market Street
Philadelphia, PA 19106

Re: *United States v. Erik Matthew Harris*, No. 21-3031; Erik Harris' Supplemental Letter Brief Responding to Order dated September 5, 2023

Dear Ms. Dodszuweit,

> The Court has directed the parties to address the following questions:
>
> whether habitual ingestion of regulated substances, including, marijuana, is analogous to or triggers conditions analogous to schizophrenia or other mental illnesses or cognitive impairments, as well as any medical or scientific evidence that the parties may wish to present that bears on that question, and whether historical precedents (or lack thereof) support disarming those with such habits, addictions, impairments or mental illnesses.

Respectfully, the questions appear to invite arguments beyond the scope of the instant appeal and to contemplate evidence gathering and factfinding functions that are outside an appellate court's role.

Mr. Harris has brought an as-applied challenge to 18 U.S.C. § 922(g)(3), which disarms anyone "who is an unlawful user of or addicted to any controlled substance." He was charged as a user, not addict, and convicted based on his purchase of firearms and his subsequent police-interview admissions to recreational marijuana use. *See* Harris Opening Br. (Br.) 50; Appx Vol. III. The statute does not define "user," does not require that a person be using or intoxicated while possessing a firearm (a conviction may be based on past use), and does not require a "user" be in actual (as opposed to constructive) possession of a firearm.[1] This Court need only decide the narrow question whether § 922(g)(3) violates the Second Amendment as applied to Erik Harris, an adult recreational user of marijuana who was not intoxicated at the time of the charged possession. It does not.

---

[1] Unlawful users include those using prescribed controlled substances in a non-prescribed manner. 27 C.F.R. § 487.11. An inference of current use may be drawn from "a conviction for use or possession … within the past year" even if the conduct was more remote, a positive drug test within the past year, and arrests if one was within the past year. *Id.*; https://www.justice.gov/file/1385186/download

Tailored to the relevant Second Amendment inquiry required in this appeal, the answer to both of the Court's questions is no. There is no scientific consensus that adult habitual or regular marijuana use is analogous to or triggers conditions analogous to schizophrenia or other mental illnesses or cognitive impairments.[2] And there is no history and tradition that existed at the founding of disarming people based on mental illness or cognitive impairments or a *potential* of forming an illness due to their behaviors. To the extent any tradition of disarming the mentally ill can be gleaned from historical sources, § 922(g)(3) does not impose a comparable burden on the right of armed self-defense and is not comparably justified at least as applied to recreational users of marijuana.

**The Court's question is beyond the scope of the instant appeal.**

The Court's question—whether "habitual ingestion" of "regulated substances" including marijuana, "is analogous to or triggers conditions analogous to schizophrenia or other mental illness or cognitive impairments"—invites arguments and evidence beyond the scope of the instant appeal. "Habitual" ingestion is not defined and could mean ingestion of a substance once a day, once a week, or once every two months. "Regulated" substances include tobacco and alcohol. "Mental illness" sweeps in a wide swath of conditions including eating disorders, agoraphobia and selective mutism, none of which pose a danger to the community.[3]

At issue here is an as-applied challenge by an adult recreational marijuana user (not addict) who was not intoxicated at the time of the charged possession. In resolving this as-applied challenge, the Court should limit inquiry to whether there is scientific consensus that regular use of marijuana triggers conditions analogous to schizophrenia or other mental illnesses or cognitive impairment. There is not.

Further, Mr. Harris suggests that the Court's question can be answered only by resort to evidence outside the record. Appellate courts are not factfinders. *See Anderson*

---

[2] Habitual marijuana use is not equivalent or analogous to mental illness. Habit is not addiction. The statute defines addict as "any individual who habitually uses any narcotic drug so as to endanger the public morals, health, safety, or welfare, or who is so far addicted…as to have lost the power of self-control…." 21 U.S.C. § 802(1). Cannabis use disorder is listed as a mental health disorder, *see* DSM-5 (5th ed.); cannabis use is not. As stated, Mr. Harris was charged as a user, not addict, and is not alleged to have been diagnosed with cannabis use disorder.

[3] An estimated more than one in five U.S. adults live with a mental illness (57.8 million in 2021). https://www.nimh.nih.gov/health/statistics/mental-illness. *See also* Carlton F.W. Larson, *Four Exceptions In Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 HSTLJ 1371, 1383 (2009) (acknowledging mental disorders cover a wide range of non-dangerous conditions).

*v. City of Bessemer City, N.C.*, 470 U.S. 564 (1985). And scientific and medical journals on these points were not submitted to the district court, are not part of the record on appeal, and should not be considered. *See* Fed.R.App.P.10(a). If the government or amici now seek to introduce such evidence, such evidence does not involve the sort of facts "not subject to reasonable dispute" contemplated by the judicial notice provision. *See* Fed.R.Evid. 201(b). More importantly, such "evidence" was not tested for its relevance, reliability and acceptance within the medical or scientific community, and it was not explained by experts.

**There is no scientific consensus that adult recreational marijuana use causes schizophrenia or analogous conditions.**

There is little scientific consensus on anything regarding marijuana in part because marijuana's scheduling as Schedule I substance inhibits research.

There are no studies proving a causal relationship between cannabis use and schizophrenia or psychosis.[4] Studies report an observed association between a subset of cannabis users and those with schizophrenia, but the nature of that association is contested. Possible explanations for the association include shared environmental risk and mutual genetic risk. Weiqiu Cheng, et al., *The relationship between cannabis use, schizophrenia, and bipolar disorder: a genetically informed study*. Lancet Psychiatry 2023; 10: 441-51 (explaining schizophrenia, lifetime cannabis use, and cannabis use disorder are partly heritable and that emerging evidence suggests a shared genetic component increases risk of psychotic disorders and cannabis use).[5] That the incidence of cannabis use disorder increased while the incidence of schizophrenia between 2000 and 2018 remained steady[6] undermines the conclusion that cannabis use causes schizophrenia. *See* W. Hall, "*Is Cannabis Use Psychotogenic?*," Lancet Psychiatry 367 (2006):193-5 (urging caution against concluding from observational studies not amenable to informative meta-analysis that cannabis causes psychosis).

In a 2023 study of individuals at high risk for developing psychosis, researchers hypothesized that increased incidence of psychosis would be linked with high frequency and potency of cannabis use, use before the age of 16, and cannabis use disorder. However, the study found no evidence that cannabis use in people at high

---

[4] CBD, the primary non-intoxicating constituent in cannabis, has been shown to have antipsychotic benefits. Ivan Urtis, *et al.*, *Cannabis Use and its Association with Psychological Disorders*, Psychopharmacology Bulletin, 50(2): 56-67 (May 2020).

[5] Erik Harris is not alleged to have a family history of schizophrenia, nor is he alleged to be at high risk of developing schizophrenia or psychosis. PSR ¶52.

[6] *See* Ole Köhler-Forsberg, et al, Schizophrenia spectrum disorders in Denmark between 2000 and 2018: Incidence and early diagnostic transition, 26 May 2023.

3

risk for psychosis had a significant effect on the incidence of psychosis or other adverse clinical outcomes. Chester, et al., *Influence of cannabis use on incidence of psychosis in people at clinical high risk,* Psychiatry and Clinical Neurosciences 77: 469-77, 475 (2023). These findings cast doubt on epidemiological data linking cannabis use to an increased risk of developing psychosis and highlight the need for additional evidence-based research. *Id.*

In sum, the association between cannabis use and risk of schizophrenia is controversial. Chester; Ivan Urtis, *et al.*, *Cannabis Use and its Association with Psychological Disorders*, Psychopharmacology Bulletin, 50(2): 56-67 (May 2020). What is uncontroversial is that evidence-based data is limited and of limited value: studies are based on self-report; there is no standardization as to age of onset or dose frequency, amount, and potency; and data may not account for important confounders like genetic predisposition. Researchers stress the need for high-quality, well-controlled scientific research leading to an evidence-based understanding of cannabis's effects.

Importantly, "most individuals who use cannabis never develop a psychotic disorder." Urtis. Put simply, marijuana is one of the most widely used substances globally, *see* Cheng; to the extent marijuana use increases the risk of developing psychotic disorders or psychosis (a debated proposition), that risk applies only to a miniscule subset of individuals who use marijuana.

**There is no scientific consensus that regular cannabis use causes long term cognitive deficits**.

Cannabis intoxication has been shown to cause short term impairment of cognitive functions like basic motor coordination and memory.[7] Greenwood, L., Lorenzetti, V., & Solowij, N. (2023). *Cannabis and Cognition: An Update on Short- and Long-term Effects.* In D. D'Souza, D. Castle, & S. Murray (Eds.), Marijuana and Madness (pp. 76-90). Cambridge: Cambridge University Press; DSM-5 (5th ed.) at 516-17 (observing that cognitive impairment depends on dose and tolerance). Notably, significant alcohol intoxication results in more severe cognitive dysfunction. DSM-5 at 513.

There is no scientific consensus about the long-term effects of heavy cannabis use, or the amelioration of such effects after abstinence, for most cognitive domains.[8] Emese Kroon, et al., *The short-term and long-term effects of cannabis on cognition: recent*

---

[7] The effects of acute intoxication are not relevant in resolving this as-applied challenge by a user who was not intoxicated at the time of the charged possession.

[8] Medical cannabis users may exhibit enhanced executive function. Sagar, K., et al., (2021). *An Observational, Longitudinal Study of Cognition in Medical Cannabis Patients over the Course of 12 Months of Treatment: Preliminary Results*. Journal of the International Neuropsychological Society, 27(6), 648-660.

*advances in the field,* Current Opinion in Psychology, Vol. 38: 49-55 (April 2021) (detailing substantial barriers to research). Research on adolescent twins suggests that cannabis does not cause long term cognitive deficits. Nicholas Jackson, et al., *Impact of adolescent marijuana use on intelligence: Results from two longitudinal twin studies*, PNAS, Vol 113 No.2 (Feb. 2, 2016) (although marijuana users showed greater decline than nonusers in areas of crystallized intelligence, the presence of baseline differences *before* marijuana involvement, the lack of dose-response relationship, and an absence of meaningful differences between discordant twins (user vs. nonuser) led researchers to conclude that observed declines were attributable to confounding factors influencing both substance *initiation* and IQ rather than a neurotoxic effect of marijuana).

In any event, cognitive impairment is not coextensive with or equivalent to mental illness. https://my.clevelandclinic.org/health/diseases/17990-mild-cognitive-impairment (describing cognitive impairment as trouble remembering, learning new things, concentrating, or making decisions affecting daily life). Thus, even if there were scientific consensus that long term marijuana use leads to enduring cognitive deficits (there is not) and even if there were a historical tradition of disarming the mentally ill (as will be seen there is not), that tradition would not support disarming regular marijuana users.

**There is no historical tradition of disarming the mentally ill. To the extent the rights of the mentally ill were restricted, such restrictions were lifted upon recovery.[9]**

Not only are users of controlled substances not analogous to the mentally ill, the government has not satisfied its burden of demonstrating a robust tradition of founding-era regulations disarming people who are mentally ill, including in the home.[10] And it cannot satisfy its Second Amendment burden by claiming that

---

[9] As already explained, there is also no sufficiently similar historical regulation banning the *potential* combination of intoxicants and guns, *i.e.*, the possession even in the home of firearms by those who use intoxicants based on their status as users. *See* Doc. 53 at 5-7; Harris' Supp. Reply Ltr. Br. (Doc. 57) 4-8.

[10] In a one-sentence footnote, the government asserted that § 922(g)(3) is analogous to unidentified prohibitions on the mentally ill. Gov't Supp. Ltr. Br. (Doc. 55) at 9 n.9. Previously it cited to presumed "longstanding prohibitions" disarming felons and the mentally ill. G.Br. (Doc. 38) at 11-12, 18. Mr. Harris has argued this was insufficient to satisfy the government's burden and indeed to preserve the argument. Doc. 57 at 5-6 n.4; Doc. 53 at 8 (citing *Range*, 69 F.4th at 101). This Court would be better equipped to resolve whether there is a historical tradition of disarming the mentally ill when presented with a challenge to a regulation actually stripping a person of Second Amendment rights based on mental illness, *see, e.g.,* 18

5

individuals can constitutionally be disarmed so long as they are "dangerous"; that standard has no basis in law or historical fact, and in any event it does not apply to Mr. Harris, an adult recreational user of marijuana who was not intoxicated at the time of the charged possession and who the district court determined did not pose a danger to the community. *See* Harris' Supp. Ltr. Brief (Doc. 53), 9.

This Court has acknowledged the lack of historical evidence disarming based on mental illness. *See Beers v. Att'y Gen'l*, 927 F.3d 150, 157 n.43 (3d Cir. 2019), *cert. granted, judgment vacated, case remanded by Beers v. Barr*, 140 S. Ct. 2758 (2020). "One searches in vain through eighteenth-century records to find any laws specifically excluding the mentally ill from firearms ownership." Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009). "Specific eighteenth-century laws disarming the mentally ill [] simply do not exist." *Id.*, 1378. *See, e.g.*, Adam Winkler, *Heller's Catch-22*, 56 UCLA L.Rev. 1551, 1563, 1565 (June 2009) ("The Founding generation had no laws limiting gun possession by the mentally ill"; such laws are "products of the twentieth century").

After noting the lack of historical evidence disarming the mentally ill, Professor Larson posited that an Originalist nevertheless might argue that "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics'"—those who have lost the use of reason, *see* Anthony Highmore, *A Treatise on the Law of Idiocy and Lunacy* 104 (1807)—"who were 'dangerous to be permitted to go abroad.'" 60 Hastings L.J. at 1377 & n.29 (quoting Henry Care, *English Liberties, or the Free-born Subject's Inheritance* 329 (6th ed. 1774)). From there, one might argue that if this infringement of liberty were permissible, "then the lesser step of mere disarmament would likely be permissible." *Id.*[11]

First, *Range* explicitly rejected argument that the greater punishment necessarily includes the lesser. *Range v. Att'y Gen.*, 69 F.4th 96, 105 (3d Cir. 2023) (en banc), *ptn. for cert. filed* Oct. 10, 2023. *Accord Folajtar v. Att'y Gen.*, 980 F.3d 897, 921 (3d Cir. 2020) (Bibas, J., dissenting) (that the "dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived,

---

U.S.C. § 922(g)(4) (disarming anyone "who has been adjudicated as a mental defective or who has been committed to a mental institution."), following record development in the district court and full appellate briefing.

[11] In a pre-*Bruen* case, the Seventh Circuit followed this ahistorical logic. *United States v. Yancey*, 621 F.3d 681, 685 (7th Cir. 2010) (citing Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations,* 60 HASTINGS L.J. 1339, 1361 n.136 (2009)). *See* Br. 30-33 (discussing *Yancey*). At the cited footnote, the Kates article provides, "The Framers seem to have been remarkably unconcerned about the mentally ill having access to firearms."

discharged their sentences, and returned to society."); *Kanter*, 919 F.3d at 461-62 (Barrett J., dissenting) (characterizing argument that the severity of punishment at the founding implicitly sanctions the lesser sanction of loss of Second Amendment rights as "misguided"). In the same way that founding-era capital punishment does not support the constitutionality of present-era felon disarmament, founding-era confinement of "lunatics" does not support disarmament of those with mental illness, let alone users of marijuana.

Second, the source cited as evincing a tradition of disarming the mentally ill actually quotes a template "Warrant to Secure a Lunatic." *See United States v. Alston*, 2023 WL 4758734, at *13 (E.D.N.C. 2023) (noting absence of proof that the English template warrant was used in the Colonies). The template warrant provides that if it were "proved" before two justices of the peace that a citizen is "by lunacy" so far disordered that he is "dangerous to be permitted to go abroad" he could be apprehended and housed in a secure place but only while such "lunacy or disorder shall continue and no longer." English Liberties, at 329. Some authorities suggest that the warrant reflected English practice under the Vagrancy Act of 1744.[12]

Under that Act, once it was shown that a person was by lunacy "furiously mad" or "so far disordered in [his] senses" that he was dangerous, officials were allowed to deport the "Lunatick" to his place of legal residence. Vagrancy Act of 1744, 17 Geo. 2, ch. 5, § 21. The individual could be "safely locked up in some secure place" only for as long "as such Lunacy or Madness shall continue." *Id.* The Act did not mandate prison and it provided that "any Friend or Relation of such Lunaticks" could "take them under their own Care and Protection" if they so chose. *Id.* § 21. Authorities could seize and sell assets to pay for treatment and care. *Id.* § 20. *See generally* 1788 NY Laws Ch.12 (requiring that lunatic's estate be safeguarded, that income derived from the estate be used to care for him and his household, and that lands and goods be restored when the lunatic comes to his right mind).[13]

---

[12] The government elsewhere cites Richard Moran, *The Origin of Insanity as a Special Verdict: The Trial for Treason of James Hadfield*, 19 L. & Soc'y Rev. 487, 488 (1985), which itself cites the English Vagrancy Act of 1744. *See* Gov't Br. 43-44, *United States v. Harrison*, No. 23-6028 (10th Cir., filed June 26, 2023). Moran describes the Act as requiring findings before two justices of the peace but qualifies, "the system was mainly informal and irregular…." *Id.*

[13] Elsewhere the government has relied on Thomas Cooley's 1868 treatise for the proposition that "[c]ertain classes have been almost universally excluded" from "the people" including slaves, women, infants, and "the idiot, the lunatic, and the felon" because they "lack either the intelligence, the virtue, or the freedom of action" necessary for the exercise of certain civic rights like voting. Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of*

Setting aside both the dearth of eighteenth-century laws barring the mentally ill from possessing firearms and *Range's* admonition that a greater punishment (confinement) does not necessarily include the lesser (disarmament), regulations confining the dangerously mentally ill are not sufficiently similar to § 922(g)(3) because they do not impose a comparable burden on the right of armed self-defense and are not comparably justified at least as applied to recreational users of marijuana.

The proffered historical precursors did not impose "a comparable burden on the right of armed self-defense" to Section 922(g)(3)'s application to Mr. Harris here. *Bruen*, 142 S. Ct. at 2133. English law required an individualized judicial determination of present dangerousness, not predictive judgments about who might become dangerous. Neither mental illness standing alone nor the *potential* of developing mental illness were sufficient to confine someone. By contrast Section 922(g)(3) disarms citizens without any individualized judicial determination of present dangerousness[14] let alone an individualized determination that the citizen falls within the category of people subject to the statute (users). Even if it is true that a person actively intoxicated with *certain* controlled substances may have impaired judgment impacting his *use* of a firearm, § 922(g)(3) is not so limited. Indeed, a person who uses controlled substances and owns a gun—but never mixes the two—can be convicted under the statute. And the punishment is much more severe: Section 922(g)(3) is currently punishable by imprisonment up to 15 years incarceration. 18 U.S.C. § 924(a)(8) (2022).

Not only does § 922(g)(3) impose a distinct burden on individual's Second Amendment right as compared to laws restricting the rights of an individual with mental illness, but also § 922(g)(3) is not comparably justified, especially not as applied to a recreational user of marijuana. First, Section 922(g)(3) contemplates disarmament without regard for danger; the statute does not require actual impairment at the time of possession. Second, as discussed above, marijuana use and mental illness are not analogous in any relevant way—there is no scientific consensus that adult recreational

---

*the American Union*, 28-29 (1868) ("the maxim that government rests upon the consent of the governed is in practice subject to exceptions"). *See* Gov't Br. 43-44, *United States v. Harrison*, No. 23-6028 (10th Cir., filed June 26, 2023) (citing Robert Dowlut, *The Right to Arms: Does the Constitution or Predilection of Judges Reign*, 36 Okla.L.Rev. 65, 96 (1983), which itself cites only the Cooley treatise for this principle). Civic rights like the voting rights discussed in Cooley's treatise involve *collective* rights; the Second Amendment confers an *individual* right not limited to civic participation. Thus, any historical restrictions on civic rights do not apply to the right to keep and bear arms and do not reflect a tradition of disarming the mentally ill. *See Kanter v. Barr*, 919 F.3d 437, 451, 462-63 (7th Cir. 2019) (Barrett, dissenting).

[14] Indeed, the district court determined that Mr. Harris did not pose a danger to any person or the community. *See* Doc. 53 at 12.

marijuana use causes psychosis or long-term cognitive impairment—so the justifications for regulating firearm possession by people with mental illness and users of marijuana cannot be sufficiently similar.[15] Indeed, as discussed further below, studies show that marijuana users experience reduced levels of aggression and that "violent behavior is either decreased or unaffected by marijuana use."

In sum, the government has not proven a history and tradition of disarming based on mental illness (or a history and tradition of disarming based on one's status as a user of intoxicants). Those founding era regulations that exist confining the mentally ill upon a determination of dangerousness during the period of illness and no longer (and those limiting the rights of certain actually intoxicated persons to carry/discharge guns at various times and places for various reasons), are not analogous to Section 922(g)(3)—they do not share the same "why" or "how" and thus do not pass muster under *Bruen*.

**Even if Section 922(g)(3) were somehow constitutional as applied to dangerous people, the conviction must be vacated because, as the district court already determined, Mr. Harris is not dangerous.**[16]

Mr. Harris was disarmed and subject to imprisonment for up to 10 years based on an unsupported legislative judgment that users of any controlled substance are dangerous if armed. The government may not simply rely on the legislature's apparent predictive judgment that all users of any controlled substance are dangerous if armed. *New York Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2131 (2022) (judicial deference to legislative interest balancing is not the deference the Constitution demands); *Folajtar*, 980 F.3d at 923 (Bibas, dissenting) ("stripping a person's fundamental rights based on projected crimes untethered from past dangerous actions

---

[15] Attempting to equate intoxication with mental illness, the government frequently cites without context Dr. Benjamin Rush's "Inquiry into the Effects of Ardent Spirits Upon the Human Body and Mind." Dr. Rush, who is now seen as an early advocate of temperance, was describing in order the common and escalating effects of a fit of drunkenness ranging from "unusual garrulity" to immodesty, to certain acts like "singing, hallooing, [and] roaring" which "indicate a temporary fit of madness." By madness Dr. Rush plainly did not mean what we now understand as mental illness.

[16] As in *Range*, this Court need not decide whether dangerousness is the correct touchstone because the government "did not carry its burden to provide a historical analogue to permanently disarm someone like [Mr. Harris], whether grounded in dangerousness or not." *Range*, 69 F.4th at 104-05 & n.9.

is a risky game indeed.").[17] As Mr. Harris has already shown, the legislature's predictive judgments are based on off-point studies and supposition that could not even satisfy means-end scrutiny. *See* Br. 22-33. Harris Reply Br. (Doc. 43) 18-20; Doc. 53 at 9 & n.6. Judicial deference to legislative judgments is particularly inappropriate when resolving an as-applied challenge by a marijuana user who was not intoxicated at the time of the charged possession and who the district court has determined did not pose a danger to any person or the community.

Not all controlled substances have intoxicating properties; thus, not all unlawful users are dangerous if armed—*e.g.*, the high schooler who unlawfully uses his sibling's prescription Adderall to cram for exams. And not all controlled substances that do have intoxicating properties render the user incapable of safely possessing a firearm when intoxicated. More particularly, researchers characterize the relationship between frequent marijuana use and violence as "spurious" pointing to studies showing that marijuana users experience reduced levels of aggression and that "violent behavior is either decreased or unaffected by marijuana use." *See* Br. 25-28. *See also* Peter Hoaken, *Drugs of Abuse and the Elicitation of Human Aggressive Behavior*, Addictive Behaviors 28, no. 9 (December 2003): 1533–54 (research indicates cannabis intoxicated individuals are less likely to act aggressively). That marijuana may lawfully be purchased in four of the six states touching Pennsylvania undermines legislative assumptions about systemic violence in the drug trade. *See* Br. 28. Similarly, marijuana's low cost undermines speculation that users are motivated to commit other crimes to feed their habit. Br. 28. *See* https://oxfordtreatment.com/substance-abuse/marijuana/average-cost-of-marijuana/ (estimating cost of a single dose in Pennsylvania and bordering states between $5.47 and $6.95).

In sum, Erik Harris is among "the people," and his right to bear arms is presumptively protected. *Bruen*, 142 S. Ct. at 2126; *Range*, 69 F.4th at 101-03. The government has not rebutted that presumption by proving 18 U.S.C. § 922(g)(3) "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135. The convictions must be reversed.

---

[17] It is difficult to envision a principled way to ascertain which supposedly "dangerous" people can and cannot be disarmed that does not involve engaging in the "judge-empowering interest balancing inquiry" that *Bruen* repudiated. 142 S. Ct. at 2129. Evaluating whether a particular group can be disarmed on "dangerousness" grounds will involve appraising how important the government's interest is and whether a challenged statute is sufficiently tailored to further that interest. *See Binderup v. Att'y Gen.*, 836 F.3d 336 (2016). This is the bread and butter of pre-*Bruen* interest-balancing.

Respectfully submitted,

LISA B. FREELAND
Federal Public Defender

*/s/ Renee Pietropaolo*
Renee Pietropaolo
Assistant Federal Public Defender
Counsel for Appellant

Federal Public Defender's Office for the
Western District of Pennsylvania
1001 Liberty Avenue, Suite 1500
Pittsburgh, PA 15222

(412) 644-6565

## CERTIFICATE OF COMPLIANCE

This letter brief complies with the Court's September 5, 2023 order because it consists of 10 single-spaced pages, excluding those parts exempted under Federal Rule of Appellate Procedure 32(f). This letter brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word 2016 for Windows 10 word count software in font size 14, type style Garamond.

*/s/ Renee Pietropaolo*
Renee Pietropaolo
Assistant Federal Public Defender

November 15, 2023

## CERTIFICATE OF SERVICE

 I hereby certify that on November 15, 2023, I electronically filed the foregoing Supplemental Letter Brief for Appellant Erik Harris pursuant to the Court's Order dated September 5, 2023, using the Third Circuit Court of Appeals' Electronic Case Filing (CM/ECF) system. I also certify that I served copies upon Filing User Andrew C. Noll, through the appellate CM/ECF system.

*/s/ Renee Pietropaolo*
Renee Pietropaolo
Assistant Federal Public Defender

November 15, 2023